<u>Louis A. Lofredo v. Tiffany & Bosco, P.A. et. al</u>
United States District Court for the District of Arizona
Case No._____

**INDEX OF EXHIBITS TO DEFENDANTS' NOTICE OF REMOVAL**

| Exhibit | Description |
|:---:|:---|
| A | State Court Notice of Removal |
| B | State Court Record – Copies of all pleadings, process, and orders served |

# Exhibit A

L. Eric Dowell, SBN 011458
Ricardo R. Bours, SBN 034054
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C. SBN 00504800
2415 East Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone:  602.778.3700
Facsimile:  602.778.3750
eric.dowell@ogletree.com
ricardo.bours@ogletree.com
*Attorneys for Defendants*

### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

### IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| Louis A. Lofredo, an individual of the State of Arizona,<br><br>        Plaintiff,<br><br>        v.<br><br>Tiffany & Bosco, P.A., a Professional Corporation, Tiffany & Bosco, P.A.'s Board of Directors (excluding Lance R. Broberg and Rosary A. Hernandez), Mark S. Bosco and Jane Doe Bosco, husband and wife, Christopher R. Kaup and Debra Kaup, husband and wife, J. Lawrence McCormley and Jane Doe McCormley, Alisa J. Gray, individually,<br><br>        Defendants. | No. CV2022-006898<br><br>**NOTICE OF FILING NOTICE OF REMOVAL** |

Defendants Tiffany & Bosco, P.A., Tiffany & Bosco, P.A.'s Board of Directors, Mark S. Bosco, Christopher R. Kaup, Debra Kaup, J. Lawrence McCormley, and Alisa J Gray (collectively, "Defendants") hereby give notice that they have, as of this date, removed this case to the United States District Court for the District of Arizona. A copy of the Notice of Removal filed in the United States District Court is attached hereto as Exhibit A.

Accordingly, pursuant to 28 U.S.C. § 1446(d), this Court "shall proceed no further unless and until the case is remanded."

RESPECTFULLY SUBMITTED this 19th day of September 2022.

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

By: *s/ L. Eric Dowell*
L. Eric Dowell, SBN 011458
Ricardo R. Bours, SBN 034054
2415 East Camelback Road, Suite 800
Phoenix, AZ 85016
eric.dowell@ogletree.com
ricardo.bours@ogletree.com
*Attorneys for Defendants*

Original of the foregoing e-filed with the Court at www.azturbocourt.gov and a copy e-served this 19th day of September, 2022, to:

Louis A. Lofredo
7614 N. 46th Avenue
Glendale, Arizona 85301
loulofredo@reagan.com
*Plaintiff pro per*

/s/   Paul A. Manley
Legal Assistant

# Exhibit B

**Exhibit B**



Select Language

Powered by Google Translate

# Civil Court Case Information – Case History

## Case Information

| | | | |
|---|---|---|---|
| Case Number: | CV2022-006898 | Judge: | Contes, Connie |
| File Date: | 6/2/2022 | Location: | Downtown |
| Case Type: | Civil | | |

## Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| Louis A Lofredo | Plaintiff | Male | Pro Per |
| Tiffany & Bosco P A | Defendant | | Ricardo Robinson-Bours |
| Mark S Bosco | Defendant | Male | Ricardo Robinson-Bours |
| Christopher R Kaup | Defendant | Male | Ricardo Robinson-Bours |
| Debra Kaup | Defendant | Female | Ricardo Robinson-Bours |
| J Lawrence McCormley | Defendant | Male | Ricardo Robinson-Bours |
| Alisa J Gray | Defendant | Female | Ricardo Robinson-Bours |

## Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 8/22/2022 | CAN - Credit Memo Appearance Fee Paid | 8/23/2022 | |
| **NOTE:** Credit Memo/Appearance Fee Paid | | | |
| 8/18/2022 | 019 - ME: Ruling | 8/18/2022 | |
| 8/17/2022 | EMF - Email Filed | 8/29/2022 | |
| 8/12/2022 | MFR - Motion For Reconsideration | 8/17/2022 | |
| **NOTE:** MOTION FOR RECONSIDERATION OF COURT'S ORDER GRANTING MOTION FOR SPECIAL APPOINTMENT TO SERVE PROCESS AND TO UNILATERALLY STAY ORDER | | | |
| 8/10/2022 | 322 - ME: Notice Of Intent To Dismiss | 8/10/2022 | |
| 8/9/2022 | ORD - Order | 8/12/2022 | |
| **NOTE:** Order Granting Motion for Special Appointment to Serve Process | | | |
| 7/21/2022 | MOT - Motion | 7/27/2022 | Plaintiff(1) |
| **NOTE:** FOR SPECIAL APPOINTMENT TO SERVE PROCESS | | | |
| 6/2/2022 | COM - Complaint | 6/7/2022 | Plaintiff(1) |
| 6/2/2022 | CSH - Coversheet | 6/7/2022 | Plaintiff(1) |

## Case Calendar

**There are no calendar events on file**

## Judgments

**There are no judgments on file**

JEFF FINE
Clerk of the Superior Court
By Marcella Mendez, Deputy
Date 06/02/2022 Time 10:19:06
Description                        Amount
-------- CASE# CV2022-006898 --------
CIVIL NEW COMPLAINT              333.00
----------------------------------------
TOTAL AMOUNT                     333.00
        Receipt# 28797011

1  Louis A. Lofredo
   7614 N. 46th Avenue
2  Glendale, Arizona 85301
   Tel: (623) 444-4841
3  Email: loulofredo@reagan.com
   *Plaintiff pro per*

4

5              **SUPERIOR COURT OF THE STATE OF ARIZONA**

6                   **FOR THE COUNTY OF MARICOPA**

7  Louis A. Lofredo, an individual of the      Case No.
   State of Arizona,                                **CV2022-006898**
8                                               **VERIFIED COMPLAINT**
                              Plaintiff,
9        vs.                                   1) RELIGIOUS-BASED
                                                  DISCRIMINATION (ARIZONA)
10 Tiffany & Bosco, P.A., a Professional       2) RELIGIOUS-BASED
   Corporation, Tiffany & Bosco P.A.'s            DISCRIMINATION (FEDERAL)
   Board of Directors (excluding Lance R.      3) RELIGIOUS-BASED
11 Broberg and Rosary A. Hernandez),              RETALIATION (ARIZONA)
   Mark S. Bosco and Jane Doe Bosco,           4) RELIGIOUS-BASED
12 husband and wife, Christopher R. Kaup          RETALIATION (FEDERAL)
   and Debra Kaup, husband and wife, J.        5) BREACH OF CONTRACT –
13 Lawrence McCormley and Jane Doe                POLICY IS PROMISSORY
   McCormley, Alisa J. Gray, individually,     6) WRONGFUL TERMATION –
14                                                POLICY IS UNLAWFUL
                              Defendants.       7) VIOLATION OF ARS §§23-350 et
15                                                seq. – EXIT AGREEMENT
                                               8) DECLARATORY RELIEF
16                                                REQUESTED – YOUTUBE VIDEO
                                               9) DECLARATORY RELIEF
17                                                REQUESTED – SEVERANCE
                                                  AGREEMENT
18
                                                  **DEMAND FOR JURY TRIAL**
19

20     Plaintiff Louis A. Lofredo ("Plaintiff" or "I") for his Complaint against

21 Defendants Tiffany & Bosco, P.A., Tiffany & Bosco's Board of Directors (excluding

22 Lance R. Broberg and Rosary A. Hernandez), Mark S. Bosco and Jane Doe Bosco,

23

1  Christopher R. Kaup and Debra Kaup, J. Lawrence McCormley and Jane Doe

2  McCormley, and Alisa J. Gray[1] alleges as follows:

3  **<u>PARTIES</u>**

4      1.     Plaintiff is an individual, who at all times has been a resident of Maricopa

5  County in the State of Arizona.

6      2.     Plaintiff is a practicing Roman Catholic and has been practicing his

7  Catholic faith for 26 years.

8      3.     Plaintiff is a paralegal by profession and has been employed in that career

9  for 26 years.

10      4.     Plaintiff's paralegal career at Tiffany & Bosco started on October 1, 2004

11  through June 4, 2021; approximately 16 years and 8 months.

12      5.     Defendant Tiffany & Bosco, P.A., ("T&B") is a Professional Corporation,

13  and at all times relevant to this case, conducts regular business in Maricopa County in the

14  State of Arizona.

15      6.     Defendant Tiffany & Bosco's Board of Directors ("Board") is the

16  governing organ of T&B with the most material influence and oversight of T&B, which

17  conducts regular business in Maricopa County in the State of Arizona.   Because the

18  Board's members change from time to time, this lawsuit specifically includes those

19  members that were Board members from March 11, 2021 through July 30, 2021,

20  excluding Lance R. Broberg and Rosary A. Hernandez.

21  _____

22  [1] The marital community of Alisa J. Gray and James A. Fassold is included in this complaint, but James A. Fassold is specifically excluded individually.

23                                    -2-

1       7.      Christopher R. Kaup ("Kaup") is a shareholder at Tiffany & Bosco, a

2 member of the Board, Director and Vice-President of T&B.

3       8.      Christopher R. Kaup was Plaintiff's supervising attorney for approximately

4 13 years.

5       9.      Mark S. Bosco ("Bosco") is a shareholder at Tiffany & Bosco, a member

6 of the Board, a Director and President of T&B.

7       10.     Mark S. Bosco is the managing director of T&B.

8       11.     Mark S. Bosco is the leader of T&B by (i) his position as managing director,

9 (ii) decision-making authorization, (iii) income and (iv) influence.

10       12.     J. Lawrence McCormley ("McCormley") is a shareholder at Tiffany &

11 Bosco, a member of the Board, a Director and Vice President of T&B.

12       13.     J. Lawrence McCormley, as many other attorneys at T&B, periodically

13 directly supervised Plaintiff's paralegal work.

14       14.     Rosary A. Hernandez ("Hernandez") is a shareholder at Tiffany & Bosco,

15 a member of the Board, a Director and Officer of T&B. She is named here in the Party

16 section to describe her position, but is specifically excluded from this lawsuit personally,

17 unless it specifically prevents the Court from granting relief on any claim.

18       15.     Lance R. Broberg ("Broberg") is a shareholder at Tiffany & Bosco, a

19 member of the Board, a Director and Vice President of T&B. He is named here in the

20 Party section to describe his position, but is specifically excluded from this lawsuit

21 personally, unless it specifically prevents the Court from granting relief on any claim.

22

23                                        -3-

16.     Lance R. Broberg, as many other attorneys at T&B, periodically directly supervised Plaintiff's paralegal work.

17.     William H. Finnegan ("Finnegan") is a shareholder at Tiffany & Bosco, the Secretary and Treasurer of T&B.  He is not named in the Complaint because Plaintiff, at this time, does not believe he was a member of the Board at the relevant time.

18.     Alisa J. Gray ("Gray") is a shareholder of Tiffany & Bosco.  She is not a member of the Board.

19.     Alisa J. Gray played a role to the events that lead to the allegations in this Complaint which led to Plaintiff's wrongful termination, both individually and in her capacity as a shareholder.

20.     For the purposes of attaching a Judgment to the community property of Bosco, Kaup and McCormley in favor of the Plaintiff, the respective spouses of Bosco, Kaup and McCormley are also Parties to this Complaint.

-4-

1

## **JURISDICTION AND VENUE**

2      21.     This Court has jurisdiction over this action under A.R.S. § 12-123 and the

3  Arizona Constitution, Article VI, § 14.

4      22.     Venue is proper in this Court pursuant to A.R.S. § 12-401.

5      23.     Although this pleading has many pages, it is construed so as to do justice

6  pursuant to Ariz.R.Civ.P. 8(f).

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1

## **GENERAL ALLEGATIONS**

2

### **Religion and Retaliation**

3      24.     This complaint is being brought in large part to protect religious liberties

4   and freedom of speech in a workplace environment in the State of Arizona and the United

5   States of America.

6      25.     "Now who is going to harm you if you are enthusiastic for what is good?

7   But even if you should suffer because of righteousness, blessed are you.  Do not be afraid

8   or terrified with fear of them, but sanctify Christ as Lord in your hearts.  Always be ready

9   to give an explanation to anyone who asks you for a reason for your hope, but do it with

10   gentleness and reverence, keeping your conscience clear, so that, when you are maligned,

11   those who defame your good conduct in Christ may themselves be put to shame.  For it

12   is better to suffer for doing good, if that be the will of God, than for doing evil.  For Christ

13   also suffered for sins once, the righteous for the sake of the unrighteous, that he might

14   lead you to God.  Put to death in the flesh, he was brought to life in the spirit. (*1 Peter*

15   *3:14-18* (New American Bible)).

16

### **T&B's Extraordinary Social Distancing Policy**

17      26.     T&B's extraordinary Social Distancing Policy's ("Policy") [2], attached

18   hereto as **Exhibit A**, stated goal was to protect its employees from COVID-19 exposure,

19

20   _____

[2] The attached Social Distancing Policy is the document I signed almost two months after all
21   employees were directed to sign it.  I only signed this document after four meetings lasting a total
of about three hours, because I was left with no choice but to sign it.  Chris Kaup did give direct
22   permission to me to mark-up and sign the document "as we had discussed in our meetings."  I
emailed it to Kevin Newell, copied to Chris Kaup, on August 5, 2020.

23                                                              -6-

1   but it became known that the Policy's primary purpose was to protect T&B itself from

2   liability that might arise from its employees initiating COVID-related negligence lawsuits

3   against it.

4       27.    Bosco, Kaup, McCormley, Gray, and the T&B Board reacted to my well-

5   informed positions and my closely-held Catholic belief to witness my views through my

6   freedom of speech in a public forum as a threat to T&B's Policy and by extension T&B's

7   potential liability.  In their opinion, such views as mine put T&B at risk for lawsuits.  I

8   had to be terminated before my views spread to other employees, attorneys and

9   shareholders, particularly in light of the emerging discussions of the next hot issue:

10   mandating the experimental RNA vaccines for all employees.

11       28.    Bosco, Kaup, and the T&B Board had already started my termination

12   process 20 minutes after the March 11, 2021 all-employee Zoom meeting[3].

13       29.    By silencing speech, religious liberties are put into grave jeopardy.

14       30.    I know my impetus to bring this lawsuit, stems from my belief in God.  The

15   former rector of Saints Simon & Jude Cathedral, Father John Lankeit, often preached that

16   as Catholics we need to be His voice in our world, and that Catholics have been silent too

17   long (Examples include, the April 4, 2021, homily for Easter Sunday,

18

---

19   [3] The moment after the March 11, 2021 all-employee Zoom meeting ended, Mark Bosco
     dispatched Kevin Newell, Jen Lovato and others to locate and interview everyone I had spoken
20   with before the Zoom meeting that morning.  So concerned that I would question the T&B Policy,
     the T&B Board directed Jen Lovato to work through that very weekend to provide a draft memo
21   that would be the forerunner to my termination.  The problem for T&B was that my record, though
     not perfect, is clean.  Therefore, a decision was made to add paper to my file to show that my
22   imminent and planned termination was not wrongful, unlawful, discriminatory, and retaliatory,
     but rather because I posed a physical "threat" to T&B.

23

1   https://www.youtube.com/watch?v=JMyMZIyf3q4,   homily   for   Feb.   16,   2020,

2   https://www.youtube.com/watch?v=HHQZn3JYuKg; homily for February 18, 2021,

3   https://www.youtube.com/watch?v=cZw7ubyOxI8).     Among   many   other   religious

4   topics, Father Lankeit impressed upon the parishioners that we have a duty to God to be

5   His voice in a secular world even when there are perceived or real consequences for our

6   speech and our witness to God's word.

7        31.     I know what has occurred in my termination experience with Tiffany &

8   Bosco was not unique because I have discovered that there are others, who have

9   previously worked for Tiffany & Bosco, have had similar experiences.

10       32.     Other T&B employees have acquiesced to the power that its employer,

11   T&B, holds over them.  And through T&B's own Severance Agreement, attached as

12   **Exhibit B**, T&B continues to retain such power over its former employees.

13       33.     Thus, I reveal that truth from my own experience in accordance with

14   *Matthew 10:26-28* (New American Bible):

15            So do not be afraid of them.  Everything now covered up will be uncovered,

16            and everything now hidden will be made clear. What I say to you in the dark, tell

17            in the daylight; what you hear in whispers, proclaim from the housetops. Do not

18            be afraid of those who kill the body but cannot kill the soul; fear him rather who

19            can destroy both body and soul in hell.

20                            **The Pandemic**

21       34.     According   to   Wikipedia   (June,   2021),   the   COVID-19   pandemic

22   ("Pandemic"), also known as the coronavirus pandemic, is an ongoing global pandemic

-8-

23

1   of coronavirus disease 2019 (COVID-19), which is caused by severe acute respiratory

2   syndrome coronavirus 2 (SARS-CoV-2).  The virus was first identified in December 2019

3   in Wuhan, China.  The World Health Organization declared a Public Health Emergency

4   of International Concern regarding COVID-19 on 30 January 2020, and later declared a

5   pandemic on 11 March 2020.

6                   **Staff Meeting(s) Relating to the Pandemic**

7          35.    In February or March 2020, Tiffany & Bosco held two (or perhaps more)

8   in-person staff meetings in a conference room owned by the property manager, which is

9   located on the ground floor of the Camelback Esplanade.

10          36.    Mark Bosco addressed staff about the Pandemic, generally as known at that

11   time.  Mr. Bosco explained at that meeting that Tiffany & Bosco would be implementing

12   policies in the future to "flatten the curve", which he explained to us meant assisting

13   T&B's employees in not being infected with COVID-19 so that the hospitals could meet

14   the demand on their collective capacity to manage incoming patients.  As a point of

15   clarification to questions, he acknowledged that "flatten the curve" did not mean

16   preventing deaths.  Options at that point, to the best of my recollection, appeared to be

17   working from home more and finding ways to increase remote capacity of the firm.

18                   **Tiffany & Bosco's Onerous Policy**

19          37.    In about  mid-June 2020, Tiffany & Bosco distributed its Social Distance

20   Policy (Last Revised on June 25, 2020) ("Policy") to its employees, attached hereto as

21   **Exhibit A.**

22

23                                      -9-

38.     The Policy, based on my research, was over-reaching, coercive and far more intrusive than any governmental mandate or proclamation that had been issued.  In fact, at that time, Maricopa County and the City of Phoenix had mandates that had only two enforcement mechanisms, one resulted in a warning; the other, after repeated infractions could lead to a fine of up to $50.  In contrast, the T&B Policy included extraordinary enforcement measures, among others:

Failure to comply with these social distancing measures may result in discipline, up to and including termination of employment.

If you witness or become aware of any employees or other individuals violating this policy, you are encouraged to report them to your direct supervisor or your Department Head Immediately.

… you must assist in contact tracing….

39.     The Policy demanded, among other tenets, that employees comply with the strictest requirements of all Social Distancing Measures for the City of Phoenix, Maricopa County and Tiffany & Bosco.  Tiffany & Bosco's Social Distancing Measures were by far always the most encompassing, over-reaching and had the harshest enforcement mechanisms from the beginning of the pandemic through the date of my termination.

40.     Further, Tiffany & Bosco reserved the "… right to modify this policy at any time in its sole discretion…"  While it may be that T&B could reserve it's right to modify the Policy, the Policy did not allow employees to agree to those modifications,

-10-

1   which was concerning because such unilateral modifications could lead to T&B's

2   enforcement mechanisms, including the "termination of employment".

3       41.     The Policy had concluding remarks to make clear the non-compliant

4   ramifications:

5           **Nothing in the policy alters the at-will nature of your employment.**

6           (Emphasis in original).

7           The COVID-19 task force of Mark S. Bosco, J. Lawrence McCormley,

8           Christopher R. Kaup, Rosary A. Hernandez, Lance R. Broberg, Jodi R. Bohr,

9           Kevin J. Newell, Jen C. Lovato, Julio Perez, James Oswald, Shranda Lopez and

10          Jose Zapata[4] are responsible for administering and enforcing this policy.

11          (In the Acknowledgement of Receipt and Review) … I understand that it is

12          my responsibility to be familiar with and abide by its [Policy] terms… This policy

13          is not promissory and does not set terms or conditions of employment or create an

14          employment contract.

15      42.     T&B's employees, through the sections above, were sent a clear message

16   that disagreement with the Policy would be received poorly by the Board, the Managing

17   Director and the Human Resources Department.  The Policy reminds each employee that

18   termination is always at-will, for example, if you try to debate the efficacy or

19   effectiveness of the Policy.

20

21   _____

    [4] It is my understanding that Kevin J. Newell, Jen C. Lovato and James Oswald are no longer
22   employees of T&B and were terminated, severed, discharged or resigned after my termination on
     June 4, 2021.

                                        -11-
23

43. The Policy provides the names of the most powerful individuals in the firm that can make enforcement decisions and reminds the reader that these persons are indeed the enforcers.

44. The final acknowledgement does not provide for dissent of any kind. The employee will abide by all terms.

45. Finally, after this all-encompassing, over-reaching Policy states in essence that full compliance is required or termination is inevitable, it states that it, the Policy, is not "promissory". That is, this extraordinary "policy" does not create a contract between the employer and employee, **when by the very nature of the creation of this extreme, extraordinary Policy, the Pandemic, it certainly did create such a contract**. (Emphasis added). *See* Breach of Contract Claim below.

**Plaintiff's Compliance with the Policy**

46. It is important to note that there were many aspects of the Policy that I did not object to and that I always followed the tenets of the Policy from the inception of the Policy through my termination. They included, but were not limited to, maintaining a six-foot (or as reasonable as possible distance) while conducting business, using alternate seating to deter face-to-face positioning, wearing a mask whenever the six foot distance could not be maintained, working from home, working alternative hours (which I did before COVID-19), taking lunches at my desk or away from the office; limiting visitors to include only business clients (not family or friends); wiping down common surfaces in common areas, limiting use of common office supplies and copiers, limiting contact with others in elevators or stairways, staying home when not feeling well, working from

-12-

1   home when directed by T&B due to a COVID-19 exposure event at work, not physically

2   contacting clients, or other employees, for example by shaking hands, etc.

3       47.    Indeed, there were two versions of the Policy that I signed.  In the first

4   version I signed, I deleted the sections of the Policy I could not abide with in good

5   conscience and added sections that I believed were relevant, such as a Sunset provision.

6   Since the first version was not acceptable, after four meetings with Chris Kaup (two of

7   which Kevin Newell attended) I signed a second version that contained every word, but

8   showed my objections, and every tenet to which I would comply with written in the

9   margins.

10       48.    Chris Kaup directed me in his office to provide a marked-up signed version

11   to Kevin Newell, which I sent by email on August 5, 2020.  Chris Kaup was copied on

12   this email.

13       49.    I was always in compliance with the Policy.

14       50.    I was never informed of any complaint from T&B that I was not in

15   compliance with the Policy.

16       **Quite Compliance for Six Months**

17       51.    From June 2020 through early March 2021, I continued to comply with all

18   required tenets of the Policy while at work.  I wore a mask, I stayed six feet away from

19   individuals whenever possibly, and I wiped down more surfaces than anyone else I saw

20   on the 7th floor, including the facilities personnel (but not necessarily the cleaning staff).

21   Although I did not shy away from discussions about my stance on the state of our world

22

23       -13-

1   in the midst of the Pandemic, I did speak with like-minded people in their personal offices

2   or to others generally discussing certain issues of the day in public.

3     52. About a week before the Tiffany & Bosco March 11, 2021 all-employee

4   Zoom meeting, I sent an email to Jen Lovato ("Lovato"), Human Resources Director,

5   requesting an advanced copy of the agenda prior to the meeting.  In March 2021, a lot of

6   changes were occurring in our society because the data that was influencing the Pandemic

7   policies were changing.  That shift in viewpoint by governmental agencies was occurring

8   in many Counties and States; the Arizona House of Representatives had introduced

9   House Bill 2770, which at the time the bill read:

10     Notwithstanding any Other Law, a Business in this State is Not Required

11    to Enforce on Its Premises a Mask Mandate That is Established by this State, a

12    City, Town or County or any Other Jurisdiction of this State.

13    53. I was optimistic that my workplace, being enlightened by the changing

14  times and new data, would rescind its liberty-restricting Policy and would announce it at

15  the upcoming meeting.

16    54. Unfortunately, according to a March 11, 2021, email exchange between

17  me, Jen Lovato and Kevin Newell, Mark Bosco had directed that the agenda to the

18  meeting be sent out by email mere hours before the meeting on March 11, 2021.  My

19  request for an advanced copy of the meeting agenda was ignored and not provided to me.

20    55. The lack of consideration to provide me with an agenda prior to the meeting

21  upset me because Mark Bosco, on almost every occasion in which he addressed T&B

22  employees at staff meetings for approximately nine years, made it clear that T&B's

23

-14-

1    management wanted open discussion on issues and that all employees should feel that we

2    could bring our concerns about issues to the "table" for an open and honest discussion.

3    Yet, in this instance, I had been intentionally kept from that "table".

4        56.    In the hour or two period before the meeting began, I rushed to get

5    electronic copies of the most recent legislative bill and executive order materials that I

6    would need to properly and persuasively present the current governmental status of the

7    pandemic policies.

8        57.    In addition, I sought out the counsel of several persons with whom I had a

9    familiar firm association to get their view about the propriety of addressing my concerns

10    about the Policy at the Zoom meeting.  I spoke with about six to eight individuals,

11    including Lance Broberg, who is a member of the Board of Directors, and Will Fischbach,

12    among others.

13        58.    In retrospect, Mr. Fischbach gave me the best counsel of all those I spoke

14    to.  Mr. Fischbach had served as a JAG Officer in the Gulf War and had conducted CLE

15    training sessions that provided great details on the war crime trials that he had prosecuted.

16    I have a great admiration for Mr. Fischbach.  He said, "Lou you are a fantastic paralegal,

17    but if you decide to speak-up at the Zoom meeting, choose your words carefully."

18        59.    Before attending the Zoom meeting, I prayed the Lord's Prayer, the Hail

19    Mary, the Glory Be to the Father and a prayer for courage to speak rightly and accurately.

20        60.    The Zoom meeting was conducted primarily by Mark Bosco, Kevin Newell

21    and Jen Lovato.  My understanding was that there were about 200 Tiffany & Bosco

22    employees participating from various offices located in multiple states.

-15-

23

61.     There was a general introduction and within about 15 minutes, Mr. Bosco announced that the mask mandate in the Policy would continue and that no changes were expected in the foreseeable future.  Mr. Bosco asked if there were any questions.

62.     Since I did have questions, I did take this opportunity to ask them.  In brief summary, which included a summary of the problems in the Policy, which appear above, I asked that the Tiffany & Bosco mask mandate in the Social Distancing Policy be ended. I explained the oppressive nature of the Policy as compared to the current mandates (not laws) in Maricopa County and the City of Phoenix.  I explained that the Arizona House of Representatives had introduced a bill to rescind the mask mandates and other pandemic-based policies for all municipalities and government buildings, but that the rescission did not include businesses, which could decide on their own policies.  I expressed my concerns that if my government should not infringe upon my God-given liberty, most certainly my employer should not do so either!

63.     I informed Mr. Bosco that I was not the only one who felt as I did at Tiffany & Bosco.  I used myself as an example and stated that herd immunity to illness comes from two known sources, either from a vaccine or by having and surviving the illness. My family of seven all contracted and survived COVID-19 in February 2020[5].  I

---

[5] In a subsequent meeting with Chris Kaup on this same date, March 11, 2021, I was informed that I had misspoken and stated I had had COVID-19 in February 2020 "… before it was fashionable."  Chris informed me that many people had been offended by my statement, some of them having loved ones that died of COVID.  Chris used this time to remind me that his father had passed away from COVID-19.  Upon reflection, what I meant to say was that my family and I had COVID-19 before it was "known" that COVID-19 was being transmitted in Arizona (February 2020).  I believe I used the term "fashionable" not for its meaning that it was "good", but rather for its meaning "before others".

1   suggested that Tiffany & Bosco should not be put in the role of being the guardian of my

2   health and my family's health, and that T&B should let its own employees and clients be

3   the stewards of their own health and the health of their families.   To do otherwise

4   infringed on our liberties.   I then urged Mr. Bosco to commit to removing the mask

5   mandate.

6       64.    Mr. Bosco diplomatically stated that although he did not like the mask

7   mandate personally, the decision to lift the mask mandate was not his alone.   It was a

8   decision that would be made by the Board.

9       65.    Mr. Bosco later wrote to another shareholder that he "… was Lou's

10   whipping boy" at the meeting.

11       **Different Reactions**

12       66.    Just after the meeting, while obtaining the mail and dropping of check(s) in

13   accounting, I encountered an attorney that stated that my words during the Zoom meeting

14   were "courageous" and that his department would accept me if I needed a place to go.   I

15   responded that I did not think that my words were "courageous".   He continued, "many

16   of 'us' feel as you do".

17       67.    Based on some of the reactions I had just had walking around the office, I

18   internally appreciated his comments, but did not know logically why in that moment.   I

19   did tell him frankly that the Holy Spirit had just entered my heart because of his words,

20   and that although I didn't know why this moment was significant, I did intrinsically know

21   it was and I thanked him for his words.   I added that I did not think such a move (from

22   Kaup's department) would be necessary.

-17-

23

68.     Within about 45 minutes after the Zoom meeting, Chris Kaup called me into his office.  Although he had not been on the Zoom meeting at the time that I spoke with Mark Bosco, he said he had been told generally what I had said.  He then asked what I said.  I said to the effect, "I spoke about the Social Distancing Policy and how it was now time to end the policy, especially the mask policy".  He then asked why I felt the need to do that on the Zoom meeting.  I replied, "Mark asked for questions."  Chris firmly disagreed.  "Lou I was told you did not ask questions that instead it was a religious and political rant."

69.     Since I didn't see what I had said could be construed as a "rant", I paused in our conversation and thought back to what I'd said.  Internally, I processed that in current times, my words could be seen as political, and certainly my informed Catholic faith did lead me to voice my view, but my questions to Mark Bosco certainly did not constitute a "rant".  I replied to the effect, "Chris I did not rant.  I explained my views based on my faith that the Policy infringes upon my liberty and the liberty of others in the firm."

70.     He then said in paraphrase, "I have been told that you spoke to others in the firm about the Zoom meeting before it began.  Will [Fischbach] said you appeared upset and Lance [Broberg] told me you were going to `blow-up' the meeting.  Others that saw you on the Zoom meeting have complained that you appeared agitated, and you said that you had COVID "before it was fashionable."  To someone who has lost a loved one to COVID, saying you had COVID before it was "fashionable" was insensitive.  As you

-18-

know, my father died from COVID."  Chris then sat back in his long-backed, executive

chair[6].

71.    "I don't recall saying, `blow-up the meeting', but I was not happy that I had

asked for a meeting agenda before today and instead I received it just before today's

meeting," I said to the best of my recollection.  "When I went to Lance's office, it was

just after I read the email.  I did not have time to process what I was going to say and I

needed time to think through things.  If I had received the agenda in advance, I would

---

[6] I had known Edgar Kaup, Chris' father, tangentially for many years and more personally in about mid-2019 when he came to Phoenix to live in a high-end nursing home close to Chris Kaup's home and family.  Chris would pick-up his father one or more times each week to have lunch or dinner with him either at a restaurant or at his home.  Chris explained that his father was an extravert and a people-person and enjoyed these times immensely.  The loss of his New Jersey home and friends, when he had to move to Arizona for his son to care for him, had been difficult on him.

In about February or March of 2020, Edgar Kaup's nursing home implemented strict measures to protect its clients from COVID-19.  The nursing home locked-down its patients, did not allow visitors and did not let its clients leave the premises, which was extremely difficult on Edgar and Edgar's failing mind.

Later as procedures evolved, the nursing home began to allow visitation of its patients after a temperature check, entry of personal data in a computer that could also be used for contact tracing, issuance of an ID badge, wearing a mask and only allowing entry of guests into certain designated common areas.  This top-notch nursing home took every conceivable measure to protect its patients from the pandemic.  While it was admittedly a fortress against COVID-19, it unfortunately took quite a toll on the failing mind of a man in his final stage of life, who nonetheless died of COVID-19.

In January of 2021, Edgar was rushed to the hospital.  Chris Kaup passed my office and stated his father had contracted COVID-19 and would likely not recover from it (as Edgar had co-morbid conditions).  I asked him, if he was going to the hospital to be with his father before he died.  He said he could not because of the hospital's COVID policy.  Unexpectedly, I said to my boss, "You're not going to hold your father's hand before he dies?  Isn't there any way you can go?!"  Chris' demeanor melted a bit in that moment, but he said in paraphrase, "I cannot.  The hospital will not allow it."

I lost a lot of personal respect for Chris in that moment because his father supported and sacrificed for him to become a skilled, successful and powerful attorney, who I personally witnessed could successfully argue to a judge (or a jury) the righteousness of his client's case, yet in his father's last hours, he willfully and knowingly declined to beseech a simple hospital admittance person for the right to hold his father's hand at his hour of his death.

-19-

1   have had that opportunity.  I do remember using the word "fashionable" on the Zoom

2   meeting, and that was an unfortunate word choice said in the moment."

3       72.     Chris moved to the front of his chair and put one hand on his desk, "I want

4   to protect you and your family."   He paused thinking, and in an even, but firm tone

5   demanded, "You said you spoke to other people.  Do you think you represent them?"

6       73.     "I 'represent' no one else, even though many other people in the firm think

7   as I do on this issue.  I spoke up because the Policy is repressive, it infringes on my God-

8   given right to breathe and for liberty.  I can be the steward of my health and the health of

9   my family.  Others can make decisions that protect their families; the Policy should be

10  lifted.  Chris, last summer you said to 'trust you', it has been nine months and the Policy

11  hasn't changed.  The consensus has changed, the mandates have changed, but the Policy

12  has not."

13      74.     On April 4, 2021, I prepared an Open Letter to the Tiffany & Bosco Board

14  of Directors requesting T&B rescind its Policy attached as **Exhibit C**.  The request was

15  based in part on most recent Executive Order of Doug Ducey at that time, the

16  infringement on the God-given right to liberty, the impediment to breathing, the excessive

17  fear of a wanning "Pandemic" and the ability for people to be their own best stewards for

18  their health and the health of their families.

19          **April 7, 2020 Board Directive from Chris Kaup to "Say Nothing"**

20      75.     On or about April 7, 2022, Chris Kaup called me into his office, at or about

21  6:00 p.m.  He had a different tone to his voice and a Blufish white water bottle container

22

23                                            -20-

1   on his desk.  Based on my familiarity with Chris, I knew he rarely drank liquids outside

2   of meals.

3        76.    Chris proceeded to describe my general conversation with Emily Fann and

4   her boyfriend the night before, and how I had described my marriage and kids to them.

5   His tone was grave because he stated that Ms. Fann had felt my question to her about one

6   day marrying her boyfriend was offensive and inappropriate.

7        77.    I explained to Chris that the conversation took place about 9:00 p.m., when

8   I was on the way out of the office and Ms. Fann and her boyfriend were putting up the

9   shelving in her new office bookcase.  The conversation was about 5 minutes long, and

10  though it had the religious root of my marriage and kids, I conveyed the story in a self-

11  deprecating, humorous manner, to which Ms. Fann and her boyfriend smiled and laughed

12  while I spoke.

13       78.    Upon inquiry, Chris stated that the inappropriate part of my conversation

14  was "God and marriage."

15       79.    I explained to Chris that I spoke about my marriage and God's role in it.  I

16  asked why, like a normal person, she did not let me know that I was making her

17  uncomfortable, or perhaps the next morning she could have come to me and let me know

18  that I should refrain from sharing such topics with her.  I would have apologized.  I then

19  would have known that our work relationship was a standard work relationship and that

20  becoming more personable was not her desire.

21       80.    There are many other T&B employees that I have spoken to over the years

22  that do want to talk beyond a fully superficial, working relationship.

-21-

23

1    81.    Chris imparted his advice to me, "Lou times have changed.  It is best to

2    presume that everyone is an eggshell and that the slightest touch could crack their shell

3    and offend them." He took a long draft of water. "I want to protect you and your family."

4    He lifted the container to his mouth again.  "What is the benefit of having any

5    conversation like that with anyone at the office?"

6    82.    That question of personal benefit to me had never been asked of me and I

7    had never thought of it in that context.  After a moment or so I said, "In this secular world,

8    I would have to agree with you that there is probably no benefit in having these personal

9    conversations in the office.  Even now, our conversation is probably one of them."  I

10   paused. "But, my Catholic belief is that I am not of this world and I am merely passing

11   through it.   My conversations are beneficial to the spiritual.   I have had many

12   conversations over my many years here and except for the two talks that seemed to have

13   caused an issue, the conversations have had varying degrees of spiritual benefit and have

14   led to many stronger personal office relationships like Mike Rodgers, Paul Cardon and

15   many others."

16   83.    For the next 30 minutes, Chris and I shared our views on many topics.  He

17   volunteered how he manages his personal relationships in the office, what is now

18   permitted by T&B's policy, how he diverts sensitive topics that may come up to a time

19   and place that are not in the office, and his personal experience on not being allowed to

20   be married in a Presbyterian Church in New Jersey and the reasons for it.

21   84.    Off-handedly Chris commented that he did not find my Open Letter to the

22   Board persuasive. *See* Exhibit C.

-22-

23

85.     We spoke at length about at least one person who I felt was touched by one of my past religious-based talks on marriage, along with a separate incident that occurred about two years prior where I had been speaking with a file clerk that was overheard by another person.  This second person was offended about the religious issues I spoke about including the Catholic Church's teaching about the cradle-to-grave pro-life religious view and the consequences of abortion.  This second person therefore informed Jen Lovato, Human Resource Manager, of a conversation to which they were not a party, but which offended them.  Jen Lovato and McCormley discussed the incident with me about a week after it occurred.

86.     At the end of the meeting, Chris linked this two-year-old conversation, my comments on the Zoom meeting, and my conversation with Emily Fann.

87.     Chris explicitly stated, "Lou, I want you to promise me that you will not speak about any non-business topics with anyone while you are in the office, no matter what time of day it is."

88.     After some more discussion, I said, "I think, I think I can agree to not speaking for six months."

89.     Chris did not seem pleased, but said, "Well, I'll take it to the Board and see what they think."

90.     "What?!" I responded and I got up from the chair I had been sitting in for the last 40 minutes.  "You're going to report what I said to the Board?  I thought we were having a personal conversation?"

91.     Chris had a dismissive, unmoved look on his face.  As if to say, "Really?"

-23-

92.    Having four children, I do my best to return home at about 7:30 p.m. each night.   This provides us time for some family time before prayer time and bedtime. However, on this night, I arrived home exhausted and sad.  Although, I did spend about an hour with my wife to discuss the 40-minute meeting, it was that start of a discussion not the end.

93.    I was disturbed and agitated by my conversation with Chris Kaup and I was unable to sleep.  At about 2:00 a.m.  I called Chris Kaup's office phone and left a message. "Chris, I am contemplating our conversation that we had late today.  I am having a hard time going to sleep and I will not be coming in tomorrow.  I will not be working from home."

94.    The next day, Thursday, I had an opportunity to speak with my wife, my kids and at least one of my friends.  I prayed on the topic.  I came to the conclusion that I could not make such a promise to give up my God-given voice while at work.  Father Lankeit had directed me to use my voice in the world and I had been persuaded by a very skillful attorney, my supervisor, and someone I considered at the time to be a friend, to give up my voice.

95.    The next morning, two days after the meeting, I found Chris Kaup as he passed by my office and asked him to sit down.  "Chris, I thought about what we said on Wednesday, and I cannot agree to only have business conversations while I am in T&B's offices.  It is not who I am or who God wants me to be.  On a practical level, someone might pass by me and say, 'Hi, how are you?' and I might say, 'not well, my mother-in-law passed away and I am thinking about her.'  They could then report this as an incident

-24-

1  because, 'Lou just needed to say, 'fine', because when I ask 'how are you', I don't need

2  to hear about death.   I'm offended!'   and I might be terminated for it under that

3  understanding.  So where do we go from here?"

4      96.    "I will check in with the Board and get back to you." Chris got up and left.

5  He never reported back to me.

6                              **Mask Mandate Update**

7      97.    Mark Bosco sent an email that modified the mask mandate portion of the

8  T&B Social Distancing Policy on Friday, May 21, 2021 at almost 5:00 p.m.   The

9  modification stated that if you were vaccinated you no longer were required to wear a

10  mask and if you had not been vaccinated you should review the recommended CDC

11  guidelines, and the email provided a link.

12      98.    I continued to wear my mask that Friday and the next Monday, May 24,

13  2021. From Tuesday through Friday of that same week, I was on vacation and not in the

14  office.  Monday, May 31, 2021, was a federal holiday and Tiffany & Bosco was closed.

15  I did not wear a mask on Tuesday, June 1 or Wednesday, June 2, 2021.

16                    **No Enforcement of the Mask Mandate Policy**

17      99.    On Monday, May 24, 2021 an attorney boasted to me that the equity

18  shareholders had a meeting and it was decided that T&B had adopted a no enforcement

19  stance on the mask mandate policy.

20      100.   Chris Kaup even commented that the meeting had been "4 hours wasted!"

21      101.   Lance Broberg commented before the equity shareholder meeting that the

22  firm could likely not enforce the mask mandate.

                                            -25-

23

1    102.   I had been provided a memo from Robert Mitchell to the Board of Directors

2  prior to the equity shareholder meeting advocating for the rescission of the mask mandate

3  based on the availability of vaccines, the changes at the CDC, and the protection and

4  preservation of liberty by allowing individuals to make their own choices.  Mr. Mitchell

5  advocated to lift the mask mandate but allow people who were still fearful to wear masks

6  in the office if they chose to do so.  The Mitchell memo is attached as **Exhibit D**.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

-26-

**The Enforcement of The Mask Mandate Policy against Louis A. Lofredo only**

103.    On Wednesday, June 2, 2021, Chris Kaup called me into his office.  Upon appearing in his office Jen Lovato was there and he asked me to close the door and have a seat.

104.    Chris began in a boisterous voice, "Lou, you have been in the break room and around the office stating that you won't be wearing a mask and haven't been vaccinated.  These types of statements have caused others in the office to…"

105.    Jen Lovato, who was seated about 3 feet to my right, physically raised her arm and placed her hand in a "stop" position toward Chris Kaup behind his desk and in his high-backed chair that was 12 feet away from us and said, "No, no… those statements were quite some time ago in the past."  She turned to me, "Lou, it is better to say that you have been vocal in the past about the masks and about vaccines.  There are people in the office that have noticed that this week you have not been wearing a mask when you pass by their desks, hallway or in the breakroom[7].  They are concerned for their health because of your prior statements.  I'm not asking, but others have told me that they have been vaccinated.  Some people even come up to me and give me papers that show they are

---

[7] McCormley had come to my office on that Wednesday late morning or early afternoon.  He leaned on the doorframe of my office, and asked me about a Chapter 7 bankruptcy process of which he was not familiar.  While I stated, Chris did Chapter 11 work, and I was also not familiar with it, I could provide him with Chris' Chapter 7 individual debtor attorney friends that could get that attorney information he needed, McCormley's eyes were roving about my desk and office.  As he pushed away from my door frame he nonchalantly stated something like, he had thought as we were discussing it and he had decided that the information would not be needed after all.  McCormley left.  While he walked down the hall, I thought our conversation was odd.  Sometime after the June 2, 2021 meeting with Kaup and Lovato later that afternoon, I recognized that McCormley was reconning my office for confirmation that I did not have a mask on my desk.

-27-

1  vaccinated and ask me to take them.  I don't want to, but I do.  I don't put them in their

2  personnel file, but I do keep them in a separate file because they gave them to me.  So,

3  what I'm saying is that I don't ask people; they just let me know.  *So I guess I'm just*

4  *going to ask you…. Lou, have you been vaccinated?*"

5       106.   As I wasn't expecting my employer to ask me a HIPAA protected medical

6  question, I responded, "I will not disclose that information."

7       107.   "I understand Lou," Jen acknowledged.  "You don't have to answer it.  But

8  I'm going to ask you another question…. Lou, after what we said, will you be wearing a

9  mask tomorrow in the office?"

10      108.   I thought about it and stated, "No, I don't intend to."

11      109.   Chris entered the conversation again in a more mild-mannered tone.  "Lou,

12  we discussed a short while ago that you were thinking about looking for a change and

13  might be looking for another, perhaps a smaller firm to move to," referencing our April

14  7, 2021 discussion.  "Have you thought about that more?"

15      110.   I paused and must have had a quizzical look on my face because Jen added,

16  "Chris told me that you might be looking for other smaller firms to work at."

17      111.   Chris sat back in his chair.  "We could then have a two- or three-week

18  transition period.  I would hire someone to fill your position and you would have time to

19  explore those options.  Have you had further thoughts on what we discussed on moving?"

20      112.   "Well Chris, when we spoke about that topic, I had thought we were having

21  a horizontal conversation and it turned out that it was a vertical conversation.  I no longer

22  feel comfortable sharing those topics with you."

                                            -28-

23

113. "What are horizontal and vertical conversations?" Chris asked, intentionally ignoring the rest of my sentence relating to his breach of my trust in him.

114. "A horizonal relationship is between friends, while a vertical relationship is a parent-child or employer-employee relationship," I stated, and I looked at Jen Lovato. Jen was nodding her head and made an affirmative comment that she knew what I was speaking about. I continued, "When we had that discussion, we spoke about many personal issues, and we shared many personal stories in those forty minutes, including the topic you are asking about now. At the end of that meeting, you stated you would 'report to the Board' what we had said. I was shocked. Well, I hoped that you only reported that I would only be having business conversations at the office and not any other parts of that personal conversation."

115. "Yes, you later said that you did not think you could only speak about business in the office," Chris added.

116. "Correct," I said. "I took the next day to think about that extraordinary directive and on that next Friday, I let you know I couldn't do that. I asked you 'Where do we go from here?' and you said you'd let me know. You didn't let me know."

117. There was silence among us for a short time.

118. Chris broke the silence, "We will need to know your decision before you leave today."

119. "What decision?" I asked.

120. "The decision on whether you will be staying at home or wearing a mask tomorrow," Chris elaborated. "Do you have any other questions?"

-29-

1       121.   "Well, I haven't had time to think about it yet. I'm not sure what I will be

2 doing. I do have a question for Jen," I said. "You mentioned that T&B employees have

3 personnel files. Do you have a personnel file for me for the 17 years that I have worked

4 here?"

5       122.   Jen pleasantly answered, "Yes, we have a personnel file for you, but it is

6 electronic. I am not sure if they had a paper file when you started, but I do know you

7 have an electronic file now that has information in it. I'm not sure what date it goes back

8 to."

9       123.   "Can I get a copy of my electronic file, including all drafts?" I inquired.

10       124.   "Yes, you can. It might take me a little time to get to it, but that should be

11 fine," Jen replied.

12       125.   "Any other questions?" Chris asked.

13       126.   "No."

14       127.   "That ends this meeting if you would excuse ..." Chris began.

15       128.   Jen interrupted, "one more thing Chris." She turned to face me and looked

16 me in the eyes. "Lou, this needs to be clear." She paused and said verbatim, "Lou if you

17 don't work from home tomorrow and you come into work not wearing a mask, we will

18 ask you to wear a mask. If you do not put on a mask, we will ask you to leave. If you

19 don't leave, we will have you escorted out. If you still don't leave that will led to a

20 termination event." She paused and said, "Is that clear?"

21       129.   I said, "Yes."

22       130.   Chris requested that Jen Lovato stay in his office after I left.

-30-

23

1       131.   It should also be noted that a day after this meeting, I learned that a

2 prospective paralegal candidate had come into the office earlier that Wednesday.   This

3 paralegal candidate was responding to an ad for a paralegal for Chris Kaup.   She had been

4 told that the position had already been filled.   Chris Kaup and Tiffany & Bosco had

5 already filled my position before the above meeting, but did not tell me that information

6 at the June 2, 2022 meeting.

7                         **Termination**

8       132.   On Friday, June 4, 2021, at about 11:00 a.m.   I was called into Chris Kaup's

9 office for a meeting.   Again, upon appearing in his office, Jen Lovato was there and he

10 asked me to close the door and have a seat.

11       133.   With Jen Lovato sitting 3 feet to my right, Chris leaned forward on his desk

12 away from his high-backed chair, which was about 12 feet away, looked directly at me

13 and began verbatim, "Lou, you have not been happy at Tiffany & Bosco.   You are not

14 happy with me.   We have made a decsi-....   A decision has been made, that your position

15 is being filled with another paralegal who will be starting soon."

16       134.   He paused for a moment and Jen took the cue, "And this separation does

17 not have to be involuntary."   She provided a brief description of how a resignation would

18 work, the "canned" T&B Severance Agreement with a two-week payment amount and a

19 mutual release of claims.   She provided some information on unemployment, COBRA

20 and distribution of my paid personal time (PPT) and paid sick leave (PSL).

21       135.   Chris interjected, "there could be a two- or three-week transition period.

22 Like I explained before, it would be of great value to our clients and me personally if you

23                         -31-

1   trained the new paralegal.  You would also have time to decide on things, like the

2   Severance Agreement.  Jen, would it be hard to get Lou a form of that Severance

3   Agreement?"

4          136.   "No.  It is a 'canned' form.  There is a male version and a female version,

5   but they are otherwise the same.  We just put in the name and amount on the last day

6   worked.  You would get 7 days to review that agreement[8].  The agreement and Tiffany

7   & Bosco suggest that you obtain counsel to review it prior to signing it.  So Chris, yes, I

8   can send that form Severance Agreement to him later today."

9          137.   "Good.  Lou any questions or comments?"

10         138.   I looked up at the ceiling and thought for a moment.  "Well… I'm still

11  processing this…," I started.  "… and I want to correct something you said." I stated the

12  following verbatim, "Chris, I am happy at Tiffany & Bosco.  I am not unhappy with you.

13  The only thing I am unhappy with is the over-reaching Policy.  I am being terminated

14  because I spoke out against the Social Distancing Policy at the Zoom meeting by

15  explaining my faith-formed views on it.  I've always complied with the Policy, but I

16  spoke out against it."

17         139.   While I paused to find words, Chris added, "Yes, we are glad that you chose

18  to wear your mask after we spoke to you on Wednesday."

19         140.   I continued, "I know many people would not tell you this, but I will not be

20  giving up my claim to litigate for a two-week payment on the Severance Agreement.  I

21  _____

22  [8] Later, Lovato sent me an email that stated because I was over a certain age, I would have 21
    days to review the Severance Agreement before signing it.

                                        -32-

23

1 may litigate it.  I haven't really processed being terminated... but," I reflected, "... I have

2 been working here for about 17 years and have been terminated.  As a matter of fact, I

3 have worked since I was 11 and have never been terminated from any job.  In that context,

4 if you want me to, yes, I will train my replacement."

5   141. Chris leaned back in his high-backed chair, "I appreciate your rights to

6 consider litigation and no it does not change my decision on the matter.  I am pleased that

7 I have anticipated your character and professionalism correctly and that you would agree

8 to train your replacement.  I am pleased with your decision."

9   142. We then spoke about the specifics of the transition dates.  It was decided

10 that I would begin transition of work to the new paralegal.  At the meeting, Chris believed

11 his start date was either Friday June 11, or Monday June 14, 2021.  We agreed that my

12 last day would be June 18, 2021.  I stated that I would not resign and that "my termination

13 would have to be involuntary."

14   143. Jen Lovato lightened the mood a bit by stating that that decision would not

15 have to made for a while, that she would support me in getting me information about

16 COBRA, etc. and she confirmed that I would also receive an email copy of a draft

17 Severance Agreement.

18   144. Later in the day as I was reporting to Chris Kaup on the status of several

19 matter he said without my solicitation, "You know the Severance Agreement can have

20 more than two weeks' pay?" I responded, "Chris, Jen said it was a 'canned' agreement."

21 He responded, "Yes, but the employee's name and amount are added to the document.  If

22

23

-33-

1   you come to me with a number that is fair, I will consider it.  Go home and think about it

2   this weekend and discuss it with your wife; let me know what you think is fair."

3       145.   I never provided any "number" to Chris Kaup for the Severance

4   Agreement.

5                    **I Began the Transition Process Immediately**

6       146.   Starting on Monday, June 7, 2021 and through Tuesday, June 8, 2021, I

7   began the transition process to the new paralegal, who Jen Lovato confirmed would be

8   starting on Monday, June 14, 2021.  Samples of this included clearing up docket dates on

9   the Prefect Law calendar, placing notes on files in my office regarding what tasks needed

10  to be done, and generally preparing for the transition so there would be little disruption

11  to T&B's clients.

12      147.   Specifically, I spoke with several attorneys and staff who were outside

13  Chris Kaup's department on transferring the responsibilities that I had on client projects.

14  I spoke with Rich Gramlich and his paralegal, Lisa Mocek, about transitioning the trial

15  tasks associated with a client on matter number, 23906-001.  I spoke with Regina Smith

16  of Rob Royal's department about matters numbers: 16957-001, -005, -006, and 007.  I

17  attempted to contact Rob Royal and tried to set-up a meeting with him, but Jack Vrablik,

18  his associate was in his office when we spoke on the phone and Mr. Royal was going to

19  be very busy for the next day or so as he was coming back from a vacation.

20      148.   The most significant transition was my responsibility to finalize and file an

21  Opening Brief in the Ninth Circuit Court of Appeals, in matter no. 16957-006, on or

22  before June 18, 2021 filing deadline.  I spoke separately with Amy Sells, and an extremely

23

-34-

1   gifted paralegal, Megan Bowen, on taking measures to assure no disruption would occur

2   before the filing deadline, which was to be my last day in the office.  I worked with Megan

3   and Amy on this transition, even placing the about 120 to 160 Designation of Record files

4   into Megan's G:/ drive where she could readily access them.

5        149.   I also spoke with Sara Hammond, a knowledgeable and efficient part-time

6   administrative legal assistant, who I was working with on some of Chris Kaup's monthly

7   invoicing tasks and a longer-term project to close about 1,000 "open" Perfect Law client

8   matters.   Ms. Hammond had a brilliant idea to assist me in getting important information

9   to the new employee.  With her guidance, I decided that I would request that IT set-up

10   the credentials for the new paralegal, including email and Perfect Law.   Although, such

11   credentials are typically done on the same day the employee starts, in this way, if IT set

12   up his credentials early, I could assign hundreds of T&B docket tasks and informatory

13   emails to my replacement before his start date. I then determined to contact IT about this

14   the next morning.

15

16

17

18

19

20

21

22

23

**Another Termination**

150.   On Tuesday, June 8, 2021, at about 5:20 p.m., Chris Kaup asked me to come to a conference room in the lobby.  I picked-up a yellow notepad, left my office, and entered the lobby conference room.  Chris Kaup, Kevin Newell, Jen Lovato and a fourth person that I did not know, a late 20 or early 30-year-old woman, who was dressed in what appeared to be blue denim sat around the conference room table.

151.   "Lou, have a seat," Chris said.  I sat.

152.   Kevin Newell spoke, "Lou, the Board met today and decided that your termination would be effective immediately.  You will not be returning to your office.  This is our security person, and she will be escorting you to your vehicle at the end of this meeting."

153.   Jen Lovato then spoke, "Lou, this is the Severance Agreement from the firm.  It has been filled out and the amount provided is two months rather than the two-weeks we spoke about."

154.   Unfortunately, I involuntarily guffawed at this surreal event happening to me.  Jen Lovato with her conciliatory tone, Chris Kaup's emotionless face, Kevin Newell's serious ex-military man expression and tone, then focusing on the small gold, nose-ring on the security woman as she lounged back in her chair seemingly bored by this happenstance: all as T&B terminated my 17-year career with it.

155.   It became a bit foggy for me as Jen explained the timelines for COBRA, paychecks and signing the Severance Agreement.  As she retrieved my personal bills from my office, I did ask Kevin Newell.  "Why can't I go back to my office?" He stated,

1   "This is not the time for that discussion."  I pondered at what point he thought that

2   discussion would occur.

3          156.  "Why am I being terminated?" I asked.

4          157.  "It is an at-will state," Kevin said with eyes of steel glaring at me.

5          158.  "That is not a reason.  Why am I being terminated?" I asked a second time.

6          159.  "It is at-will," Kevin repeated and Chris Kaup echoed.

7          160.  Jen came back into the room and handed me my personal bills.  She said

8   that she would personally pack my office and assure everything in my office was sent to

9   me by courier tomorrow.  She asked me to give her my electronic access card and I did

10  so.  She left me with these words.

11         161.  "Lou, let me be clear.  You are no longer an employee of Tiffany & Bosco.

12  You can no longer represent yourself as an employee at Tiffany & Bosco.  You will be

13  escorted to your car by the security guard.  You are to leave the premises and you are not

14  to return to Tiffany & Bosco.  If you return to the premises, the police will be called, and

15  we will have you arrested.  Have I been clear?"  She paused for an answer.

16         162.  "Yes."  I put the pen in my hand down on the yellow pad as I rose.

17         163.  Chris Kaup, who was only in the corner of my right eye, said verbatim,

18  "I'm sorry it had to end this way."  There was an additional very short sentence he

19  mumbled, so I only heard the end of the sentence, "Thank you."

20         164.  Without speaking, the female security guard with a nose ring took me to

21  the elevator, out to my vehicle, and she watched me start my vehicle and leave from the

22  building that was my work home for nearly 17 years.

-37-

23

## COUNT ONE

## RELIGIOUS DISCRIMINATION – ARIZONA CIVIL RIGHTS ACT

## (as to Defendants, T&B, Board, Bosco, Kaup, McCormley, and Gray)

165.   Plaintiff incorporates the preceding paragraphs as if set forth fully hereinafter.

166.   "It is an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to the individual's compensation, terms, conditions or privileges of employment because of the individual's . . . religion." A.R.S. §41-1463 (B)(1).

167.   Defendants T&B, Board, Bosco, Kaup, McCormley, and Gray, either as the direct employer or as an officer, director or shareholder that has caused employer to act (collectively for this Count, "Defendants") and Plaintiff were in an employer and employee relationship, respectfully.

168.   Plaintiff is a member of a protected class (religious).

169.   Plaintiff is a member of the Roman Catholic Church.

170.   Defendants are aware that Plaintiff is religious.

171.   Defendant T&B's attorney, Michael Tiffany, has witnessed Plaintiff's attendance at Mass over the years, specifically at St. Thomas the Apostle, located a few blocks south of T&B's Camelback office, 2312 E Campbell Ave, Phoenix, on certain Holy Days of Obligation that were on weekdays.

172.   Defendant T&B's attorney, Hernandez, Board member, has witnessed Plaintiff's and Plaintiff's family's attendance at Mass over the years, specifically at Our

-38-

1  Lady of the Angles Catholic Church, located 5802 E. Lincoln Drive, Scottsdale, Arizona,

2  on many occasions in the past.

3       173.   A good number of Defendant T&B's attorneys and staff are aware of the

4  strong religious beliefs of Plaintiff because he has shared his religious affiliation and/or

5  faith-based views with them on a variety of occasions, including, but not limited to, Mike

6  Tiffany, Mark A. Bosco, Leonard McDonald, Kevin Nelson, Pamala Kingsley,

7  Hernandez, Kaup, Broberg, Tina Ezzell, Richard Gramlich, Finnegan, Alex Poulos,

8  Ashley Case, Amy Sells, Gianni Pattas, Will Fischbach, Megan Bowen, May Lu, Robert

9  Royal, Robert Mitchell, Michael Wrapp, Emily Fann, John Hink, Gaya Shanmuganatha,

10 Todd Lenczycki, Rebecca Lewis, Jen Hamlin, Debra Davenport, Kaleigh Stilchen, Kesha

11 Cabanilla, Shari D. Hanger, Shelley Boettge, Julio Perez, Sharanda Lopez, Sienna

12 Meyers, Kelley Irish, among others.

13      174.   Defendant T&B's former attorneys and staff are aware of the strong

14 religious beliefs of Plaintiff because he has shared his religious affiliation and/or faith-

15 based views with them on a variety of occasions, including but not limited to, Greg Seibt,

16 Jeffrey Sandell, Mario A. Micheli, Darrel Dorsey, Natalya Ter-Grigoryan, Richard Oney,

17 Lori Martin, Justin Nelson, Michael Rogers, Paul Cardon, Marcos Tapia, Jennifer Lovato,

18 Kevin Wiese, James Oswald, Jason Ozment, Andrew Ellis, Claire Summers, Lauri

19 Andrisani, Oscar Andujo, Frank Mead, Chris LaVoy, Roxanne Regnier, Kevin Morrow,

20 Jamie Holland, Regina Smith, Jack Vrablik, Laura Wochner, Jose Zapata, Judy James,

21 Marcos Tapia, among others.

22

23

-39-

175.   Plaintiff acknowledges that many of T&B's attorneys, shareholders, directors, and staff are religious, a fair portion of whom are Roman Catholic; however, Plaintiff also has direct information and thereby acknowledges that many faithful people, who work at T&B, did not, could not or would not stand for their faith-filled beliefs because they also feared suffering religious discrimination through retaliation and the loss of their career at T&B.

176.   Defendants do not desire religious views be spoken in its offices.

177.   Defendants do not desire religious views to become disruptive in its offices.

178.   Defendants discourage discussion of religious views in its offices.

179.   Defendants' biases against actually communicating religious thoughts and views created a repressive, hostile and, in my specific case, career-ending, work environment.

180.   Defendants' termination of Plaintiff included the motivating factor of spoken religious views.  *See* A.R.S. §41-1463 (B)(1).

181.   Plaintiff was terminated and retaliated against for protected religious activities, among others.

182.   Defendants have unwritten policies, specifically the mindset of the Board, to implement written policy, to hamper or prevent religious views from being expressed in its offices.

183.   Defendants' policies on expressing religious views will be enforced by the Human Resources department.

-40-

184.   Violation of Defendants' policies on expressing religious views could lead to disciplinary action, up to and including termination.

185.   Plaintiff's perceived violation of Defendants' written and unwritten policies, led to a strong warning and corrective action against Plaintiff. *See* Complaint at paragraphs 85-86, wherein my religious speech about marriage and pro-life issues, were confronted in a meeting by McCormley, and Lovato.

186.   Plaintiff's perceived violation of Defendants' written and unwritten policies, led Kaup, on behalf of the Board, to direct Plaintiff to discontinue not only Plaintiff's religious speech about marriage and pro-life issues, but *all personal speech whatsoever* on T&B's property, regardless of the time of day.

187.   Plaintiff's perceived violation of Defendants' written and unwritten policies led Kaup and Lovato, on behalf of the Board, to confronting Plaintiff about his lack of cooperation with the Board's mandate to discontinue all personal speech, including religious speech about marriage and pro-life issues at the June 2, 2020 meeting in Chris Kaup's office.

188.   On June 8, 2020, Plaintiff's perceived violation of Defendants' written and unwritten policies, led Kaup, Newell, and Lovato, on behalf of the Board, to terminating Plaintiff, effective immediately, prohibiting Plaintiff from returning to his office, escorting the Plaintiff to his vehicle, and forewarning its 17-year veteran with the firm, Plaintiff, with arrest should he return to the premises.

-41-

1      189.   Upon information and belief that can be proven through the discovery and

2  litigation process, Plaintiff was terminated for his "...religious and political rant" at the

3  March 11, 2021 all-employee Zoom meeting.

4      190.   Plaintiff filed a discrimination complaint with the Attorney General of the

5  State of Arizona and has been allowed to file such claims in Superior Court.

6      191.   T&B, as a specific Defendant consisting of its equity shareholders, failed

7  to oversee Board, Bosco, Kaup, and McCormley on their poor leadership, poor

8  recommendations and poor decisions relating to this Count, and therefore directly and

9  proximately caused harm to Plaintiff.

10      192.   The acts, policies and practices of Defendants, as alleged herein, violate the

11  religious discrimination provisions of Arizona Civil Rights Act.

12      193.   Plaintiff is entitled to economic damages, in an amount to be proven at trial,

13  as a result of Defendants' willful discrimination and retaliation.

14      194.   Plaintiff is entitled to economic pain and suffering damages in an amount

15  to be proven at trial, as a result of Defendants' willful discrimination and retaliation.

16      195.   Plaintiff is entitled to recover his attorneys' fees and costs incurred herein.

17  A.R.S. §§ 12-341-12-341.01.

18

19

20

21

22

23

-42-

1

**COUNT TWO**

2

**(RELIGIOUS DISCRIMINATION – TITLE VII OF CIVIL RIGHTS ACT)**

3

**(as to Defendants, T&B, Board, Bosco, Kaup, McCormley, and Gray)**

4    196.   Plaintiff incorporates the preceding paragraphs as if set forth fully

5    hereinafter.

6    197.   "It shall be an unlawful employment practice for an employer - (1) ... to

7    discharge any individual, or otherwise to discriminate against any individual with respect

8    to his compensation, terms, conditions, or privileges of employment, because of such

9    individual's ... religion..." SEC. 2000e-2, [section 703].

10    198.   Defendants T&B, Board, Bosco, Kaup, McCormley, and Gray, either as

11    the direct employer or as an officer, director or shareholder that has caused employer to

12    act (collectively for this Count, "Defendants") and Plaintiff were in an employer and

13    employee relationship, respectfully.

14    199.   Plaintiff is a member of a protected class (religious).

15    200.   Plaintiff is a member of the Roman Catholic Church.

16    201.   Defendants are aware that Plaintiff is religious.

17    202.   Defendant T&B's attorney, Michael Tiffany, has witnessed Plaintiff's

18    attendance at Mass over the years, specifically at St. Thomas the Apostle, located a few

19    blocks south of T&B's Camelback office, 2312 E Campbell Ave, Phoenix, on certain

20    Holy Days of Obligation that were on weekdays.

21    203.   Defendant T&B's attorney, Hernandez, Board member, has witnessed

22    Plaintiff's and Plaintiff's family's attendance at Mass over the years, specifically at Our

23

-43-

1   Lady of the Angles Catholic Church, located 5802 E. Lincoln Drive, Scottsdale, Arizona,

2   on many occasions in the past.

3       204.   Defendant T&B's attorneys and staff are aware of the strong religious

4   beliefs of Plaintiff because he has shared his religious affiliation and/or faith-based views

5   with them on a variety of occasions, including, but not limited to, Mike Tiffany, Mark A.

6   Bosco, Leonard McDonald, Kevin Nelson, Pamala Kingsley, Hernandez, Kaup, Broberg,

7   Tina Ezzell, Richard Gramlich, Finnegan, Alex Poulos, Ashley Case, Amy Sells, Gianni

8   Pattas, Will Fischbach, Megan Bowen, May Lu, Robert Royal, Robert Mitchell, Michael

9   Wrapp, Emily Fann, John Hink, Gaya Shanmuganatha, Todd Lenczycki, Rebecca Lewis,

10   Jen Hamlin, Debra Davenport, Kaleigh Stilchen, Kesha Cabanilla, Shari D. Hanger,

11   Shelley Boettge, Julio Perez, Sharanda Lopez, Sienna Meyers, Kelley Irish, among

12   others.

13       205.   Defendant T&B's former attorneys and staff are aware of the strong

14   religious beliefs of Plaintiff because he has shared his religious affiliation and/or faith-

15   based views with them on a variety of occasions, including but not limited to, Greg Seibt,

16   Jeffrey Sandell, Mario A. Micheli, Darrel Dorsey, Natalya Ter-Grigoryan, Richard Oney,

17   Lori Martin, Justin Nelson, Michael Rogers, Paul Cardon, Marcos Tapia, Jennifer Lovato,

18   Kevin Wiese, James Oswald, Jason Ozment, Andrew Ellis, Claire Summers, Lauri

19   Andrisani, Oscar Andujo, Frank Mead, Chris LaVoy, Roxanne Regnier, Kevin Morrow,

20   Jamie Holland, Regina Smith, Jack Vrablik, Laura Wochner, Jose Zapata, Judy James,

21   Marcos Tapia, among others.

22

23

-44-

206. Plaintiff acknowledges that many of T&B's attorneys, shareholders, directors, and staff are religious, a fair portion of whom are Roman Catholic; however, Plaintiff also has direct information and thereby acknowledges that many faithful people, who work at T&B, did not, could not or would not stand for their faith-filled beliefs because they also feared suffering religious discrimination through retaliation and the loss of their career at T&B.

207. Defendants do not desire religious views be spoken in its offices.

208. Defendants do not desire religious views to become disruptive in its offices.

209. Defendants discourage discussion of religious views in its offices.

210. Defendants' biases against actually communicating religious thoughts and views created a repressive, hostile and, in my specific case, career-ending, work environment.

211. Defendants' termination of Plaintiff included the motivating factor of spoken religious views. *See* 2000e-2(m), [section 703(m)].

212. Plaintiff was terminated and retaliated against for protected religious activities, among others.

213. Defendants have unwritten policies, specifically the mindset of the Board, to implement written policy, to hamper or prevent religious views from being expressed in its offices.

214. Defendants' policies on expressing religious views will be enforced by the Human Resources department.

-45-

215.   Violation of Defendants' policies on expressing religious views could lead to disciplinary action, up to and including termination.

216.   Plaintiff's perceived violation of Defendants' written and unwritten policies, let to a strong warning and corrective action against Plaintiff. *See* Complaint at paragraph 85-86, wherein my religious speech about marriage and pro-life issues, were confronted in a meeting by McCormley, and Lovato.

217.   Plaintiff's perceived violation of Defendants' written and unwritten policies, led Kaup, on behalf of the Board, to direct Plaintiff to discontinue not only Plaintiff's religious speech about marriage and pro-life issues, but *all personal speech whatsoever* on T&B's property, regardless of the time of day.

218.   Plaintiff's perceived violation of Defendants' written and unwritten policies, led Kaup and Lovato, on behalf of the Board, to confronting Plaintiff about his lack of cooperation with the Board's mandate to discontinue all personal speech, including religious speech about marriage and pro-life issues at the June 2, 2020 meeting in Chris Kaup's office.

219.   On June 8, 2020, Plaintiff's perceived violation of Defendants' written and unwritten policies, led Kaup, Newell, and Lovato, on behalf of the Board, to terminating Plaintiff, effective immediately, having a gold-nose-ringed, female security guard, escort the Plaintiff to his vehicle, and forewarning its 17-year veteran with the firm, Plaintiff, with arrest should he return to the premises.

-46-

220.   Upon information and belief that can be proven through the discovery and litigation process, Plaintiff was terminated for his "...religious and political rant" at the March 11, 2021 all-employee Zoom meeting.

221.   Defendants did not attempt to make an effort to reasonably accommodate, offer a reasonable accommodation that would eliminate the religious conflict, or that it would have been an undue hardship to accept the employee's request. Opuku-Boeteng, 95 F.3d at 1467.

222.   In fact, Defendants, immediately after the March 11, 2021 all-employee Zoom meeting, began a concerted campaign, using primarily Newell and Lovato, to gather information that could lead to the termination of Plaintiff.

223.   T&B, as a specific Defendant consisting of its equity shareholders, failed to oversee Board, Bosco, Kaup, and McCormley, on their poor leadership, poor recommendation and poor decisions relating to this Count and therefore directly and proximately caused harm to Plaintiff.

224.   The acts, policies and practices of Defendants, as alleged herein, violate the religious discrimination provisions of Title VII of the Civil Rights Act of 1964.

225.   Plaintiff is entitled to economic damages, in an amount to be proven at trial, as a result of Defendants' willful discrimination and retaliation.

226.   Plaintiff (and each additional Plaintiff that will be added to this Complaint) is entitled to compensatory damages under See 42 U.S.C. § 1981a, as a result of Defendants' willful discrimination and retaliation in an amount of $200,000, because

-47-

1    Defendants have and had at the time of the occurrence between 200 and 501 employees.

2    42 U.S.C. § 1981 (b).

3         227.    Plaintiff is entitled to recover his attorneys' fees and costs incurred herein.

4    42 U.S.C. § 2000e-5(k) et al.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## COUNT THREE

### (RELIGIOUS RETALIATION – ARIZONA CIVIL RIGHTS ACT)

### (as to Defendants, T&B, Board, Bosco, Kaup, and McCormley)

228.   Plaintiff incorporates the preceding paragraphs as if set forth fully hereinafter.

229.   Defendants T&B, Board, Bosco, Kaup, and McCormley, either as the direct employer or as an officer, or director that has caused employer to act (collectively for this Count, "Defendants") and Plaintiff were in an employer and employee relationship, respectfully.

230.   Plaintiff engaged in a protected religious activity.

231.   Under Article II, section 12, of the Arizona Constitution, "No religious qualification shall be required for … employment."

232.   Plaintiff engaged in a personal freedom of speech activity.

233.   Under Article II, section 6, "Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right."

234.   Plaintiff exercised his free speech rights to periodically communicate with others at T&B about his deeply held traditional Catholic values, for example, traditional marriage and defense of an unborn child to be born, among other values ("Religious Topics").

235.   Plaintiff exercised his free speech rights to communicate to Defendants at the T&B March 11, 2021 all-employee Zoom meeting relating to the Policy based upon

-49-

1    my deeply held traditional Catholic values to speak about the failings of the Policy.  *See*

2    Complaint above.

3       236.   Plaintiff was terminated and retaliated against for protected religious

4    activities, amount others.

5       237.   Plaintiff has established a prima facia case of retaliation for:

6         a.   <u>Utilizing</u> his religious freedom to speak out against the Policy at the

7            T&B March 11, 2021 all-employee Zoom meeting;

8        b.   <u>Resulting</u> in the employer Defendants' adverse and retaliatory actions

9            against Plaintiff, which include, by

10           i.   attempting to prevent the Plaintiff from *all personal speech*

11              *whatsoever* while on Defendants' premises;

12          ii.   directing Plaintiff to wear a mask *after* the equity shareholders

13              had voted to lift the mask mandate portion of the Policy;

14         iii.   illegally requiring Plaintiff to disclose HIPAA information about

15              his vaccination status;

16         iv.   terminating Plaintiff on June 4, 2021;

17          v.   breaching the Exit Agreement, fully described in the ICAZ wage

18              complaint and Reply, attached hereto as **Exhibit E**[9];

19

20

---

21 [9] The entirety of Louis A. Lofredo's Industrial Committee of Arizona's Wage Claim, including
the original Wage Claim and Reply which are both attached as **Exhibit E**, is hereby incorporated
22 into this Complaint in its entirety, primarily in an effort to reduce the size of the Complaint by
about 40-100 pages.

23

1        vi.  prohibiting Plaintiff from returning to his office and escorting

2        Plaintiff to his vehicle, after the second termination on June 8,

3        2021 at approximately 5:30 p.m.; and

4        vii.  refusing to provide, and *directing all Attorneys at T&B* to refuse

5        to provide Plaintiff with a reference or letter of recommendation

6        after exclusively employing Plaintiff as a paralegal at T&B for

7        almost 17 years;

8        viii.  refusing to provide Plaintiff with his entire personnel file;

9      c.  Establishing the causal link that this protective activity (religious free

10      speech) was retaliatory because;

11        i.  the termination process began immediately; beginning about 20

12        minutes after the Zoom meeting at which Plaintiff exercised his

13        religious free-speech;

14        ii.  the additional materials entered into my file beginning

15        immediately after the March 11 all-employee Zoom meeting, for

16        the purpose of tainting my good character and diverting attention

17        from Defendants' retaliatory practice, by creating a false image

18        of Plaintiff;

19        iii.  the unique additional mandates placed upon Plaintiff alone,

20        including

21        1.  to censorship of all Plaintiff's speech;

22        2.  to have only Plaintiff wear a mask;

-51-

23

3.  to violate Plaintiff's HIPAA rights; and

4.  otherwise pressure and punish Plaintiff; due to his exercise of religion and free-speech;

iv.  the example of firing Plaintiff to other employees, would be a clear and horrifyingly message to staff, associates and dissenting shareholders, that to oppose the Defendants' Policy or any other conceive Defendants' mandates[10] would lead to "… disciplinary action, up to and including termination" and if an employee was a shareholder, forced disassociation with the firm; and

v.  the stated post termination attempts by Defendant Kaup directly or T&B, Board, Bosco, Kaup and McCormley, through counsel Joseph T. Clees, to coerce Plaintiff to sign a Severance Agreement, which is a document that further prohibits Plaintiff's *right of free speech AFTER termination*, in order for Plaintiff to receive a recommendation letter.  *See* attached Exhibit B, Severance Agreement and **Exhibit E**, Reply[11] in support of Wage Claim, for attached copies of the Severance Agreements.

---

[10] T&B, T&B's Board, Bosco, Kaup and other shareholders were considering mandating vaccinations for all T&B employees just about the time of the March 11, 2021 all-employee Zoom meeting.

[11] The Reply at length discusses the Defendants' Severance Agreement, which is powerfully, perhaps illegally, one-sided in favor of the Employer.  Anyone contemplating leaving T&B, should seriously consider the "canned" Severance Agreement, and T&B's shareholder should certainly modify it, in the interest of Justice to their departing employees; staff, attorneys and shareholders alike.

1      238.   Plaintiff's practice of his religious belief to freely speak out about Religious

2    Topics, including the Policy, is a sincerely held belief and based on traditional

3    Catholicism.

4      239.   Defendants had a duty to accommodate Plaintiff's religious view because

5    periodically speaking to other co-workers, who were typically work friends, did not

6    impose an undue hardship on Defendants. Indeed, in over 17 years, and likely hundreds

7    of instances relating to speech about God or Catholicism, only two instances of Plaintiff's

8    religious speech were brought to the attention of the T&B Board or Board members, one

9    instance in about mid-2019 and the second, in April, 2021. The second instance was

10   partially exaggerated so as to be used as a means to create a document path for Plaintiff's

11   termination.

12     240.   Defendants had a duty to accommodate Plaintiff's religious view because

13   *consideration* of lifting the Policy, based on religious, political, scientific, or even legal

14   exposure, did not impose an undue hardship on Defendants. Indeed, even though

15   Defendants had planned on terminating Plaintiff in mid-March 2021, the equity

16   shareholders voted to lifted the mask mandate portion of the Policy, and this lifting took

17   effect on May 21, 2021. Still Plaintiff was retaliatorily terminated two weeks later by

18   Defendants, while Plaintiff complied with the Policy and the Defendants' specific

19   requirement for Plaintiff only to continue to wear a mask, even after all other employees'

20   mask restrictions were lifted by the equity shareholders.

21     241.   Additional evidence of Defendants' retaliation against Plaintiff, includes

22   the fact that there were other shareholders at T&B that would have accepted a transfer of

23

1   Plaintiff into their respective departments based on Plaintiff's paralegal experience and

2   because they believed that Plaintiff's actions on the Zoom meeting were reasonable.

3   However, at least one of the shareholders that approached the Defendants with a transfer

4   request had it made known by one or more of the Defendants that accepting my transfer

5   into such other department may lead to the separation of that entire department from

6   Tiffany & Bosco.

7       242.    The acts, policies and practices of Defendants, as alleged herein, violate the

8   retaliation discrimination provisions of the Arizona Civil Rights Act ("ACRA").

9       243.    Plaintiff has been damaged by Defendants' violations of the ACRA.

10      244.    T&B, as a specific Defendant consisting of its equity shareholders, failed

11  to oversee Board, Bosco, Kaup, and McCormley, on their poor leadership, poor

12  recommendations and poor decisions relating to this Count and therefore directly and

13  proximately caused harm to Plaintiff.

14      245.    Plaintiff is entitled to economic and pain and suffering damages as a result

15  of Defendants' unlawful discrimination and retaliation in violation of the ACRA.

16      246.    Plaintiff is entitled to recover her attorneys' fees and costs incurred herein.

17  A.R.S. §§ 12-341-12-341.01; A.R.S. § 41-1481 et al.

18

19

20

21

22

23                                              -54-

**COUNT FOUR**

**(RELIGIOUS RETALIATION – TITLE VII OF CIVIL RIGHTS ACT)**

**(as to Defendants, T&B, Board, Bosco, Kaup, and McCormley)**

247.   Plaintiff incorporates the preceding paragraphs as if set forth fully hereinafter.

248.   Defendants T&B, Board, Bosco, Kaup, and McCormley, either as the direct employer or as an officer, or director that has caused employer to act (collectively for this Count, "Defendants") and Plaintiff were in an employer and employee relationship, respectfully.

249.   Plaintiff engaged in a protected religious activity.

250.   Under the First Amendment of the United States Constitution, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

251.   Plaintiff exercised his free speech rights to periodically communicate with others at T&B about his deeply held traditional Catholic values, for example, traditional marriage and defense of an unborn child to be born, among other values ("Religious Topics"). *See* Title VII of Civil Rights Act.

252.   Plaintiff engaged in a personal freedom of speech activity.

253.   Plaintiff exercised his free speech rights to communicate to Defendants at the T&B March 11, 2021 all-employee Zoom meeting relating to the Policy based upon

-55-

1   my deeply held traditional Catholic values to speak about the failings of the Policy.

2   Complaint above.

3        254.   Plaintiff was terminated and retaliated against for protected religious

4   activities, amount others.

5        255.   Plaintiff has established a prima facia case of retaliation for:

6        a.   Utilizing his religious freedom to speak out against the Policy at the

7             T&B March 11, 2021 all-employee Zoom meeting;

8        b.   Resulting in the employer Defendants' adverse and retaliatory actions

9             against Plaintiff, which include, by

10            i.   attempting to prevent the Plaintiff from all personal speech

11                 whatsoever while on Defendants' premises;

12            ii.  directing Plaintiff to wear a mask after the equity shareholders

13                 had voted to lift the mask mandate portion of the Policy;

14            iii. illegally requiring Plaintiff to disclose HIPAA information about

15                 his vaccination status;

16            iv.  terminating Plaintiff on June 4, 2021;

17            v.   breaching the Exit Agreement, fully described in the ICAZ wage

18                 complaint and Reply, attached hereto as Exhibit E ;

19            vi.  prohibiting Plaintiff from returning to his office and escorting

20                 Plaintiff to his vehicle, after the second termination on June 8,

21                 2021 at approximately 5:30 p.m.; and

22

                        -56-

23

vii.  refusing to provide, and directing all Attorneys at T&B to refuse to provide Plaintiff with a reference or letter of recommendation after exclusively employing Plaintiff as a paralegal at T&B for almost 17 years;

viii.  refusing to provide Plaintiff with his entire personnel file;

c.  Establishing the causal link that this protective activity (religious free speech) was retaliatory because;

i.  the termination process began immediately; beginning about 20 minutes after the Zoom meeting at which Plaintiff exercised his religious free-speech;

ii.  the additional materials entered into my file beginning immediately after the March 11 all-employee Zoom meeting, for the purpose of tainting my good character and diverting attention from Defendants' retaliatory practice, by creating a false image of Plaintiff;

iii.  the unique additional mandates placed upon Plaintiff alone, including

1.  to censorship of all Plaintiff's speech;

2.  to have only Plaintiff wear a mask;

3.  to violate Plaintiff's HIPAA rights; and

4.  to otherwise pressure and punish Plaintiff; due to his exercise of religions and free-speech;

-57-

iv.  the example of firing Plaintiff to other employees, would be a clear and horrifyingly clear message to staff, associates and dissenting shareholders, that to oppose the Defendants' Policy or and other conceive Defendants' mandates would lead to "... disciplinary action, up to and including termination" and if a shareholder, forced disassociation with the firm; and

v.   the stated post termination attempts by Defendant Kaup directly or T&B, Board, Bosco, Kaup and McCormley, through counsel Joseph T. Clees, to coerce Plaintiff to sign a Severance Agreement, which is a document that further prohibits Plaintiff's right of free speech AFTER termination, in order for Plaintiff to receive a recommendation letter.  *See* Exhibits 11 and 12, to attached Exhibit E, Reply in support of Wage Claim, for attached copies of the Severance Agreements.

256.   Plaintiff's practice of his religious belief to freely speak out about Religious Topics, including the Policy, is a sincerely held belief and based on traditional Catholicism.

257.   Defendants had a duty to accommodate Plaintiff's religious view because periodically speaking to other co-workers, who were typically work friends, did not impose an undue hardship on Defendants.  Indeed, in over 17 years, and likely hundreds of instances relating to speech about God or Catholicism, only two instances of Plaintiff's religious speech were brought to the attention of the T&B Board or Board member, one

-58-

1   instance in about mid-2019 and the second, in April, 2021.  The second instance was

2   partially exaggerated so as to be used as a means to create a document path for Plaintiff's

3   termination.

4       258.   Defendants had a duty to accommodate Plaintiff's religious view because

5   consideration of lifting the Policy, based on religious, political, scientific, or even legal

6   exposure, did not impose an undue hardship on Defendants.   Indeed, even though

7   Defendants had planned on terminating Plaintiff in mid-March 2021, the equity

8   shareholders voted to lifted the mask mandate portion of the Policy, and this lifting took

9   effect on May 21, 2021.  Still Plaintiff was retaliatorily terminated two weeks later by

10  Defendants, while Plaintiff complied with the Policy and the Defendants' specific

11  requirement for Plaintiff only to continue to wear a mask, even after all other employees'

12  mask restrictions were lifted by the equity shareholders.

13      259.   Additional evidence of Defendants' retaliation against Plaintiff, includes

14  the fact that there were other shareholders at T&B that would have accepted a transfer of

15  Plaintiff into their respective departments based on Plaintiff's paralegal experience and

16  because they believed that Plaintiff's actions on the Zoom meeting were reasonable.

17  However, at least one of the shareholders that approached the Defendants with a transfer

18  request had it made known by one or more of the Defendants that accepting my transfer

19  into such other department may lead to the separation of that entire department from

20  Tiffany & Bosco.

21      260.   The acts, policies and practices of Defendants, as alleged herein, violate the

22  retaliation discrimination provisions of the Title VII of Civil Rights Act ("Title VII").

23

-59-

1      261.   Plaintiff has been damaged by Defendants' violations of Title VII.

2      262.   T&B, as a specific Defendant consisting of its equity shareholders, failed

3  to oversee Board, Bosco, Kaup, and McCormley, on their poor leadership, poor

4  recommendations and poor decisions relating to this Count and therefore directly and

5  proximately caused harm to Plaintiff.

6      263.   Plaintiff is entitled to economic damages, in an amount to be proven at trial,

7  as a result of Defendants' willful discrimination and retaliation.

8      264.   Plaintiff (and each additional Plaintiff that will be added to this Complaint)

9  is entitled to compensatory damages under 42 U.S.C. § 1981a, as a result of Defendants'

10  willful discrimination and retaliation in an amount of $200,000, because Defendants have

11  and had at the time of the occurrence between 200 and 501 employees.  42 U.S.C. § 1982

12  (b).

13      265.   Plaintiff is entitled to recover her attorneys' fees and costs incurred herein.

14  42 U.S.C. § 2000e-5(k) et al.

15

16

17

18

19

20

21

22

23

**COUNT FIVE**

**(Breach of Contract – Policy is Promissory)**

**(as to Defendants, T&B, Board, Bosco, Kaup, and McCormley)**

266.   Plaintiff incorporates the preceding paragraphs as if set forth fully hereinafter.

267.   Defendants T&B, Board, Bosco, Kaup, and McCormley, either as the direct employer or as an officer, or director that has caused employer to act (collectively for this Count, "Defendants") and Plaintiff were in an employer and employee relationship, respectfully.

268.   ARS 23-1501 A. states, "The public policy of this state is that: 1. The employment relationship is contractual in nature."

269.   As stated above, the Policy was over-reaching, coercive and far more intrusive than any governmental mandate or proclamation that had been issued.  In fact, although Maricopa County and Phoenix City mandates only had two enforcement mechanisms, one resulted in a warning, the other, after repeated infractions, could lead to a fine of up to $50; the T&B Policy in contrast included extraordinary enforcement measures, that for example, "Failure to comply with these social distancing measures may result in discipline, up to and **including termination of employment**." (Emphasis added).

270.   The Policy demanded, among other tenets, that employees comply with the strictest requirements of all Social Distancing Measures for the City of Phoenix, Maricopa County and Tiffany & Bosco.

-61-

271.    Tiffany & Bosco's Social Distancing Measures were by far always the most encompassing, over-reaching and had the harshest enforcement mechanisms from the beginning of the pandemic through the date of my termination.

272.    Further, Tiffany & Bosco reserved the "… right to modify this policy at any time in its sole discretion…"  While it may be that T&B could reserve it's right to modify the Policy, the Policy did not allow employees to agree to those modifications, which was concerning because such unilateral modifications could lead to T&B's enforcement mechanism, including the "termination of employment".

273.    The COVID-19 task force of Mark S. Bosco, J. Lawrence McCormley, Christopher R. Kaup, Rosary A. Hernandez, Lance R. Broberg, Jodi R. Bohr, Kevin J. Newell, Jen C. Lovato, Julio Perez, James Oswald, Shranda Lopez and Jose Zapata[12] are responsible for administering and enforcing this policy.

274.    The Policy and directions from the Board made it clear that there was no other choice, but to sign the Policy to remain employed at T&B.

275.    On August 5, 2020, the patience of the Board and Chris Kaup had run and I was directed that I must sign the Policy.

276.    The Policy is an extraordinary document that exists only due to the extraordinary nature of a pandemic.

---

[12] It is my understanding that Kevin J. Newell, Jen C. Lovato and James Oswald are no longer employees of T&B and were terminated, severed, discharged or resigned after my termination on June 2, 2021.

277.   The Policy was objected to by many employees to which I spoke and was only signed because it would jeopardize their careers if it was not signed.

278.   Plaintiff made known his objections to the Policy.

279.   Plaintiff was still made to sign the document, under protest.

280.   Defendant Kaup did authorize that Plaintiff could write his objections to the Policy in the margins and neither T&B, the Board or Kaup made any comment to Plaintiff about such objections.

281.   Plaintiff's long employment would have ended if Plaintiff did not sign the Policy.

282.   The Policy is promissory in nature.

283.   The Defendants' mandate that all employees sign the Policy constitutes a contractual relationship, pursuant to A.R.S. 23-501 A. 2., "… this written contract must be set forth in the employment handbook or manual or any similar document distributed to the employees, if that document expresses the intent that it is a contract of employment…".

284.   The Policy was created by Defendants, and thereby has the same effect and validity of a signature.  The employees were mandated to sign such document or it would end in termination, so all employees signed the Policy.  Thus, the Policy is promissory in nature.

285.   Plaintiff signed the Policy, Plaintiff complied with all tenets of the Policy, Plaintiff was terminated while complying with the Policy.

-63-

286.   Defendants breach, though its termination of Plaintiff, while the Policy was in effect, and egregiously when the mask mandate portion of the Policy, was only being enforced against Plaintiff, constitutes a breach of contract, pursuant to ARS 23-1501 A. 3. (a), (b)(i) and (b)(ii).

287.   Plaintiff has been damaged by Defendants' breech

288.   Plaintiff is entitled to economic recovery from Defendants to be determined at trial based on such breech in this Count.

289.   The Plaintiff is entitled to an award of attorney's fees and costs pursuant to the Promissory Note and A.R.S. §§ 12-341 and 12-341.01.

**COUNT SIX**

**(Wrongful Termination – Policy is Unlawful)**

**(as to Defendants, T&B, Board, Bosco, Kaup, and McCormley)**

290.    Plaintiff incorporates the preceding paragraphs as if set forth fully hereinafter.

291.    Defendants T&B, Board, Bosco, Kaup, and McCormley, either as the direct employer or as an officer, or director that has caused employer to act (collectively for this Count, "Defendants") and Plaintiff were in an employer and employee relationship, respectfully.

292.    Pursuant to Title VII and Arizona Civil Rights Act, it unlawful to take adverse action against any individual because that person has opposed an unlawful employment practice.

293.    The Policy is unlawful.

294.    The Policy was arrived at through Practical Law, which provided the guidance to the Board to implement is tenets based on a now know false consensus.

295.    The Policy, instead of having the intent to protect its employees from COVID-19, was meant to protect T&B from litigation.

296.    The Policy gave greater control over employees, even other shareholders, to the Board.

297.    The most powerful and influential members of T&B, known as "The COVID-19 task force" in the Policy, included Bosco, McCormley, Kaup, Hernandez,

-65-

1   Broberg, Jodi R. Bohr, Kevin J. Newell, Jen C. Lovato, among others, were responsible

2   for administering and enforcing this policy.

3       298.   The COVID-19 task force did not include any shareholders that vocally

4   questioned the Policy or its implementation.

5       299.   Plaintiff opposed the Policy.

6       300.   Plaintiff has knowledge of many other employees at T&B that opposed the

7   Policy.

8       301.   Although this section does not relate to religion, my faith-based views,

9   impelled me to question this authoritarian Policy and the unlawful discrimination against

10  T&B's employee.

11      302.   Plaintiff signed the Policy under protest, for fear of being terminated, and

12  by at least stating my objections in the margins of the Policy, on August 5, 2020.

13      303.   Plaintiff also spoke about and enunciated his religious and political belief

14  at T&B's March 11, 2021 all-employee Zoom meeting that the Policy, created by

15  Defendants, was ill-conceived, damaging and over-reaching, especially in light of the

16  almost non-existent enforcement mechanisms collectively of Arizona State, Maricopa

17  County and City of Phoenix government mandates.

18      304.   By far, the Policy included the most draconian enforcement mechanisms,

19  including "discipline, up to and including termination of employment."

20      305.   On April 4, 2021, Plaintiff wrote an Open letter to the Tiffany & Bosco

21  Board of Directors eloquently requesting the Board rescind the Policy. *See* Open Letter

22  attached as Exhibit C.

-66-

23

1  306. One sentence from the Open Letter states, "For those who are fear-filled,

2 no respite has been given them by the ongoing sacrifices of liberty by their fellow men

3 and women. It does not register in their minds that their lack of courage, infringes on

4 others or that there are deaths that have been caused due to their fear, such as from suicide,

5 or a failure to go to doctors or hospitals with minor conditions that if treated early would

6 have normally been routine diagnosed and treated."

7  307. Per Freitag v. Ayers, 468 F.3d 528, 542 (9th Cir. 2006), employees are

8 considered to have "opposed" an employment practice when they have opposed what they

9 reasonably perceived to be unlawful discrimination.  Plaintiff brought this unlawful

10 discrimination to Defendants attention on multiple occasions.

11  308. Plaintiff presented to Defendants the factual basis for reasonably believing

12 that Defendants engaged in unlawful discrimination. *See* above three examples.

13  309. "Adverse actions" were taken by Defendants that "well might have

14 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"

15 *Burlington Northern & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting

16 *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

17  310. Plaintiff suffered the adverse actions listed in Claims Three and Four.

18  311. Plaintiff has been damaged by the termination of his employment by

19 Defendants.

20  312. Plaintiff had worked at T&B for 17 years, it is reasonable, that but for, the

21 wrongful, unlawful, discriminatory, and retaliatory termination, Plaintiff would have

22 worked at T&B through to retirement.

-67-

23

313.     Plaintiff is entitled to economic recovery from Defendants, for lost wages and benefits, calculated to be between $634,180.20 and $1,074,679.00 based on a calculated sum certain, either by a comparison of gross wages of 2020 at T&B exclusively and 2021 gross wages received (1st amount) or a comparison of gross wages of 2020 at T&B exclusively, to the projected 2022 gross wages to be received from non-T&B sources (2nd amount).

314.     The Plaintiff is entitled to an award of attorney's fees and costs pursuant to the contractual Policy under A.R.S. §§ 12-341 and 12-341.01.

-68-

**COUNT SEVEN**

**(VIOLATIONS OF A.R.S. §§23-350 et seq. – EXIT AGREEMENT)**

**(as to Defendants, T&B, Board, Bosco, Kaup, and McCormley)**

315.   Plaintiff incorporates the preceding paragraphs as if set forth fully hereinafter.

316.   Defendants T&B, Board, Bosco, Kaup, and McCormley, either as the direct employer or as an officer, or director that has caused employer to act (collectively for this Count, "Defendants") and Plaintiff were in an employer and employee relationship, respectfully.

317.   Defendants and Plaintiff are in an employer and employee relationship, respectfully, as defined by A.R.S. § 23-350(3).

318.   On January 10, 2022, Plaintiff filed a Wage Claim with the Industrial Commission of Arizona Labor Department ("ICAZ").

319.   On or about March 22, 2022, Defendant T&B filed a response to Plaintiff's Wage Claim.

320.   On May 9, 2022, ICAZ provided Plaintiff with a copy of Defendant Tiffany & Bosco's Response.

321.   On May 18, 2020, Plaintiff file a Reply in support of his ICAZ Wage Claim. *See* original Wage Claim and Reply attached hereto as Exhibit E.

322.   As detailed in the above Counts, T&B's Board decided to wrongfully, unlawfully, and discriminatorily terminate me because I challenged the tenets of the Policy at T&B's March 11, 2021 all-employee Zoom meeting.  There was nothing I could

-69-

1    say at the moment of my termination on June 4, 2021 to change that; the decision had

2    already been made[13].

3          323.   Chris Kaup then offered a separate and distinct Exit Agreement after

4    termination of my 17-year employment agreement.  He offered these terms:

5      • Train your replacement;
       • Transition your work; and
6      • I'll allow you to work during this period dependent on when your replacement starts
         work.
7          o Matthew Burns, my replacement, had already been hired.[14]

8      My counteroffer:

9      • I did not agree, and stated that I would not sign a Severance Agreement in order to
         retain my legal claims;
10         o This was verbally said and agreed to.  Chris stated that he did not intend to
             take away my time to consider the Severance Agreement and my claim
11           options;

12     • I did agree to train my replacement, transition my work, and stay two weeks,
         possibly three, to complete these tasks.
13
           324.   Chris accepted my counteroffer.  Further, he smiled and expressed his
14
     pleasure at my professionalism to agree to such a transition, and was heartened that he
15
     was correct about my character.  Lovato witnessed this exchange.
16
           325.   The consideration in the Exit Agreement was that in exchange for me
17
     staying at T&B to (i) transition my responsibilities for Chris Kaup, Robert Mitchell, Amy
18
     Sells, Rob Royal, Rich Gramlich and other attorneys who I was currently working with
19

20
     _____

21   [13] Sam Mayasich of GPAC, had been searching for "fantastic paralegals" for Chris Kaup for about
     a month or two prior to my termination.
22   [14] Chris Kaup had hired my replacement before my termination date.  His rate of pay was about
     $5 less an hour than my rate of pay.

                                              -70-
23

1   to other responsible people, and (ii) to physically train my replacement after his arrival,

2   I would have time to begin preparing a resume, and locating a new paralegal position at

3   another firm. Each of the above-referenced attorneys directly, except Rob Royal, spoke

4   with me on either June 7 or 8 about transitioning work, before I was escorted out.

5          326.   Although Defendant T&B's Response states I failed to do these tasks,

6   documents and witnesses exist that demonstrate otherwise.[15,16]

7          327.   There is no question that all the elements of a contract existed: an offer,

8   counteroffer, acceptance and consideration. The Exit Agreement contract did exist. T&B

9   admits this, but references it in the Response to the ICAZ Wage Claim as a "tentative

10  timeline" or "arrangement". This argument was crafted after I was escorted out on June

11  8, 2021.

12         328.   The Exit Agreement was distinct from my 17-year employment agreement

13  and is binding. T&B inaccurately conflates the employment agreement with the Exit

14  Agreement, and although before in emails Mr. Clees wrote the Exit Agreement was

15  "unenforceable", the Exit Agreement has uncited "legal deficiencies" in T&B's

16

---

17  [15] T&B also utilizes a document management program called Perfect Law ("PL"). I believe that a review of the PL logs will show that I transitioned scores of docket dates to new individuals or

18  added helpful notes to docket entries, evidencing my commitment to the Exit Agreement.
[16] Just an hour or so before T&B escorted me out, Sara Hammond, a legal assistant at T&B,

19  discussed her brilliant idea for me to enlist T&B's IT staff to set-up an account for my replacement prior to his start date, Monday, June 14, 2021. Ms. Hammond explained that though it was not

20  standard practice for IT to set-up an account prior to someone starting work at T&B, it had been done before. In this manner, I could directly assign docket tasks to his profile before he starts. I

21  believe that evidence of this task is either shown on a yellow note pad that was on my desk or an email that was being written or was written and sent to IT (James Oswald), copied to Chris Kaup.

22  I do not have access to or possession of this evidence, because I was prevented from going back to my office before being escorted out on June 8, 2021.

-71-

23

1    Response.  T&B did not provide any legal authority to support the position that the Exit

2    Agreement was not binding in its ICAZ Response.

3         329.   As of this writing, the ICAZ has not made a decision on the Wage Claim.

4         330.   This has caused a financial hardship on Plaintiff.

5         331.   To date, Plaintiff has not received the unpaid amount of $3,498.42 from

6    Defendants[17].

7         332.   Plaintiff is entitled to treble damages pursuant to A.R.S. § 23-355(A) for

8    Defendants' knowing and willful refusal to pay her earned and accrued wages in the

9    amount of $10,495.26[18].

10        333.   Plaintiff is entitled to recover attorneys' fees and costs reasonably incurred

11   herein.  *A.R.S. §§ 12-341-12-341.01.*

---

[17] Plaintiff's ICAZ Wage Claim only requested a decision from the ICAZ for T&B to pay me $3,498.92 for the Exit Agreement, while my Severance Agreement would have paid me over four times that amount!  T&B may state that time has expired for me to accept the Severance Agreement, but I have emails that show T&B, through Mr. Clees lifted all deadline restrictions on the Severance Agreement of $15,779.20 AND he added the $3,498.42 wage claim to the severance payment for a total amount of **$19,277.62**, if I would be willing to sign the Severance Agreement. *See* Exhibit 9 of Reply.

[18] Triple damages are being requested based on only the ICAZ Wage Claim dates.  If Defendants had paid that Wage Claim prior to Plaintiff filing this Complaint, Plaintiff did not intend to request triple damages (and likely would not have been entitled to them).

## DECLARATORY RELIEF REQUESTED – YOUTUBE VIDEO

### (as to Defendants, T&B, Board, Bosco, Kaup, McCormley, and any aggrieved person or entity including YouTube)

334.   Plaintiff incorporates the preceding paragraphs as if set forth fully hereinafter.

335.   As described in the section "Another Termination" above, on Tuesday, June 8, 2021, at about 5:20 p.m., Chris Kaup, Kevin Newell, Jen Lovato and a security person dressed in blue denim, made Plaintiff's "at-will" termination "immediate".

336.   Plaintiff produced a short video reproduction of this approximately 5-minute event and published it on YouTube, titled, "Kids Terminate Dad at Tiffany & Bosco" ("Video").

337.   The Video was mildly popular and within three weeks it garnered about 450 hits.

338.   About three weeks after the Video was uploaded, YouTube took the video down based on an undisclosed compliant.  YouTube does not divulge information about the complainant.

339.   On March 28, 2022, I requested that YouTube reinstate the Video or to allow me to address the complaint for YouTube's adjudication.

340.   On April 1, 2022, YouTube, wrote, "Upon further review, we've decided to reinstate the content.  The content in question is once again active and in good standing."

341.   Plaintiff requests that the Court, or a Jury pursuant to ARS 12-1839, issue an Order to determine that:

    a.   The Video does not infringe upon anyone's rights;

    b.   Plaintiff is free to express the events that personally occurred to him;

    c.   Any valid complaints sent to YouTube about the Video, shall be adjudicated by this Court or by the tenets of this Court's Order after issuance; and

    d.   YouTube may not remove from its free viewing platform, this Video, linked (https://www.youtube.com/watch?v=JwLBJlqnVWs) as **Exhibit F,** so as to become part of this Court's record.

342.   It is reasonable and just that this Court pursuant to ARS 12-1831, 1835, 1836, 1837, 1838 adjudicate this publication and not the complaint process of YouTube.

343.   The Court clearly has jurisdiction because YouTube clearly has a presence in Arizona, Plaintiff and all Defendants reside in Arizona and all persons referenced in the Video are Arizona residents.  In addition, pursuant to ARS 12-1845, "This article shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it, and to harmonize, as far as possible, with federal laws and regulations on the subject of declaratory judgments and decrees."

344.   Pursuant to ARS 12-1831, "Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed.  No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for.  The

-74-

1    declaration may be either affirmative or negative in form and effect; and such declarations

2    shall have the force and effect of a final judgment or decree."

3         345.    Pursuant to ARS 12-1835, "The enumeration in sections 12-1832, 12-1833

4    and 12-1834 does not limit or restrict the exercise of the general powers conferred in

5    section 12-1831, in any proceeding where declaratory relief is sought, in which a

6    judgment or decree will terminate the controversy or remove an uncertainty."

-75-

## DECLARATORY RELIEF REQUESTED – SEVERANCE AGREEMENT

## (as to Defendants, T&B, Board, Bosco, Kaup, McCormley, and any aggrieved

## person or entity including former T&B employees)

346.    Plaintiff incorporates the preceding paragraphs as if set forth fully hereinafter.

347.    Defendants T&B, Board, Bosco, Kaup, and McCormley, either as the direct employer or as an officer, or director that has caused employer to act (collectively for this Count, "Defendants") and Plaintiff were in an employer and employee relationship, respectfully.

348.    As described in the Counts above, T&B Defendant has what Lovato described as a "canned" Severance Agreement that is often utilized when its employees leave its employ.

349.    Defendants provided Severance Agreements to Plaintiff on both the date of termination on June 4, 2021, and on the date Plaintiff was escorted from T&B's premises, June 8, 2021.

350.    Plaintiff is aware that other former employees were provided with a Severance Agreement or other written documentation, which include[19]:

      a.  Greg Seibt

      b.  Jeffrey Sandell

---

[19] Plaintiff will be prejudiced if Defendants, refuse to answer which of the former employees were provided Severance Agreements.  Such refusal may necessitate Plaintiff to use legal subpoenas upon each former employee for depositions and documents in order to obtain copies of their records, including Severance Agreements.

1          c.  Mario A. Micheli

2          d.  Darrel Dorsey

3          e.  Natalya Ter-Grigoryan

4          f.  Richard Oney

5          g.  Lori Martin

6          h.  Justin Nelson

7          i.  Danielle Bello

8          j.  Michael Rogers

9          k.  Paul Cardon

10        l.  Marcos Tapia

11        m. Jennifer Lovato

12        n.  Kevin Newell

13        o.  Kevin Wiese

14        p.  James Oswald

15        q.  Jason Ozment

16        r.  Jason Enright

17        s.  Andrew Ellis

18        t.  Claire Summers

19        u.  Samantha Martinez

20        v.  Lauri Andrisani

21        w. Oscar Andujo

22        x.  Frank Mead

23

1    y. James Christian

2    z. Bill Simon (deceased)

3    aa. Jack Vrablik

4    bb. Laura Wochner

5    cc. Chris LaVoy

6    dd. Roxanne Regnier

7    ee. Erin Hertzog

8    ff. Kevin Morrow

9    gg. Jamie Holland

10   hh. Regina Smith

11   ii. Jose Zapata

12   jj. Judy James

13   kk. Ashley Zimmerman Marsh

14   ll. Marcos Tapia

15   351. A number of the former T&B employees, which Plaintiff has contacted, do

16 not believe that Defendants treated them fairly upon exiting the firm, but cannot discuss

17 the issues because of the strict, one-sided provisions of the Severance Agreement that

18 favor the T&B Defendant[20].

19

20    [20] I want to note that until the day I was terminated on June 4, 2021, I enjoyed working at T&B

21 and I believed all the best about my employers.  Now, after what they have done to me and after communicating with at least a score of former shareholders, associates and staff, I have lost

22 respect for them.  T&B's worst aspects come to the surface after someone departs, because they were terminated, quit or were forced out.

-78-

23

1    352.   "But for" the Severance Agreement, many of the above individuals would

2   have been more truthful about telling Plaintiff about their treatment up on exit.   This

3   would have provided Plaintiff with an opportunity to seek new employment with a firm

4   that acted more fairly to its employees.

5    353.   Defendants, through the Severance Agreement and other "confidential"

6   documents, prejudiced Plaintiff because Plaintiff was under the impression that Bosco

7   actually meant what he said on almost every occasion in which he addressed T&B

8   employees at staff meetings for approximately nine years.   Bosco, and his surrogates,

9   such as various COO's and Human Resource Managers, made it clear that T&B's

10  management wanted open discussion on issues and that all employees should feel that

11  they could bring concerns about issues to the "table" for an open and honest discussion.

12  Yet, Bosco, did not mean what he said as demonstrated in this Complaint at length.

13   354.   The Severance Agreement that was provided to me literally three minutes

14  before I was escorted out of the premises on Tuesday, June 8, 2021 states that T&B would

15  pay me eight weeks of compensation, for a total amount of $15,779.20.[21,22]

16  _____

17  [21] Please note, that I have provided notice on several occasion to T&B and Mr. Cleers that no
     communications, even those settlement communications under FRCP 408 or any state law
     equivalent are protected from use to determine the truth of the matter.   *See* attached email at
18  Exhibit 17 of Reply.   I have provided notice that all settlement communications could be made
     may be public, and further, if I decided a litigation is necessary, I may use all documents, even
19  those claiming to be sent under FRCP 408, in a Court of law."   *See* Exhibit 1 attached to the Wage
     Claim.
20  [22] One example of the power that T&B wields against former employees is shown in the
     Severance Agreements at paragraph 10 on pages 3-4, titled, "Violation of Agreement".   First, it
21  is not reciprocal.   Second, the "Hammer clause" is monstrously punitive to deter even a skilled
     attorney's challenge to its validity.   It reads, "violation … shall give rise to … a refund of the
22  consideration paid….", which appears reasonable, then the "Hammer" comes: "Employee agrees
     to an award of $1,000,000 [MILLION DOLLARS!] against him for any Violation of Paragraph

23

-79-

355.    Plaintiff requests that the Court, or a Jury pursuant to ARS 12-1839, issue an Order to determine that:

      a.  The current form of T&B Severance Agreement is unlawful;

      b.  Provide guidance to T&B and Board to revise the Severance Agreement within a short period of time;

      c.  To provide notice to all employees, who have signed Severance Agreements within the last seven years of those Court Ordered changes; and;

      d.  To prohibit T&B Defendant from enforcing any provisions deemed unlawful, or which is voluntarily removed by T&B, of the Severance Agreement, to those that have previously signed a Severance Agreement with such unlawful or removed language.

356.    It is reasonable and just that this Court pursuant to ARS 12-1831, 1835, 1836, 1837, 1838 adjudicate this publication and not the complaint process of YouTube.

357.    Pursuant to ARS 12-1831, "Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed.  No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for.  The

---

7".  Indeed, part of paragraph 7 is damaging Employer's servers, which admittedly would cause T&B great injury, but lumped into the same paragraph 7 is "electronically stored information…" presumably such items as a flash drive.  So, if T&B ever brings suit against a former employee, the threat of a $1,000,000 consequence is real, daunting, and an abuse of power to which a former employee is required to submit in order to be paid ANY severance payment amount.

-80-

1   declaration may be either affirmative or negative in form and effect; and such declarations

2   shall have the force and effect of a final judgment or decree."

3          358.    Pursuant to ARS 12-1835, "The enumeration in sections 12-1832, 12-1833

4   and 12-1834 does not limit or restrict the exercise of the general powers conferred in

5   section 12-1831, in any proceeding where declaratory relief is sought, in which a

6   judgment or decree will terminate the controversy or remove an uncertainty."

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**<u>PRAYER</u>**

Plaintiff prays for the following to God:

A.     That Defendants soften their respective hearts. "I will give you a new heart, and a new spirit I will put within you.  I will remove the heart of stone from your flesh and give you a heart of flesh." *(Ezek. 36:26)* (New American Bible);

B.     That Defendants are open to hear reason from other shareholders and faith-filled people within their individual lives.  "My brothers, if anyone among you should stray from the truth and someone bring him back, he should know that whoever brings back a sinner from the error of his way will save his soul from death and will cover a multitude of sins." *(James 5:19–20)* (New American Bible);

C.     That Defendants realize their errors in their respective lives and turn to God, "No, the hand of the LORD is not too short to save, nor his ear too dull to hear. Rather, it is your crimes that separate you from your God, It is your sins that make him hide his face so that he does not hear you. *(Isa. 59:2)* (New American Bible);

D.     That Defendants "Repent, for the kingdom of heaven is at hand!" *(Matt 3:2)* (New American Bible); and

E.     That Defendants realize that in this conflict between us, we all may grow closer to God. "Then he said to all, 'If anyone wishes to come after me, he must deny himself and take up his cross daily and follow me.  For whoever wishes to save his life will lose it, but whoever loses his life for my sake will save it.  What profit is there for one to gain the whole world yet lose or forfeit himself?  Whoever is ashamed of me and

-82-

1   of my words, the Son of Man will be ashamed of when he comes in his glory and in the

2   glory of the Father and of the holy angels...."" *(Luke 9:23-27)* (New American Bible).

-83-

1

## **RELIEF**

2       Plaintiff prays for relief from the Court as follows:

3       A.      For a Court Order directing that Defendants issue a written and video

4   statement apologizing for the manner in which Plaintiff was terminated, acknowledging

5   wrongdoing and rescinding the untruthful statements about Plaintiff's character.

6       B.      For a Court Order directing T&B and the Board to sunset the Policy and

7   prevent such restrictive policies from being installed in the future;

8       C.      For a Court Order directing Bosco, Kaup and McCormley to resign from

9   the Board and resign as officers of T&B;

10      D.      For a Court Order directing that Bosco, Kaup and McCormley may not

11  unduly influence others, other than as a shareholder of T&B, for the next 10 years.

12      E.      For a Court Order declaring that the current form of the T&B Severance

13  Agreement is unlawful and directing T&B to modify future Severance Agreements so

14  they are not entirely T&B sided, with the exception of payment of funds to the person

15  leaving T&B.

16      F.      For lost wages and benefits, calculated to be between $634,180.20 and

17  $1,074,679.00 based on a calculated sum certain, either by a comparison of gross wages

18  of 2020 at T&B exclusively and 2021 gross wages received by T&B and the Plaintiff's

19  new employer (1st amount) or a comparison of gross wages of 2020 at T&B exclusively,

20  to the projected 2022 gross wages to be received from Plaintiff's new employer (2nd

21  amount).

22

23                          -84-

1      G.     For payment of treble the unpaid wages ($3,498.42) due under the Exit

2      Agreement and specifically detailed in the ICAZ Wage Complaint, in the amount of

3      $10,495.26 from Defendants.

4      H.     For compensatory and punitive damages in an amount to be proven at trial,

5      but no less than the amount prescribed under 42 U.S.C. § 1981a ($200,000) for each

6      additional Plaintiff;

7      I.     For pre and post judgment interest;

8      J.     For an award of Plaintiff's attorney's fees pursuant to the A.R.S. § 12-

9      341.01;

10     K.     For Plaintiff's costs incurred herein pursuant to and A.R.S. § 12-341 and

11    A.R.S. § 41-1472;

12     L.     For a Court Order lifting Defendants' verbal June 8, 2021 restriction upon

13    Plaintiff, and thereby allowing Plaintiff to enter the T&B premises for lawful activities,

14    such as having lunch with former co-workers or as any other T&B client or guest; and

15     M.    Any and all other relief this Court deems just and equitable.

16     Dated this 2nd day of June, 2022:

17

18                             By: _____

19                               Louis A. Lofredo

                                 *Plaintiff pro per*

20

21

22

23

1

<u>**VERIFICATION**</u>

2       Pursuant to Rule 8(h) of Ariz.R.Civ.P. I, Louis A. Lofredo, as the author of this

3   Verified Complaint, verify under the penalty of perjury, state the forgoing is true and

4   correct and the that the matters and things contained herein are believed to be true to the

5   best of my information, knowledge and belief.

6       Dated this 2nd Day of June, 2022:

7

8                 By: _____

9                    Louis A. Lofredo
                        *Plaintiff proper*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**Index of Exhibits**

| Exh. | Description |
|---|---|
| A | Social Distancing Policy - Signed by Lofredo with Reservations Noted dated August 5, 2020 |
| B | LOUIS LOFREDO_ SEVERANCE AGREEMENT – June 8, 2021 |
| C | Open Letter to the Tiffany & Bosco Board of Directors - April 4, 2021 |
| D | Email Board from Mitchell re Dispensing with Mask Requirement – May 17, 2021 |
| E1 | Lofredo's Wage Claim to ICAZ – January 10, 2022 - WC-2122-1826 (with Exhibits 1-6) |
| E2 | Lofredo's Reply to ICAZ – May 18, 2022 - WC-2122-1826 (with Exhibits 7-17) |
| F | "Kid Terminate Dad at Tiffany & Bosco", YouTube Video linked as https://www.youtube.com/watch?v=JwLBJlqnVWs |

-87-

# Social Distancing Policy
## Last Revised June 25, 2020

As you return to work in the midst of the 2019 novel coronavirus (COVID-19) pandemic, Tiffany & Bosco, P.A. wants to assure you of its continued commitment to maintaining a safe and healthy workplace and that we are taking additional measures to protect you, your coworkers, and your families from the spread of COVID-19. As part of those efforts, we are implementing a new Social Distancing Policy. Please read this policy carefully.

### Importance of Social Distancing

The Centers for Disease Control and Prevention (CDC) has found that one of the most effective ways of preventing the spread of COVID-19 is limiting face-to-face contact with others, known as social distancing or physical distancing. The Occupational Safety and Health Authority (OSHA) similarly recommends increased social distancing when preparing workplaces to respond to COVID-19.

This Social Distancing Policy is a key part of our overall strategy and commitment to maintaining a healthy workplace in light of the COVID-19 pandemic. Although our knowledge about the virus and how it spreads is evolving, based on the information we have now, these measures will help curb its spread. Compliance with this policy is essential because current consensus on the virus suggests, among other things, that:

- COVID-19 is highly contagious.
- COVID-19 spreads mostly among people who are in close contact (within about 6 feet, or two arms' lengths) for a prolonged time period (between 10 and 30 minutes, depending on the distance).
- The virus generally spreads when an infected person coughs, sneezes, or talks, and droplets from their mouth or nose get in the air and land in the mouths or noses of nearby people.
- A person who has the virus may not have any symptoms but may still spread COVID-19.
- A person can get COVID-19 by touching another person, such as with a handshake, or by touching another surface or object that has the virus on it and then touching their own mouth, nose, or eyes.
- The virus can live on surfaces for up to several days, depending on the surface and other conditions.

For these reasons, the CDC and other public health experts have recommended limiting contact with other people and common surfaces to limit the spread of COVID-19. We need your full cooperation and compliance with these measures to make them effective in this new work environment.

*[Handwritten annotation in right margin:]* Current consensus has evolved; there are no longer all tenents of "consensus." Certain doctors are being silenced that disagree with many aspects of the management of this virus and the response to it and effective therapies (e.g. Hydroxy-chloroquine). Therefore, "consensus" may not have been arrived at if it is the consideration of all available data.

### Social Distancing Measures

Following the CDC's guidance, Tiffany & Bosco, P.A. requires that you comply with the protocols and procedures listed herein while in the workplace. The City of Phoenix and Maricopa County has implemented new emergency proclamations with specific mask requirements in businesses and public spaces. Become familiar with those requirements. As these emergency orders are ever changing, to the extent that this policy is not as strict as any emergency proclamation or order, you are expected to comply with the stricter of the two.

*[Handwritten annotation in right margin:]* I affirm I will comply with only proclamations of the City of Phoenix and Maricopa County.

*[Handwritten annotation in left margin:]* I will comply

- **Masks:** You are expected to wear a mask at any time you are unable to maintain a distance of six feet between yourself and another person and any other time as required

**Exhibit A to Complaint**

by a current emergency proclamation or order in effect.  If you believe you are eligible for an exception to this mask requirement, bring any exception request to Jen C. Lovato.

*[handwritten: I will comply]* • **Health:**  If you are not feeling well and/or have a fever, you **must** stay home.

*[handwritten: I will comply with not reporting to work after known exposure. I will not be tested. I will not assist with "contact tracing", but will likely let T+B know any contacts at work]* **Known exposure:** Do not report to work if you have knowingly been exposed to COVID-19, even if you are asymptomatic.  Report any known exposure to Jennifer Lovato, or if unavailable to Kevin Newell. You will need to be tested prior to returning to the office.  In the meantime, you must assist us in contact tracing, so we can take the necessary steps to reduce the potential spread throughout the workspace.

*[handwritten: I will comply]* **Teleworking/Work from Home:** Tiffany & Bosco, P.A. is committed to teleworking arrangements to the extent feasible and consistent with business necessity. Please check with your Department Head whether your department and business needs can accommodate telecommuting.

*[handwritten: I understand]* **Schedule Changes:** Your Department Head may change your schedule to minimize the number of employees in the workplace at any given time. These changes may involve any combination of:

- continued or increased teleworking, to the extent feasible;
- alternate day work schedules;
- staggered lunch and break times; and
- staggered arrival and departure times.

*[handwritten: I will comply]* **Large Gatherings Prohibited.** Large in-person gatherings and in-person meetings of more than ten people are prohibited in the workplace until further notice. However, nothing in this policy prohibits employees from communicating with one another about workplace issues or gathering virtually using audio, visual, or other technology.

*[handwritten: I will comply]* **Meeting Restrictions.** Limit in-person meetings to the extent consistent with business necessity. If meeting in-person:

- maintain at least a six-foot distance between participants;
- use alternate spaced seating arrangements across tables or desks to avoid direct face-to-face positioning;
- you may wear a face mask during the meeting;
- you should engage in regular handwashing or use of hand sanitizer which is available in each conference room;
- accommodate reasonable employee requests to participate remotely or from a private workspace in the office to the extent feasible; and
- do not attend if you are experiencing any COVID-19 symptoms or have knowingly been exposed to COVID-19.

*[handwritten: I will comply]* **Six-Foot Distance.** To the extent possible, maintain a six-foot distance from others when crossing paths or walking near others' desks or workstations. Because a six-foot distance is not always possible, masks must be worn when walking the hallways. When walking by an occupied workspace, put as much space between you and your coworker as possible as you walk by.

*I will comply*

- **No Physical Greetings**. Do not shake hands or greet others in any manner that requires physical contact (such as fist or elbow bumps). In the "new normal" this is considered polite, not rude.

*I will comply*

- **Common Spaces Restricted.** The lunchrooms may be used in compliance with the above social distancing guidelines. Employees must take care to clean[shared appliances, such as coffee makers, microwaves, and refrigerators, or vending machine before and after each use.

*I will comply*

- **Break Locations.** You are encouraged to take lunch or breaks at your desks or outdoors.

*I will comply*

- **Visitor Limitations.** All personal visitors are prohibited until further notice, except in cases of emergency. All other visitors are prohibited unless they are essential to facilities operations, cleaning, repair, or otherwise essential to the business. Necessary clients, expert witnesses, opposing counsel, mediators and the like are permitted on the premises.

*I will comply, by limiting use of shared equipment*

- **Shared Supplies and Equipment**. Do not share personal office supplies and equipment. Notify Facilities if you need equipment that was previously shared, such as staplers, scissors, or other personal office equipment. Limit the use of shared electronic and other equipment, such as printers, copiers, and scanners, to the extent consistent with business necessity. If you need to use this equipment:

*I will comply*

  - wear a mask when in the mail room, lunch room, or other shared spaces;

*I will comply As time permits*

  - maintain a six-foot distance from others when waiting to use the equipment;

*I will comply as time permit*

  - use hand sanitizer in the copy rooms before and after each use;

*I will comply*

  - clean each shared equipment station before and after each use on all touch surfaces.

- **Elevator and Stairway Use.** Comply with building personnel instructions and limitations regarding elevator and stairway access. Exercise caution when making physical contact with elevator buttons or stairway doors to minimize risks. Be prepared to wear a mask in the elevator in the event you are not riding alone.

*I will consult posted notices.*

- **Consult Posted Notices.** Comply with all posted and distributed notices throughout the workplace reminding employees about social distancing, handwashing, and reporting illness and other safety and health protocols.

*I will review new guidelines and determine if I will comply at that time.*

- **Be Flexible.** Adhere to new guidelines as they emerge, as this issue is new and evolving.

### Policy Modification

*I understand T&B's right to modify, I will review and determine my compliance at that time.*

Government and public health guidelines and restrictions and business and industry best practices regarding COVID-19 are changing rapidly as new information becomes available and further research is conducted. Tiffany & Bosco, P.A. reserves the right to modify this policy at any time in its sole discretion to adapt to changing circumstances and business needs, consistent with its commitment to maintaining a safe and healthy workplace. Even if this policy is not revised, you are expected to follow the emergency orders or proclamations in effect.

### Enforcement and Non-Retaliation

*I do not agree to this enforcement policy.*

Failure to comply with these social distancing measures may result in discipline, up to and including termination of employment.

If you witness or become aware of any employees or other individuals violating this policy, you are encouraged to report them to your direct supervisor or your Department Head immediately.

3

Tiffany & Bosco, P.A. prohibits any form of discipline, reprisal, intimidation, or retaliation for reporting a violation of this policy or any other health and safety concern. Employees also have the right to report work-related injuries and illnesses, and Tiffany & Bosco, P.A. will not discharge, discriminate, or otherwise retaliate against employees for reporting work-related injuries or illnesses.

**Continued At-Will Employment**

**Nothing in this policy alters the at-will nature of your employment.**

**Policy Administration**

The COVID-19 task force of Mark S. Bosco, J. Lawrence McCormley, Christopher R. Kaup, Rosary A. Hernandez, Lance R. Broberg, Jodi R. Bohr, Kevin J. Newell, Jen C. Lovato, Julio Perez, James Oswald, Shranda Lopez and Jose Zapata are responsible for administering and enforcing this policy. If you have any questions regarding this policy, or if you have questions about health and safety that are not addressed in this policy, please contact Jen C. Lovato or Kevin J. Newell.

**Acknowledgment of Receipt and Review**

I, _Louis A. Lofredo_ (employee name), acknowledge that on _I disagree that_
_____ (date), I received and read a copy of Tiffany & Bosco, P.A.'s Social _this extraordinary_ Distancing Policy, dated May 15, 2020 and understand that it is my responsibility to be familiar _lengthy policy_ with and abide by its terms. I understand that the information in this policy is intended to help _does not_ Tiffany & Bosco, P.A.'s employees to work together effectively on assigned job responsibilities. _is not promissory_ This policy is not promissory and does not set terms or conditions of employment or create an _by its very_ employment contract. _I sign this policy under protest. This policy was signed_ _nature._ _only because Chris Kaup & Kevin Newell had several meeting with me to discuss this policy and our_ _mutual concerns. It was very important_ _to me that I received felt my liberties_       _Signature_ _would not be further infringed upon in_ _the name of "public health."_                  _Louis A. Lofredo_

Printed Name

_8/5/2020_

Date

## SEVERANCE AGREEMENT AND GENERAL RELEASE

This Severance Agreement and General Release ("Agreement") is entered into as of June 8, 2021, in the County of Maricopa, State of Arizona, between LOUIS A. LOFREDO ("EMPLOYEE") and Tiffany & Bosco, P.A. ("EMPLOYER" or "Company"). EMPLOYEE and EMPLOYER are the "parties" to this Agreement. In consideration of the mutual promises in this Agreement, and other good and valuable consideration, the parties agree to be legally bound by the following promises and acknowledgements:

1.     Payments to EMPLOYEE:  EMPLOYER agrees to pay EMPLOYEE eight weeks or 320 hours for a total of fifteen thousand seven hundred seventy nine dollars and 20 cents ($15,779.20), less lawfully required deductions and withholdings, for which a Form W-2 shall issue if EMPLOYEE is not in default of any provision of this agreement. The payments shall be made in four installments of three thousand, nine hundred forty four dollars and 80 cents ($3,944.80) on the next regularly scheduled pay date and paid thereafter on the regularly scheduled payroll dates, after this Agreement becomes effective pursuant to Paragraph 17. The parties agree that these payments are in addition to any other benefits and payments to which EMPLOYEE is otherwise legally entitled. EMPLOYEE acknowledges and agrees that he has received payment of all compensation and benefits owed to him pursuant to his employment with EMPLOYER, and that the Company is not indebted to him in any amount or for any reason.

2.     Release of Claims:    EMPLOYEE acknowledges that the consideration in Paragraph 1 represents full and final payment of all claims by EMPLOYEE against the Company, and is in excess of what EMPLOYEE would otherwise be entitled by virtue of his employment. By signing this Agreement and in consideration for the payments in Paragraph 1, EMPLOYEE completely and forever releases EMPLOYER, and any past, present, or future owners, shareholders, directors, officers employees, attorneys, agents, insurers, partners, predecessors and successors in interest, beneficiaries, executors, administrators, personal representatives, heirs, successors, affiliates and assigns of the Company and any other persons, firms, corporations, or entities with which the Company has been, is now, or may hereafter be affiliated (hereinafter the "Released Parties"), from any and all existing claims, demands, grievances, or lawsuits that involve or arise from the employment relationship between EMPLOYEE and EMPLOYER, or the termination of that relationship. This general release includes, but is not limited to, claims, demands, or lawsuits that arise under any of the following laws or regulations: Title VII of the Civil Rights Act of 1964, as amended; the Age Discrimination in Employment Act of 1967, as amended; the Employee Retirement Income Security Act, as amended; the Americans with Disabilities Act, as amended; the Family and Medical Leave Act, as amended; the Arizona Civil Rights Act, as amended; the Arizona Employment Protection Act, as amended; Arizona wage statutes; the Arizona Medical Marijuana Act; any other federal, state, or local constitution, statute, ordinance, or regulation; or any other theory of recovery including, but not limited, to claims for breach of contract, wrongful discharge, and any tort or other claim of personal injury. EMPLOYEE's release includes any and all existing claims that in any way involve or arise from the employment relationship between EMPLOYEE and the Company that exist as of the EMPLOYEE's execution of this Agreement, even if the facts and/or legal theories supporting those claims are unknown to EMPLOYEE at this time. This release binds EMPLOYEE's marital community, heirs, and assigns, as well as him.

**Exhibit B to Complaint**

Employee's Initials _____

4G67406

3.   Covenant Not To Sue/Right To Participate In Agency Proceedings: EMPLOYEE agrees that he will not bring a lawsuit against the Released Parties asserting any of the claims released in this Agreement.  In the event EMPLOYEE ever acts in disregard of the covenants made in this Paragraph, and files a lawsuit based on any legal claims that the EMPLOYEE has agreed to release, EMPLOYEE will pay for all costs incurred by EMPLOYER, including all reasonable attorneys' fees incurred in defending against EMPLOYEE's previously-released claims.  EMPLOYEE acknowledges and agrees that this Agreement may be pled as a complete bar to any action or suit before any court or adjudicative body with respect to any complaint or claim arising under any federal, state, local or other law relating to any possible claim that existed or may have existed as a result of his employment or termination with EMPLOYER. EMPLOYEE also affirmatively represents that he is not aware of any claims he is not releasing through this Agreement.

Nothing in this Agreement is intended to limit or impair in any way EMPLOYEE's right to file a charge with the U.S. Equal Employment Opportunity Commission (EEOC) or comparable federal, state and local agencies, or EMPLOYEE's right to participate in any such charge filed with such agencies and to recover any appropriate relief in any such action. However, the parties agree that appropriate relief may not include remedies that personally benefit EMPLOYEE and which he has released and waived under this Agreement, including all legal relief, equitable relief, statutory relief, reinstatement, back pay, and front pay, and all other damages, benefits, remedies, or relief that EMPLOYEE may be entitled to as a result of the filing or prosecution of any such charge against EMPLOYER by EMPLOYEE, or any resulting civil proceeding or lawsuit brought on behalf of EMPLOYEE and which arises out of any matters that are released or waived by this Agreement.  This Agreement shall not preclude EMPLOYEE from bringing a charge or suit to challenge the validity or enforceability of this Agreement under the Age Discrimination employment Act (29 U.S.C. § 620, et seq.) as amended by the Older Workers Benefit Protection Act.

4.   Application for Employment:  EMPLOYEE understands and agrees that, as a condition of this Agreement, he shall not be entitled to any employment with the Company, its subsidiaries, affiliates, joint ventures, or any successor, and he hereby waives any alleged right of employment or re-employment with the Company, its subsidiaries or related companies, or any successor.  EMPLOYEE further acknowledges and agrees that the forbearance to seek future employment stated in this Paragraph is purely contractual, and is in no way involuntary, discriminatory or retaliatory.

5.   Neutral Reference:  EMPLOYER agrees that it will respond to any employment reference requests directed to EMPLOYER's Human Resource Manager regarding EMPLOYEE by providing only EMPLOYEE's date of employment and position/title, per the Company standard policy.

6.   Confidential and Proprietary Information: EMPLOYEE agrees that the Company is in a highly competitive business and that its success depends in great part on maintaining a competitive advantage through having and using confidential and/or proprietary information (hereinafter referred to collectively as "Proprietary Information").  By way of illustration but not limitation, the term "Proprietary Information" includes any of the following in any form of data storage: (a) financial information regarding EMPLOYER, its Shareholders and employees, customer lists, trade secrets, inventions, ideas, copyrights, art works, images, drawings, designs

Page 2 of 7

Employee's Initials _____

4G67406

and techniques, other works of authorship, know-how, improvements, discoveries, developments; (b) company policies, manuals, procedures, forms, checklists, flow charts, and (c) information regarding plans for research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers. EMPLOYEE agrees that he has had access to Proprietary Information, and therefore: EMPLOYEE promises to immediately return all Proprietary Information to the Company, and not to disclose any such materials to any person, including any competitor of the Company or otherwise use such materials in any future employment or business efforts; and EMPLOYEE further agrees that any retention or use of Proprietary Information would irreparably harm the Company and that monetary damages might not be an adequate remedy for any such retention or use. EMPLOYEE therefore agrees that a court may enjoin and restrain him from violating this Paragraph without a showing by the Company that irreparable harm might result from the violation.

7.    Future Actions:  EMPLOYEE agrees that he will not take any actions which may damage any assets of EMPLOYER, including any computer systems, servers or electronically stored information and will not attempt to access any servers, systems or electronically stored information at any time for any purpose.  EMPLOYEE further agrees that he will not assist any person with attempting to access EMPLOYER's computer systems, servers and/or electronically stored information.  EMPLOYEE also agrees that if he has any electronically stored information belonging to EMPLOYER or any other confidential material of EMPLOYER, he will inform Kevin J. Newell, Chief Operating Officer, about that fact and either return that material or information to EMPLOYER or destroy it at the option of the EMPLOYER.

8.    Non-Disclosure of Agreement:  EMPLOYEE agrees to hold in strict confidence the negotiations resulting in, contents, and terms of this Agreement, except (1) as required by law, (2) to secure advice from a legal or tax advisor, (3) to his immediate family, or (4) in a legal action to enforce the terms of this Agreement.  EMPLOYEE further agrees to use every effort to prevent disclosure of the existence or terms of this Agreement by any of the persons referred to in (2) and (3) above.  EMPLOYEE agrees that the contents of this Paragraph are material terms of the Agreement.

9.    Non-Disparagement:  EMPLOYEE agrees not to publicly make comments that are derogatory, defamatory, or disparaging of EMPLOYER and any Released Parties.  Such prohibited comments include any communication, oral or written, which would cause or tend to cause the recipient of the communication to question the business condition, integrity, competence, fairness, or good character of the person or entity to whom the communication relates. This Paragraph shall not apply to communications required by law, or that are otherwise privileged as a matter of law.  EMPLOYEE's non-disparagement obligations under this Paragraph do not interfere with or restrict EMPLOYEE's ability to communicate with any federal, state, or local agency, including any with which a charge has been filed.

10.    Violation of Agreement:  EMPLOYEE understands that any violation or breach of a material term of this Agreement by him shall give rise to a claim against him by the Company and/or its parent, subsidiaries, affiliates, successors, or assigns for a refund of the consideration paid pursuant to this Agreement and shall forever release and discharge the Company and its parents, subsidiaries, affiliates, successors, and assigns from the performance of any obligations arising from this Agreement, including those payment obligations outlined in

Employee's Initials _____

Paragraph 1, but shall not release EMPLOYEE from performance of his obligations under this Agreement. Because the calculation of the damages to EMPLOYER from any breach by EMPLOYEE of Paragraph 7, EMPLOYEE agrees to an award of $1,000,000.00 against him for any violation by him of Paragraph 7. You also agree that any such actions by you would be willful and malicious and necessarily will cause damage to the Firm and its property.

11. <u>Medicare</u>: EMPLOYEE affirms, covenants, and warrants he is not a Medicare beneficiary and is not currently receiving, has not received in the past, will not have received at the time of payment pursuant to this Agreement, is not entitled to, is not eligible for, and has not applied for or sought Social Security Disability or Medicare benefits. In the event any statement in the preceding sentence is incorrect (for example, but not limited to, if EMPLOYEE is a Medicare beneficiary, etc.), the following sentences (i.e., the remaining sentences of this Paragraph) apply. EMPLOYEE affirms, covenants, and warrants he has made no claim for illness or injury against, nor is he aware of any facts supporting any claim against, the released parties under which the released parties could be liable for medical expenses incurred by the EMPLOYEE before or after the execution of this agreement. Furthermore, EMPLOYEE is aware of no medical expenses which Medicare has paid and for which the released parties are or could be liable now or in the future. EMPLOYEE agrees and affirms that, to the best of his knowledge, no liens of any governmental entities, including those for Medicare conditional payments, exist. EMPLOYEE will indemnify, defend, and hold the released parties harmless from Medicare claims, liens, damages, conditional payments, and rights to payment, if any, including attorneys' fees, and EMPLOYEE further agrees to waive any and all future private causes of action for damages pursuant to 42 U.S.C. § 1395y(b)(3)(A) et seq.

12. <u>No External Representations or Agreements</u>: This Agreement constitutes the sole and entire agreement between the parties regarding the subject matter addressed herein, and supersedes any and all understandings and agreements that may have been reached earlier on this subject matter. There are no understandings, representations, or agreements other than those set forth in this Agreement. No provision of this Agreement shall be amended, waived or modified except in writing, signed by the parties.

13. <u>Limited Admissibility of Agreement</u>: The parties agree that this Agreement may not be introduced in any proceeding, except to establish conclusively the settlement and release of the claims it encompasses or to otherwise ensure rights created by this Agreement. This Agreement is not to be interpreted as an admission of any liability or other obligation to EMPLOYEE except as expressly set forth in this Agreement.

14. <u>Severability</u>: If any provision of this Agreement is held by a court or arbitrator of competent jurisdiction to be invalid, void, or unenforceable for whatever reason, the remaining provisions of this Agreement shall nevertheless continue in full force and effect without being impaired in any manner whatsoever.

15. <u>Arbitration.</u> All disputes or claims arising out of, or related to, or concerning this Agreement shall be determined exclusively by arbitration before a single arbitrator in accordance with the Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association ("AAA"). This Agreement is an individually negotiated agreement, and thereby the costs associated with any such arbitration shall be paid in accordance with AAA's Fee Schedule for such agreements.

Employee's Initials _____

16.   <u>Other Instruments</u>: The Parties expressly agree to execute any further or additional instruments as may reasonably be required to perform any other acts necessary to effectuate and carry out the purposes of this Agreement.

17.   <u>No Assignment of Claims</u>:   EMPLOYEE represents and warrants to the EMPLOYER that he has not assigned, and will not assign, in whole or in part, to any third party (whether an individual or entity), any claims EMPLOYEE may have against the EMPLOYER.

18.   <u>Tax Treatment</u>:   The Payment to EMPLOYEE is intended to fall within the separation pay exception to the application of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") as set forth in Treasury Regulation Section 1.409A-1(b)(9).   To the extent the Severance Payment becomes subject to Code Section 409A and applicable guidance thereunder, this Agreement shall be construed, and payments are made hereunder, as necessary to comply with such Code Section and such guidance.   To the extent the terms of this Agreement are contrary to, or fail to address the minimum requirements of, Code Section 409A and all applicable guidance issued thereunder, the EMPLOYER may, in its sole discretion, take steps as it deems reasonable to provide the payments in a manner that complies with Code Section 409A and the guidance issued thereunder.   However, any and all tax liability and penalties resulting from non-compliance with Code Section 409A shall remain the sole responsibility of EMPLOYEE.

19.   <u>Reliance</u>:  EMPLOYEE warrants and represents that: (a) EMPLOYEE has relied on EMPLOYEE's own judgment regarding consideration for and language of this Agreement; (b) no statements made by the EMPLOYER have in any way coerced or unduly influenced EMPLOYEE to execute this Agreement; and (c) this Agreement is written in a manner that EMPLOYEE understands, and EMPLOYEE has read and understood all paragraphs of this Agreement.

20.   <u>Modification</u>:  This Agreement may not be modified or changed unless done in writing and signed by both Parties.

21.   <u>Choice of Law</u>:  This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona.

22.   <u>Counterparts</u>: This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall together constitute one and the same document.

23.   <u>Health Benefits</u>: Following the separation date identified in Paragraph 1 of this Agreement and/or termination of his eligibility for health benefits coverage as an active participant pursuant to applicable plan documents, EMPLOYEE shall be eligible to elect health insurance benefits continuation coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act (COBRA).

24.   <u>Attorneys' Fees and Costs</u>:  In any proceeding or action to enforce this Agreement or recover damages arising out of its breach, the prevailing party shall be awarded its reasonable attorneys' fees and costs.   In the event EMPLOYEE or EMPLOYER should breach any provision of this Agreement, and the other party employs an attorney to protect their or its

Employee's Initials _____

interests therein and obtains injunctive relief and/or a judgment in their or its favor, then the party which obtains injunctive relieve and/or judgment in their or its favor shall be entitled to recover from the other party reasonable attorneys' fees, costs of action, and applicable pre-judgment and post-judgment interest at the legal rate of interest, in addition to all other categories of recovery to which the prevailing party may be entitled. Further, in the event EMPLOYEE should breach this Agreement, EMPLOYEE shall be obligated to tender back and return to EMPLOYER all payments set forth in Paragraph 1 of this Agreement previously paid at the time of breach.

25. <u>EMPLOYEE Avowals:</u> EMPLOYEE, by his execution of this Agreement, avows that the following statements are true:

    a.    That he has been given the opportunity and has in fact read this entire Agreement and has had all questions regarding its meaning answered to his satisfaction;

    b.    That he has done nothing and taken no actions, at any time, which has or may in the future cause any damage to or impair the operations of EMPLOYER's computer systems, servers and electronically stored information.

    c.    That he is hereby advised to seek independent legal advice and/or counsel of his own choosing prior to the execution of this Agreement;

    d.    That he fully understands the contents of this Agreement and understands that it is a FULL WAIVER OF ALL CLAIMS against the released parties;

    e.    That this FULL WAIVER OF ALL CLAIMS is given in return for valuable consideration, as provided under the terms of this Agreement;

    f.    That he enters into this Agreement knowingly and voluntarily in exchange for the promises referenced in this Agreement **AND THAT NO OTHER REPRESENTATIONS HAVE BEEN MADE TO HIM TO INDUCE OR INFLUENCE HIM EXECUTION OF THIS AGREEMENT.**

26. <u>Periods for Considering and Revoking Agreement:</u> EMPLOYEE acknowledges that he has been given at least 21 days to consider this Agreement. EMPLOYEE agrees that, if he signs this Agreement before the end of the above 21-day period, his signature is intended to waive his right to consider the Agreement for 21 days. The parties agree that EMPLOYEE may revoke this Agreement at any time within 7 days after signing the Agreement by written notice, hand-delivered to the below address. The parties acknowledge and agree that this Agreement is not effective or enforceable until the 7-day revocation period has expired. Notice of revocation may be hand-delivered in writing by 5:00 p.m. or e-mailed no later than the seventh day of the revocation period to:

    Tiffany & Bosco, P.A.
    Human Resource Manager
    2525 E. Camelback Road, Seventh Floor
    Phoenix, AZ 85016
    hr@tblaw.com

Employee's Initials _____

4G67406

27.   Code Section 409A:   The terms of this Agreement shall be construed and administered in a manner calculated to satisfy the short-term deferral exception under Treas. Reg. Section 1.409A-1(b)(4); the separation pay plan exception under Treas. Reg. Section 1.409A-1(b)(9)(iii); and the welfare benefit exception under Treas. Reg. 1.409A-1(b)(9)(v) to Code Section 409A.   Any reference in this Agreement to a termination of employment (or similar term) means a "separation from service" as defined in Internal Revenue Code Section 409A and the applicable guidance issued thereunder.   In the event the Agreement fails to satisfy an exception to Internal Revenue Code Section 409A and the applicable guidance issued thereunder, it will be construed and administered in accordance therewith to the extent permitted by law.   All rights to payments and benefits hereunder shall be treated as rights to receive a series of separate payments and benefits to the fullest extent allowed by Internal Revenue Code Section 409A.

LOUIS A. LOFREDO                            Tiffany & Bosco, P.A.

_____             By:_____
Signature                                   Its:_____

Date:_____            Date:_____

Employee's Initials _____

4G67406

**Open letter to the Tiffany & Bosco Board of Directors.**
**April 4, 2021**

"Breathe." This is advice a physician gives to her patient suffering from anxiety. God shaped man from the soil of the ground and blew the *breath of life* into his nostrils, and man became a living being (Genesis 2:7). "Just breathe" is more than a phrase in yoga; it is a way of finding the inner wisdom that is the promise of yoga.

Without breath there is no life. Breathing relieves tension in the body. Breathing helps our psychological state, regulates our emotions, stops panic attacks, detoxifies the body, helps us heal better, leads to longer life, enhances our focus, boosts physiological and psychological reactions to stress, assists in controlling anger and fear by lowering stress hormones being released into the blood stream, and helps us manage pain, among many other benefits.

Governor Douglas A. Ducey's Executive Order - 2021-06 - *Business Guidelines Transition from Requirement to Recommendations* executed on March 25, 2021 rescinds eight COVID-19 Executive Orders and very simply put, removes the government from regulating face coverings and physical distancing policies in Arizona (attached) based on a variety of factors that indicate that the risk previously posed by COVID-19 has significantly decreased.

Currently House Bill 2770 is engrossed in the Arizona House of Representatives. In its current form it reads:

> Notwithstanding any Other Law, a Business in this State is Not Required to Enforce on Its Premises a Mask Mandate That is Established by this State, a City, Town or County or any Other Jurisdiction of this State.

The time for ending the T&B Social Distancing Policy is here. It has been a year, or almost a year, since this good-intentioned, but ill-conceived and damaging Policy was put into force. I am aware of many staff, associates and partners at Tiffany & Bosco that have disagreed with this Policy, but simply complied because it was not important enough to lose the status of openly opposing it. They signed the Policy to simply keep the status quo and appease the policymakers.

A government based on individual freedoms does not infringe upon that liberty with a fleeting promise of security. Benjamin Franklin famously said, "They who can give up essential liberty to obtain a little temporary safety, deserve neither liberty nor safety."

T&B had in place an all-encompassing, over-reaching social distancing policy, mask mandate and directives to wipe down every surface, door, cabinet, and refrigerator handle touched. Everyone was permitted to stay at home when feeling ill or work from home. If someone tested positive for COVID-19, a two-week quarantine was mandated for both the tested person and everyone in close contact with that person. Still COVID-19 infected many in the ranks of this fine firm. So, either the staff, associates and partners were cheating on the Policy requirements, or the firm's stringent Policy proved ineffective.

1

**Exhibit C to Complaint**

At the first inaugural address of Franklin D. Roosevelt on March 4, 1933, amid the Great Depression, he stated in part, "... the only thing we have to fear is fear itself--nameless, unreasoning, unjustified terror which paralyzes needed efforts to convert retreat into advance." T&B's Policy attempted to address several concerns including, the need to "flatten the curve", its personnel's fear of death by COVID-19, the personnel's fear of being exposed to COVID-19 in the workplace, and most of all by the threat of litigation by a disgruntled former staff person, associate or partner (or worse, their estate) should someone have died from COVID-19.  In those first few months, these fears may be seen as natural, but now in light of the data we have, the rise of heard immunity through exposure to COVID-19 and many of the general public's faith in the vaccines made to protect against it, the fear has subsided and the time for rescinding T&B's Policy has arrived.

The Policy established by T&B was ineffective, over-reaching, and detrimental to the overall health of its employees and as Winston Churchill said, "If you have ten thousand regulations you destroy all respect for the law." Prime minister Churchill also said, "Courage is rightly esteemed the first of human qualities because it has been said, it is the quality which guarantees all others." And "Courage is what it takes to stand up and speak, it's also what it takes to sit down and listen." I asked this Board to take courage, listen and rescind its Policy.

There will be those who say that the Policy is for the protection of the health of T&B's personnel and clients, and it should not be removed.  Indeed, in the present circumstances, is it necessary for T&B to take on the role as guardian of the health of all those who walk in their doors?  Or perhaps, that was never a good role for T&B.  Instead, it is now as it was in the past: everyone has been making decisions to protect their own health; to shake hands, to wear a mask, to work from home, and now to take one of a variety of experimental vaccines (Emergency Use Authorization for Vaccines Explained | FDA).

For those who are fear-filled, no respite has been given them by the ongoing sacrifices of liberty by their fellow men and women.  It does not register in their minds that their lack of courage, infringes on others or that there are deaths that have been caused due to their fear, such as from suicide, or a failure to go to doctors or hospitals with minor conditions that if treated early would have normally been routine diagnosed and treated.

This simple paralegal asks this Board to rescind the T&B Social Distancing Policy immediately. Basic freedoms should not be infringed by the government and even more so - not by an employer. I ask you to take courage.  Breathe.


Louis A. Lofredo, paralegal
Tiffany & Bosco, P.A.

| | |
|---|---|
| **From:** | Robert D. Mitchell |
| **Sent:** | Monday, May 17, 2021 1:03 PM |
| **To:** | Board of Directors & KJN |
| **Subject:** | For your Consideration . . . |

Dear Board of Directors,

In advance of your meeting this week, I would like to make my best attempt to persuade you to dispense with the mask requirement in the office immediately, and instead allow it to be at each employee's option.

I start with an acknowledgement that the Board of Directors' intentions are to act in the best interest of the firm and its people. I have no doubt of that. But for the reasons I share with you below, I believe those best interests of the firm and its people are served by relaxing the mask wearing standards.

First, the CDC has itself determined that masks are no longer needed in most indoor settings for persons who are vaccinated. In its announcement, the CDC reserved the possibility of certain exceptions continuing such as hospitals and mass transportation, which obviously is not what we do.

Please remember, the vaccine is easily and abundantly available now. I drive by West World all the time, and there is a constant lighted sign reminding people that "walk-ins are welcome". My family doctor office makes them available to anyone.

Further, vaccines either work or they don't work. We have been told that they work, and so those of us who dutifully got our vaccinations, should be able to return to normal life now. That is why we got the vaccination.

In follow-up to the new CDC directives, major companies such as Walmart, Costco, Target and many others (albeit admittedly not all yet) have removed their mask requirements. I don't know about you, but I certainly think our work environment is a lot more germ free and clean than a typical Walmart.

In our office, we have limited close contact with other employees except where we pass each other in the hall, happen to be in the restroom at the same time, or run into each other in the breakroom. These limited interactions typically involve a few minutes or even less of close proximity. Most of the time we are working in our respective work areas well-spaced apart.

While their may be an inclination to say let's be "careful" and "prudent" and delay our following of the CDC guidelines to make some people feel good, there are two serious problems with such an approach. First, we are not the medical experts, and we should not be substituting our lay judgment for those with the requisite medical credentials we previously relied upon when they said we needed to wear masks. We listened to them then. Why should that change now? We should listen to them now. Second, and most importantly, we cannot forget how mentally distressing this whole pandemic has been to so many people, including undoubtedly many in our office. Wearing masks one day longer than we need to wear them only continues the depression and anxiety caused by the whole pandemic. Frankly, for me and for many others, this has been a horrible experience. We have gone through more than a year now, worrying about our health, our economy, our jobs, and our careers. Fortunately, we have made it through the pandemic and it is now time to be grateful for the vaccine and get back to work.

**Exhibit D to Complaint**

1

Let's honor our oath to the Constitution as lawyers and remember one of the most important elements of the Constitution is the protection and preservation of our individual liberties.   Chief among those liberties is the right to make individual choices for ourselves.

If some people are still fearful about COVID, I am not insensitive.   I completely support their ability to wear a mask in the office for as long as they want to do so.   If some people want to continue working remotely, just to feel safe, I support that too.    But for the mental health of the rest of us, let's go back to normal and get out of the dark funk these masks have caused us for so long.

Thank you for your consideration.

Regards,
Robert

## TIFFANY & BOSCO, P.A.

**Robert D. Mitchell | Shareholder | 602.452.2730**
Seventh Floor Camelback Esplanade II | 2525 E Camelback Road | Phoenix, AZ 85016
P 602.255.6000 | F 602.255.0103 | C 602.722.3855
rdm@tblaw.com | Bio | vCard | Website | Practice Areas

Offices in California | Arizona | Nevada | New Mexico | Michigan | Alabama | Florida

**CONFIDENTIALITY NOTICE:** The information contained in this message may be protected by the attorney-client privilege. If you believe that it has been sent to you in error, do not read it.  Please immediately reply that you have received the message in error, then delete it.  Thank you.

**Unpaid Wage
Claim Form**

INDUSTRIAL COMMISSION OF ARIZONA
LABOR DEPARTMENT
P.O. BOX 19070
PHOENIX, ARIZONA 85005-9070
PHONE (602) 542-4515   FAX  602-542-8097

WAGE CLAIM NO._____
(FOR OFFICE USE ONLY)

AMOUNT $ _____
(FOR OFFICE USE ONLY)

**CLAIMANT INFORMATION:**

Last Name: <u>LOFREDO</u> First Name: <u>LOUIS</u> MI: A | DOB: June 24, 1966

Address (including Apartment No., if applicable):  7614 N. 46TH AVE | City: GLENDALE
State: AZ Zip Code: 85301

E-Mail Address: loulofredo@reagan.com | Telephone Number: (480) 304-8300 | Cell Phone Number: HOME - (623) 444-4841

*Select ONE preferred method of communication and service: E-Mail

Note: You must promptly notify the Labor Department of any changes to your address, telephone number, or e-mail address

**EMPLOYMENT INFORMATION:**

Employer Name: TIFFANY & BOSCO, P.A. | Telephone Number: (602) 255-6000 | Type of Business: LAW FIRM

Address (including Suite No., if applicable): 2525 E. CAMELBACK ROAD, SUITE 700 | Suite No.:

City: PHOENIX State:  AZ Zip Code: 85016 | Owner's Name(s): MARK BOSCO, MANAGING PARTNER

Owner's Mailing or E-Mail Address: msb@tblaw.com

Additional Information (business e-mail address, corporate name, additional business addresses, owner's cell phone number, etc.): PERSONNEL THAT HAD DIRECT INFORMATION ON MY CLAIM HAVE ALSO BEEN FIRED OR DISMISSED. FORMER HUMAN RESOURCES DIRECTOR - JEN LOVATO, FORMER COO - KEVIN NEWELL, SUPERVISING ATTORNEY - CHRIS KAUP.
ADDITIONAL INFORMATION IS BEING PROVIDED BASED ON THE DATES OF EMPLOYMENT BELOW.

**JOB INFORMATION:**

Your Job Title: PARALEGAL | Type of Work Performed:

Who hired you: HR PERSON FROM 17 YEARS AGO, THROUGH RICH ONEY, WHO ALSO NO LONGER WORKS AT T&B | Their Title/Position: HUMAN RESOURCES DIRECTOR

Who supervised you: CHRIS KAUP
Their Title/Position: PARTNER/SHAREHOLDER
Address Where Work Was Performed: SAME.

Start Date of Employment: October 1, 2004 Last Date of Employment: June 18, 2021

Still Employed: No

Rate of Pay:  $49.31 ☒ Hourly ☐ Day ☐ Week ☐ Monthly ☐ Commission ☐ Other

How Often Were You Paid:  ☐ Weekly ☐ Bi-Weekly ☒ Semi-Monthly ☐ Monthly ☐ Other

Was the wage agreement:

**Exhibit E1 to Complaint**

How were you paid: ☐ Check ☐ Cash ☒ Direct Deposit ☐ Pay Card ☐ Other

**GENERAL JOB INFORMATION QUESTIONS**

Was the job contracted in Arizona? ☒ Yes ☐ No  If no, Where?

Did you quit? ☐ Yes ☒ No

If yes, why?

Were you discharged? ☒ Yes ☐ No

If yes, why? I SPOKE AT A ZOOM MEETING ABOUT THE T&B MASK MANDATE AND SOCIAL
DISTANCING POLICIES.

Do you owe money to the employer?  ☐ Yes ☒ No

If yes, how much?

Explain:

Do you have any employer's property?

If yes, what property? I HAVE SOME INCIDENTAL OFFICE EQUIPMENT, MOUSE, PENS, FILE FOLDERS,
STAPLER, PAPER CLIPS ETC.

Is the employer still in business? ☒ Yes ☐ No

Has the employer filed for bankruptcy?   ☐ Yes ☒ No

Were you an Independent Contractor? ☐ Yes ☒ No  Explain:

Did the employer withhold taxes? ☐ Yes ☒ No

Did the employer use time cards? ☒ Yes ☐ No

Revised June 2020

Continue on 2nd  page

**Page 2**

**Unpaid Wage Claim Form**

FILL OUT **ONLY** THE SECTION(S) THAT APPLY AND ATTACH SUPPORTING DOCUMENTS.

| HOURLY: | AMT OWED | DATES BY          MM/DD/YY |
|---|---|---|
| Number of hours unpaid **64.00** X            $49.31 | $3,155.84 | From: June 9, 2021                          to June 18, 2021 |
| SALARY: X | $0.00 | From:              to: |
| COMMISSION: Gross Sales                    X | $0.00 | From:              to: |
| PIECE RATE: Was job based on completion of work? No | | From:              to: |
| VACATION/PTO: $4.62 Hours X              $49.31 | $227.81 | From: June 9, 2021                        to: June 18, 2021 |
| BONUS: Submit an explanation on a separate sheet of paper | | From:              to: |
| UNAUTHORIZED DEDUCTION: Submit a copy of the paystub(s) showing the deduction(s) | | From:              to: |
| MILEAGE: Number of Miles:                X ¢ per mile | $0.00 | From:              to: |
| NSF CHECKS: Submit bank documents or a copy of the NSF check | | From:              to: |
| OTHER: Medical HSA Employer Portion | $115.00 | From: June 9, 2021                        to: June 18, 2021 |

**TOTAL GROSS AMOUNT OWED**          $3,498.65

(Do not deduct taxes)

NOTE: SUBMITTING AN INCOMPLETE UNPAID WAGE CLAIM FORM MAY DELAY OR RESULT IN DISMISSAL OF YOUR CLAIM.

I hereby certify that this is a true statement to the best of my knowledge and further certify that the above-listed information is complete and accurate. I understand that acceptance of this Unpaid Wage Claim by the Labor Department does not guarantee an award or collections of an award. I authorize the Labor Department to receive monies due to me and to mail such monies at my own risk. (Checks may be picked up or will be mailed to the address on file at the Labor Department.)

I have supporting documents and evidence related to my Unpaid Wage Claim, including relevant pay stubs. If "Yes," you must promptly submit your supporting documents and evidence to the Labor Department by U.S. Mail (P.O. Box 19070, Phoenix, AZ 85005-9070), Fax (602-542-8097), or e-mail (Laborinv@azica.gov).

| | | |
|---|---|---|
| January 10, 2022 | /S/ LOUIS A. LOFREDO | 184.178.197.18 |

Date:

Claimant's Name:

Signature:

## RE: Exit Agreement - Possible Ethical Violations - NOT Protectedunder Rule 408

From:  Camarena, Cheyenne <cheyenne.camarena@ogletree.com>
Sent:   Mon, Sep 27, 2021 at 8:52 am
To:      loulofredo@reagan.com
Cc:      Clees, Joseph T.

---

image001.png (9.1 KB)

---

**ⓘ**    Images not displayed.    **SHOW IMAGES   |   ALWAYS SHOW IMAGES FROM THIS SENDER**

---

Good morning Mr. Lofredo,

Mr. Clees is currently overseas but your email has been passed on to Tiffany & Bosco.

Thank you,

**Cheyenne Camarena | Practice Assistant | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
Esplanade Center III, 2415 East Camelback Road, Suite 800 | Phoenix, AZ 85016 | Telephone: 602-778-
3738 | Fax: 602-778-3750
cheyenne.camarena@ogletree.com | www.ogletree.com

**From:** loulofredo@reagan.com <loulofredo@reagan.com>
**Sent:** Sunday, September 26, 2021 11:47 PM
**To:** Clees, Joseph T. <Joseph.Clees@OgletreeDeakins.com>
**Cc:** Camarena, Cheyenne <cheyenne.camarena@ogletreedeakins.com>; Kelly, Diane M.
<diane.kelly@ogletreedeakins.com>
**Subject:** Re: Exit Agreement - Possible Ethical Violations - NOT Protected under Rule 408

*[Caution: Email received from external source]*

---

Dear Mr. Clees:

You failed to confirm receipt of my last email to your office, which was sent on September 6, 2021. **Please confirm receipt of this email within two days of receiving it.**

You may recall that you directed me to communicate only with you and not with my former employer, on the matter of my former employment with Tiffany & Bosco, P.A.  If you don't confirm receipt of my emails, how can I be sure that you are receiving my emails and bringing them to the attention of your client?  Therefore, I beg you to confirm receipt of my communications or I will begin directly communicating with my former employer again.

Further to your discussions and continued position, that my verbal agreement relating to my termination, or Chris Kaup's "exit strategy" as described in Jen Lovato's emaildated June 30, 2021 (hereinafter, the "Exit Agreement") is not enforceable is flawed.  I was terminated on Friday, June 4, 2021 at about 10:30 a.m.  This ended my employment agreement.  A *separate and distinct* Exit Agreement was then entered into.

As a fanciful analogy, after ending a conflict such as a war, terms of surrender are entered into. T&B as the victor, terminated my employment and with it, unilaterally ended my 17-year career.  I was powerless to change the termination of my employment agreement.  Now T&B was dictating

**Exhibits 1 & 2**

the terms of my surrender, through negotiation, for a more favorable outcome for itself by offering me something in return.

As such, T&B, through Chris Kaup, initiated a new *offer* to me:

- Even though I had been terminated, would I agree to train and transition my replacement for a week or two? Because:
  - It would help T&B's clients;
  - It would help me (Chris); and
  - It would benefit you (Lou, a chance to find new employment while being paid).

Obviously, I was shocked. I expressed my shock by stating that I had not been terminated in any other job, even though I had been working since I was eleven. I also said that I had had a 17-year career employee at T&B and was only being terminated because I questioned ending the mask mandate on the March 11, 2021 Zoom meeting. With these statements, I added that although most people wouldn't state that they might retained their rights to sue, that I was doing so. As such the following *counter-offered* was made:

- I would train my replacement if Chris understood I would not sign the severance agreement, because I was not giving up my potential claims without more thought; and
- I would agree to train my replacement for another two, maybe three weeks.

Chris *accepted* my offer:

- He expressed his pleasure at my professionalism to agree to such a transition and was heartened that he was correct about my character.
- He and Jen Lovato talked about my replacement's start date, which was clarified in an email latter, but it was agreed that I would train him from Friday, June 11 or Monday, June 14, 2021 through Friday, June 18, 2021. A full ten days of work June 7, 2021 through June 18, 2021.

The *consideration* in this Exit Agreement verbally made between T&B and me is that in exchange for me staying at T&B to transition my responsibilities for Chris Kaup, Robert Mitchell, Amy Sells, Rob Royal, Rich Gramlich and other attorneys that I was currently working with, to other responsible people and also to physically train my replacement after his arrival, I would be paid the same compensation for the two week period, so as to give me time to begin preparing a resume, and locating a new paralegal position at another firm after my 17-year career was terminated by T&B.

This verbal agreement was reduced to writing in various emails between June 4, 2021 and June 8, 2021 mostly between Jen Lovato and me copied to Chris Kaup. (Please provide me with all those emails as I may not have them all in electronic format). Also contrary to Jen's latter written email dated June 30, 2021, Chris agreed to the two-week Exit Agreement specifically allowing me to retain my litigation rights by not signing the Severance Agreement.

- There is no question that all the elements of a contract existed; an offer, counter-offer, acceptance and consideration. **The Exit Agreement contract did exist.**
- You opined that the Exit Agreement is not binding because employment agreements can be terminated at will. **The Exit Agreement was distinct from my 17-year old employment agreement and is binding.**
- Because you inaccurately conflated the employment agreement with the Exit Agreement, you concluded the Exit Agreement is not enforceable. **The verbal Exit Agreement, is just as valid as a written agreement and is enforceable.**

https://webmail.reagan.com/versions/webmail/19.0.13-RC/popup.php?wsid=84b3dffff4a44999886401a95c97e1fb-507f25c3f3b140fa8cccd43be65ac3c...   2/6

In addition, there may be ethical rule violations by T&B and Chris Kaup if the Exit Agreement is not honored and I am not paid for that eight days work. That is lawyers have a duty "[w]hether or not engaging in the practice of law ... to conduct themselves honorably." Ethical Rules, Preamble, ~ [1]. Lawyers are subject to the law like any other citizen, but their duties as lawyers reflect a public policy that expects lawyers to act "honorably" in all of their personal and professional endeavors. *Id.* Thus, "[a] lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs." *Id.*, ~ [5]. Consistent with this principle, " ... a lawyer who commits fraud in the conduct of a business is subject to discipline for engaging in conduct involving dishonesty, fraud, deceit or misrepresentation." *Id.*,~ [3], citing ER 8.4.

Tiffany & Bosco, through Chris Kaup, shareholder, entered into an Exit Agreement with me, Lou Lofredo, on June 4, 2021. T&B breached that Exit Agreement, separate and distinct from the almost 17-year employment agreement with me, on June 8, 2021, by physically walking me off the premises and threatening police arrest should I return. Based on that breach, **Tiffany & Bosco owes me $3,498.42**, the amounts and reasons for the numbers were detailed in my September 6, 2021 email to you below, which you failed to respond to.

I am providing you another week, to confirm that T&B will be paying me this amount. I would prefer not to have to file both an Unpaid Wage Claim Form ("Wage Claim") with the Industrial Commission of Arizona Labor Department and potentially a Bar Complaint against an attorney that I worked with for over 14 years for an amount that is less than a full paycheck. However, I will do so, because I had a valid and enforceable Exit Agreement, I am owed this money, and it is the correct course of action.

Sincerely,

Lou Lofredo, paralegal
(623) 444-4841

-----Original Message-----
From: "loulofredo@reagan.com" <loulofredo@reagan.com>
Sent: Monday, September 6, 2021 11:05pm
To: diane.kelly@ogletree.com
Cc: "Camarena, Cheyenne" <cheyenne.camarena@ogletree.com>, "Joseph Clees" <joseph.clees@ogletree.com>
Subject: FW: Re: Response to Clees' Assertion that No Termination Terms Were Agreed Upon - NOT Protected under Rule 408

Dear Ms. Kelly:

Further to Ms. Camarena's OOM, please confirm you will be providing Mr. Clees with the email below.

Sincerely,

Louis A. Lofredo, paralegal
(623) 444-4841
-----Original Message-----
From: "loulofredo@reagan.com" <loulofredo@reagan.com>
Sent: Monday, September 6, 2021 11:00pm
To: "Camarena, Cheyenne" <cheyenne.camarena@ogletree.com>, "Joseph Clees"
<joseph.clees@ogletree.com>
Subject: Re: Response to Clees' Assertion that No Termination Terms Were Agreed Upon - NOT Protected under Rule 408

1/10/22, 8:13 PM                    RE: Exit Agreement - Possible Ethical Violations - NOT Protected under Rule 408

Dear Mr. Clees:

I am responding to a single section of your July 29, 2021 email relating to the verbal agreement that was made about T&B and my agreement on the terms of my termination. In the future, I may respond to the other sections of your July 29, 2021 email which for the most part are inaccurate.

I have now had adequate time to review the Arizona Revised Statutes that appear to be the most relevant about wage disputes, including A.R.S. § 23-353 to which you cite. I am owed for (i) eight 8-hour days of work, (ii) the employer portion of the HSA contribution and (iii) the PPT/PST time that would be accrued over that time. The total amount owed to me is $3,498.42. The formula is as follows:

I do not agree that there was no verbal agreement relating to my termination struck on June 4, 2021. First there was a witness, Jen Lovato. Second the follow-up emails between me, Jen Lovato and Chris Kaup prove that the agreement was in existence and was moving forward. Third, I understand there was discussion of making my termination immediate and breaking the verbal agreement at a Board Meeting on Tuesday, June 8, 2021. (Incidentally, please provide me with a copy of all these documents, including the memo/email from Jen Lovato relating to the Wednesday and Friday, June 2 and June 4, 2021 meetings between Chris Kaup and me, which she attended.)

For clarification, the negative connotation about me in your email that I intended to "cause an incident" is overstated for a wrongful purpose. That is I had no intent to "cause an incident, On the contrary, my career at T&B spanned 17 years, and in the very meeting I was *terminated*, I agreed to work for an additional 2 weeks AND train my REPLACEMENT. I asked Chris if my continued contemplation over litigation with T&B for this very termination would preclude me from training the new person. Chris stated that no, he did not believe that my continued review of litigation would preclude me from staying to train my own REPLACEMENT. Chris actually applauded the content of my character in that June 4, 2021 meeting based on this and his understanding of the forthright person I am (which presumably was not the "threatening" and "fear-invoking" person he collaborated to fire two short business days later). For my part, I verbally agreed to the terms of my termination, because it was the best for T&B's clients, for Chris Kaup and obviously I needed the benefit of time to investigate my options, get a resume together and create a plan to get employed after 17 years of working for the same firm. Since, I had not been looking for employment before the date of my termination, this two-week time period was crucial for me to timely find a law firm where I could continue my paralegal career.

Also, if I am incorrect in the presumption that you were using "cause an incident" to denote a negative characteristic to me and you actually meant the truth; that is that T&B officials were referring to my behavior of speaking to many staff, associates and partners on Friday, Monday and Tuesday about T&B's action of terminating me, a 17 year employee , who is good and loyal, then please state so in your next email. Finally, Jen wrote to me that she knew I had intended to quit prior to the agreed upon termination date, which is fatuous. I have never been terminated in my working life. My behaviors in all my work experiences have not indicated this. In three separate firm changes as a paralegal (over 17 years ago), I gave my two-week notice and assisted in the transfer of client confidential files, EVEN in the face of a partner dispute that was appealed twice and ended up in the Ninth Circuit. In addition, I am a father of four between the ages of 8 and 15 (at the time) with a wife that is a stay at home, home-schooling mother. I have no personal reason to end my paycheck or my relationships with professionals that have precious contacts that can lead to new employment.

Let's discuss your "fear for safety" reference. My career at T&B was peaceable for 17 years. Over 30 people donated to my son's cross-country team from work, demonstrating, I am known and well-liked at T&B. Other than the incidents that were placed in my file on or after March 11, 2021 to add volume to my personnel file, there is only one item that was written and placed in my file in the normal course, which Jen Lovato gave me copies of. If T&B believes I am a disruptor, it is because they are uncomfortable with my witness to my Catholic faith.

As to "threats", what can you possibly mean?  I am a paralegal with no power to hire or fire persons.  IN CONTRAST, T&B has all the power to hire, fire, or not to promote, etc.  In my circumstance, T&B explicitly directed its attorneys not to provide me with a recommendation for employment.  T&B also made known that no one is to communicate with me at all.  I have been cast as someone who has "gone off the deep end" and people have been directed "to distance" themselves from me.  This occurred in a partner meeting and has trickled down to staff, associates and friends of the firm.  Documents and personnel at T&B clearly know that the threatening party here is T&B and for the most part those threats of retaliation have been headed.  T&B HAS used its power to force professionals to disassociate from me or pay consequences, which could include termination, reprimand, disassociation or partner separation from the firm.  What better way to get compliance from everyone remaining at the firm than to terminate a 17 year career employee and threaten those that remain with termination for even having lunch or talking with me.  That is a lot of control over your employees/partners; it is something to fear the loss of your livelihood.

(Incidentally, please provide me with the agendas and any meeting minutes from the Partner and Board of Director Meetings that include my name or a reference to me.  Some of the Agendas have amorphous titles relating to employee relations, etc., so you will have to review each of them starting from March 11, 2021).

Mr. Clees, this is a much longer email than I had anticipated.  I intended to file the attached draft Unpaid Wage Claim Form ("Wage Claim") with the Industrial Commission of Arizona Labor Department on or about September 13, 2021; however I understand you will need time to evaluate my request and communicate with the Board of Directors about this, **so I will file it on or after September 17, 2021,** unless T&B obviates the need for me to file it by paying me the $3,498.42 that it owes to me under the terms of our verbal agreement by that same date.

I intend to use the following as attachments to my Wage Claim (note the Wage Claim was a website wizard interface so I printed it to pdf before I deleted it on the website interface.  I will do my best to duplicate the Wage Claim form you have attached to this email when I file it; however even certain fields did not fully print to Adobe copy attached):

1. This email;
2. Perhaps your email response;
3. T&B Paycheck to Lou Lofredo period-ending June 9, 2021;
4. Email thread Lovato, Lofredo dated June 30, 2021 re Reframing Verbal Agreement;
5. Email thread Poulos, Lofredo dated July 15, 2021 re Response to Severance Agreement; Employment, Wages; and
6. Open Letter to the Tiffany & Bosco Board of Directors - April 4, 2021.

Please be aware that I provided you notice before and again now that none of our communications will be protected under Rule 408 and that will can both utilize these communications in the manner we deem fit.

Sincerely,

Louis A. Lofredo, paralegal
(623) 444-4841

1/10/22, 8:13 PM                    RE: Exit Agreement - Possible Ethical Violations - NOT Protectedunder Rule 408

*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

| Hourly Rate | Hours Owed | Wages | Medical Health Savings Account | Accrued PPT/ PST Hours | Amount | Total Due |
|---|---|---|---|---|---|---|
| $49.31 | 64.00 | $3,155.84 | $115.00 | 4.62 | $227.58 | $3,498.42 |

| CO. | FILE | DEPT. | CLOCK | VCHR. NO. | 073 |
|-----|------|-------|-------|-----------|-----|
| K7N | 000390 | 002911 | | 0000230078 | 1 |

# Earnings Statement



TIFFANY & BOSCO PA
PAYROLL ACCOUNT
2525 E. CAMELBACK, #700
PHOENIX, AZ 85016

| | |
|---|---|
| Period Beginning: | 05/26/2021 |
| Period Ending: | 06/09/2021 |
| Pay Date: | 06/15/2021 |

Filing Status: Married filing jointly
Exemptions/Allowances:
　Federal: Standard Withholding Table

**LOUIS A. LOFREDO**
**7614 N 46TH AVENUE**
**GLENDALE AZ 85301**

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | 49.3100 | 50.00 | 2,465.50 | 43,059.95 |
| Holiday | 49.3100 | 8.00 | 394.48 | 1,577.92 |
| Ppt | 49.3100 | 24.00 | 1,183.44 | |
| Overtime | | | | 4,419.41 |
| Bereavement | | | | 443.79 |
| Gross Pay | | | 54,043.42 | 52,656.91 |

| Other | this period | year to date |
|-------|-------------|--------------|
| Hsa Dd | -115.00 | |
| Hsa Dd Er | -225.00 | |
| Net Check | | $0.00 |

\* Excluded from federal taxable wages

Your federal taxable wages this period are
$2,532.25

| Deductions | Statutory | | |
|------------|-----------|---|---|
| | Social Security Tax | -162.02 | 2,697.01 |
| | Medicare Tax | -37.89 | 630.75 |
| | AZ State Income Tax | -68.37 | 1,146.08 |
| | Federal Income Tax | | 245.08 |

| Other Benefits and Information | this period | total to date |
|--------------------------------|-------------|---------------|
| Pers.Paid Time | 52.60 | |
| Psl | 34.43 | |
| Totl Hrs Worked | 50.00 | |

| Other | | |
|-------|---|---|
| Hsa Pre-Tax | -115.00* | 1,265.00 |
| Pop Ee Dental | -105.92* | 635.52 |
| Pop Ee Med | -1,198.08* | 7,188.48 |
| Pop Ee Vision | -11.30* | 67.80 |
| Roth $ | -323.47 | 4,212.55 |
| Voluntary Life | -29.16 | 131.46 |
| 401(K) | -80.87* | 1,053.14 |
| Hsa Ded Off Set | | -2,615.00 |

**Important Notes**
BASIS OF PAY: HOURLY

**Additional Tax Withholding Information**
Taxable Marital Status:
　AZ:　　　Married
Exemptions/Allowances:
　AZ:　　　Tax is 2.7%

| Adjustment | | |
|------------|---|---|
| Hsa Ded Off Set | +340.00 | |

| | | |
|---|---|---|
| Net Pay | | $2,251.34 |
| Checking 1 | -1,499.34 | |
| Checking 3 | -412.00 | |

© 2009 ADP, LLC

---

TIFFANY & BOSCO PA
PAYROLL ACCOUNT
2525 E. CAMELBACK, #700
PHOENIX, AZ 85016

| | |
|---|---|
| Advice number: | 00000230078 |
| Pay date: | 06/15/2021 |

Deposited to the account of
**LOUIS A. LOFREDO**

| | account number | transit ABA | amount |
|---|----------------|-------------|--------|
| | xxxxxxxxxxxxx2906 | xxxx  xxxx | $115.00 |
| | xxxxxx7296 | xxxx  xxxx | $1,499.34 |
| | xxx7693 | xxxx  xxxx | $412.00 |
| | xxxxxxxxxxxxx2906 | xxxx  xxxx | $225.00 |

**THIS IS NOT A CHECK**

**NON-NEGOTIABLE**

**Exhibit 3**

## RE: Error in Calculation of Wages

From:  Jennifer C. Lovato <JCL@TBLAW.COM>
Sent:  Wed, Jun 30, 2021 at 5:16 pm
To:  loulofredo@reagan.com
Cc:  Christopher R. Kaup, Alexander Poulos, Mark S. Bosco

image005.jpg (5 KB)    image006.png (12.3 KB)    image007.jpg (2.3 KB)    image008.png (11.9 KB)
image009.jpg (5 KB)    image010.png (12.3 KB)    image011.jpg (2.3 KB)    image012.png (11.9 KB)
**– Download all**

---

ⓘ    Images not displayed.    **SHOW IMAGES** | **ALWAYS SHOW IMAGES FROM THIS SENDER**

---

Lou,

I was present at our meeting on June 4, 2021 and Chris Kaup provided an exit strategy and proposed transition plan only.  At no time did Mr. Kaup enter into an employment contract or guaranteed compensation agreement through June 18, 2021, as you claim. He did provide a tentative timeline and agreed to provide you two weeks' severance and a letter of recommendation _if_ you remained employed through the transition and executed the proposed Agreement.

You did offer to remain with Tiffany & Bosco to train the new paralegal. However, shortly thereafter, you made comments in the office to the effect that you did not intend to work through the transition period and that you would "cause an incident" at the firm. This comment caused serious concerns among your colleagues. Lou, this is not the first time you have made such a threat in the workplace and the decision was made to terminate your employment immediately.

We did not disclose the forgoing details to you during the June 8, 2021 meeting out of courtesy for all involved and in order to deescalate the situation and allow for an orderly separation under difficult circumstances. I trust you will understand the situation and we wish you well in your future endeavors.

Jen

🖼tblogo
**Jennifer C. Lovato | HR Manager**
Seventh Floor Camelback Esplanade II | 2525 E Camelback Road | Phoenix, AZ 85016
D 602.288.7919 | P 602.255.6000
jcl@tblaw.com | vCard | Website

Offices:  Alabama | Arizona | California | Florida | Michigan | Nevada | New Mexico

**CONFIDENTIALITY NOTICE:**  The information contained in this message may be protected by the attorney-client privilege.
If you believe that it has been sent to you in error, do not read it.  Please immediately reply to the sender that you have received the message in error, then delete it.  Thank you.

🖼AV Preeminent   🖼/versions/webmail/19.0.7-RC/images/blank.gif   🖼tblf-badge-2018

**From:** loulofredo@reagan.com <loulofredo@reagan.com>
**Sent:** Sunday, June 27, 2021 5:56 PM
**To:** Rosary A. Hernandez <RAH@tblaw.com>
**Cc:** Jennifer C. Lovato <JCL@TBLAW.COM>; Kevin J. Newell <kjn@tblaw.com>
**Subject:** RE: Error in Calculation of Wages

**Exhibit 4**

Dear Rosary:

I am writing to you because I have not received a response to my below email, and, as a member of the Board, I am sure you can expedite a response from T&B's administration.

Sincerely,

Lou
——Original Message——
From: "loulofredo@reagan.com" <loulofredo@reagan.com>
Sent: Wednesday, June 23, 2021 10:18am
To: "Jennifer Lovato" <jcl@tblaw.com>
Cc: "Kevin J. Newell" <kjn@tblaw.com>
Subject: FW: RE: Error in Calculation of Wages

Dear Jen:

I have not received a response to the below email.  Will Chris Kaup and T&B
be honoring the agreement and pay me the amounts it owes to me through June 18, 2021?

Sincerely,

Lou
——Original Message——
From: "loulofredo@reagan.com" <loulofredo@reagan.com>
Sent: Friday, June 18, 2021 12:48pm
To: "Jennifer C. Lovato" <JCL@TBLAW.COM>
Cc: "Kevin J. Newell" <kjn@tblaw.com>
Subject: RE: Error in Calculation of Wages

Dear Jen:

On Friday, June 4, 2021 at about 11:00 a.m., I was terminated.  **An agreement was then made between Chris Kaup and I** that you witnessed, in which I agreed to ease the transition to both T&B's clients and Chris by training my replacement, and Chris agreed to my final date of work on June 18, 2021 to further those ends.  He expressed his pleasure at my professionalism to agree to such a transition, and was heartened that he was correct about my character.

Immediately, and before my replacement started at T&B, I began fulfilling my part of the agreement.  Samples of this include clearing up docket dates on the Prefect Law calendar, placing notes on files in my office on what tasks needed to be done, and generally preparing for the transition so there would be little disruption to T&B clients.  Specifically, I spoke with several attorneys and staff that were outside Chris Kaup's department on transferring the responsibilities that I had on client projects.  The most significant transition was my responsibility to finalize and file KCI's (Client-Matter No.16947-006) Ninth Circuit Appeal Brief on or before June 18, 2021 (today).  As a professional, I spoke separately with Amy Sells and an extremely gifted paralegal, Megan Bowen, on taking measures to assure no disruption would occur.  I worked with Megan and Amy on this transition, even placing the about 120 to 160 Designation of Record files into Megan's G:/ drive where she could readily access them.  Indeed, I even spoke with Sara Hammond to coordinate the timing of moving docket entries and responsibilities to my replacement.  Sara, another exceptional employee, on Tuesday afternoon, just prior to T&B prohibiting me from further access to my office and having security walk me to my vehicle, provided me with sound advice to ask IT to assign T&B credentials to my replacement *before* his start date, so I could begin sending informatory emails and include my replacement's initials in new Perfect Law docket dates.

This agreement to transition was important for T&B as shown above, and it was also important to me, my wife and my four children.  Being terminated on Friday, June 4, with a promise to work until June 18, then being physically locked-out and walked out with security on Tuesday, June 8, 2021 did not provide me with adequate time to process my June 4 termination, prepare a resume after working 17 years exclusively for T&B, begin a list of professional contacts to assist me in

finding a new employer, and generally easing the immense stress of the unwarranted termination by my employer.

As for taking severance, that decision is independent of the agreement that was made above.  We have an agreement and I expect that Chris Kaup and T&B will honor that agreement and pay me the amounts it owes to me through June 18, 2021.

Sincerely,

Lou Lofredo
(623) 444-4841


——Original Message——
From: "Jennifer C. Lovato" <JCL@TBLAW.COM>
Sent: Friday, June 18, 2021 11:03am
To: "loulofredo@reagan.com" <loulofredo@reagan.com>
Cc: "Kevin J. Newell" <kjn@tblaw.com>
Subject: RE: Error in Calculation of Wages

Hi Lou,
Your final paycheck included hours worked through Tuesday, June 8, as that was your last day of employment.  I have attached your timecard for your review.  Your accrued PPT and PSL was also paid on June 15 in a separate check.  Severance is the only form of additional compensation you will receive should you decide to sign and return the Severance Agreement.

Please reach out with any additional questions or if I can be of assistance.

Jen
[image: xblogo]
Jennifer C. Lovato | HR Manager
Seventh Floor Camelback Esplanade II | 2525 E Camelback Road | Phoenix, AZ 85016
D 602.288.7919 | P 602.255.6000
jcl@tblaw.com | vCard | Website

Offices:  Alabama | Arizona | California | Florida | Michigan | Nevada | New Mexico

**CONFIDENTIALITY NOTICE:**  The information contained in this message may be protected by the attorney-client privilege.
If you believe that it has been sent to you in error, do not read it.  Please immediately reply to the sender that you have received the message in error, then delete it.  Thank you.

[image] AV Preeminent   [image] /versions/webmail/19.0.7-RC/images/blank.gif   [image] blf-badge-2018


From: loulofredo@reagan.com <loulofredo@reagan.com>
Sent: Thursday, June 17, 2021 5:31 PM
To: Jennifer C. Lovato <JCL@TBLAW.COM>
Subject: Re: Error in Calculation of Wages

Dear Jen:

I just reviewed my last pay statement.  It appears I did not get paid for Wednesday, June 9, 2021.  In addition, I was not paid for June 10 and 11 and June 14-18, 2021.  Will that check be issued in the next pay periods?

Sincerely,

Lou Lofredo
(623) 444-4841

## RE: Response to Severance Agreement / Reference / Wages

**From:** loulofredo@reagan.com <loulofredo@reagan.com>
**Sent:** Fri, Jul 2, 2021 at 11:34 am
**To:** Alexander Poulos
**Cc:** klm@tblaw.com, ljm@tblaw.com, sta@tblaw.com, tcb@tblaw.com, jrb@tblaw.com, alc@tblaw.com, tme@tblaw.com, whf@tblaw.com, wmf@tblaw.com, rcg@tblaw.com, rah@tblaw.com, spl@tblaw.com, mlu@tblaw.com, rdm@tblaw.com, kpn@tblaw.com, gvillareal@tblaw.com, rlewis@tblaw.com, kcabanilla@tblaw.com, lmocek@tblaw.com, sab@tblaw.com, rgh@tblaw.com, sdh@tblaw.com, smmeyers@tblaw.com, rjg@tblaw.com, klm@tblaw.com, jwr@tblaw.com, rar@tblaw.com, maw@tblaw.com, rknudsen@tblaw.com, dxp@tblaw.com, ddd@tblaw.com, jallen@tblaw.com, paigek@tblaw.com, slopez@tblaw.com

---

image001.jpg (4.8 KB)       image002.png (13 KB)       image003.png (9.8 KB)
Email Thread Lovato, Lofredo RE Error in Calculation of Wages.pdf (229.1 KB)
Email Thread Lovato, Lofredo RE Severance Agreement Extension.pdf (175.5 KB)   **– Download all**

---

ℹ   Images not displayed.   **SHOW IMAGES  |  ALWAYS SHOW IMAGES FROM THIS SENDER**

---

Dear Alex:

Informationally, these were the parting words my employer said to me through Jen Lovato on June 8, 2021 at 5:30 p.m. after I was called into a conference room with Chris Kaup, Kevin Newell and a 30-something "security" woman dressed in blue denim with a gold nose ring, "Lou, let me be clear. You are no longer an employee of Tiffany & Bosco. You can no longer represent yourself as such. You will be escorted to your car by the security guard, and you are not to return to Tiffany & Bosco. If you return to the premises, the police will be called, and **we will have you arrested.** Have I been clear?"

You were friendly with me in my 17 years at Tiffany & Bosco. I understand your role in the firm for loss prevention and to avoid litigation. However, I have hope you are a just and good person that will not continue to support further indecent behavior started by the Board, or perhaps specific members of the Board.

Let me be clear now, I was terminated by T&B because I spoke out against the Social Distancing Policy based on my faith. This is substantiated by my personnel file. The Board started a process to malign my character so it could "justifiably" terminate me, immediately after the March 11, 2021 Zoom meeting. The Board, through selected members and HR, have conducted "interviews" and "investigated" me to find what could be used against me after my questions at the Zoom meeting. I have come to learn that this is Mark Bosco's will.

During the last several months, Chris Kaup has acted as if this investigation and maligning was not being done. Jen Lovato, who authored the maligning information against me, also acted nonchalantly as if I was just another employee during our several discussions together with Chris Kaup. Her work, along with other items in draft, are now part of my personnel file along with some new items that have been gathered after my termination. The Boards' behavior can be seen in these files and were likely not shared with the Equity Shareholders, who I hope elect this powerful body that guides the Equity Shareholders. Alex, I ask that you provide me with my personnel record, including these drafts. If the Board prohibits you from providing them to me, I personally ask you to retain a copy of my personnel file so it does not continue to grow and change after my termination.

I have not retained counsel. I have not determined if I will bring a claim against Tiffany & Bosco and the Board. However, I do not accept Tiffany & Bosco's claimed right to do anything and everything in its sole discretion. I am also an equal party to these discussions. Tiffany & Bosco failed to timely provide me with an extension of the Severance Agreement upon my request. Jen blatantly ignored my request for an extension while answering the other questions in the same

**Exhibit 5**

email.  The deadline has past for the Severance Agreement and it cannot be extended unilaterally by Tiffany & Bosco.

Tiffany & Bosco cannot dictate how I communicate with people I have known for up to 17 years, who happen to be employees at the firm.  As you can see above, I can no longer have a lunch with any of these people because if I return to the T&B's premises, T&B will call the police and have me arrested.  As such, I will email or call people who were my friends and professional contacts as I see fit.  I have done nothing wrong.  I have told the truth about my termination and how poorly I have been treated in the interim.  How this information *is being conveyed to* the T&B investigative arm of the Board and then how the information *is being "diplomatically" presented to you and the other Equity Shareholders* is unknown to me, but I anticipate it has been exaggerated to place a poor or maligning light upon me and my character.  In truth, the Board is a team of T&B's most highly skilled attorneys; it is not possible for a paralegal to be more persuasive then any one of them, unless I am telling the truth.  For your convenience, I have copied this email to many of those that I have requested a recommendation letter from (and to many who I have not yet done so).  Since soft persuasion is used primarily by the Board to enforce its will, it will now have dictate to its employees to not communicate with me because it does not want them to be informed of how poorly it treats its employees if they disagree with its soft, unrelenting persuasion.

As you will see by the attached email, Chris Kaup did make an agreement to pay me through June 18, 2021.  The "exit strategy" Jen, through Chris, now claims was made, is a post-termination idea.  I never stated I would "cause an incident" and I am not a "threat" as Jen stated in her email.  Instead, T&B's Board's actions are a "threat" to itself.  T&B made my termination immediate because I let other T&B attorneys and staff know that T&B had terminated a 17-year employee for speaking out against a mask policy.  Thus, the Board -- or certain members of it -- to cover-up its bad decision, terminated me immediately and had a security woman with a nose ring escort me out to my car.

I performed on the verbal agreement with Chris Kaup to transition the new paralegal who replaced me into the firm (see attached email relating to the transitionary tasks I completed in my first two days of the agreement), and that I would work through June 18, 2021.  I should be paid on that agreement.  I have not looked at any wage statutes, but I understand there is a three day time time limit to pay me.  Since, at this time I will honor that agreement, if T&B decided to also honor it, then I should have been paid no later than June 30, 2021.  It is up to T&B if it wants to pay me by check today by the third day, today **July 2, 2021.**  It would have to be couriered to my house, because I have been prohibited to pick it up.

As Chris Kaup stated as I was being "perp-walked" out, "I am sorry it had to come to this ... Thank you."

Sincerely,

Lou

——Original Message——
From: "Alexander Poulos" <AP@tblaw.com>
Sent: Thursday, July 1, 2021 5:57pm
To: "loulofredo@reagan.com" <loulofredo@reagan.com>
Cc: "Mark S. Bosco" <MSB@tblaw.com>, "Christopher R. Kaup" <CRK@tblaw.com>
Subject: Severance Agreement / Reference

Lou,

We will extend the deadline for you to accept our severance offer and sign the Severance Agreement until July 15, 2021, subject to prior revocation in our sole discretion.

As for your request for a reference, we are willing to provide a written reference solely for purposes of assisting you with securing other employment and as a part of the Severance Agreement. Please contact us to address this option.

Finally, you have contacted many of our lawyers and staff seeking a reference. Going forward, please direct all reference-related inquires to me.

Thank you,

Alex

**Alexander Poulos | Firm General Counsel | Shareholder | 602.255.6030**
**Attorney At Law**

tblogo
Seventh Floor Camelback Esplanade II | 2525 E Camelback Road | Phoenix, AZ 85016
P 602.255.6000 | F 602.255.0103
ap@tblaw.com | Bio | vCard | Website | Practice Areas

Offices:  Alabama | Arizona | California | Florida | Michigan | Nevada | New Mexico

AV Preeminent Rating

**CONFIDENTIALITY NOTICE:**  The information contained in this message may be protected by the attorney-client privilege.
If you believe that it has been sent to you in error, do not read it.  Please immediately reply to the sender that you have received the message in error, then delete it.  Thank you.

**Open letter to the Tiffany & Bosco Board of Directors.**
**April 4, 2021**

"Breathe." This is advice a physician gives to her patient suffering from anxiety. God shaped man from the soil of the ground and blew the *breath of life* into his nostrils, and man became a living being (Genesis 2:7). "Just breathe" is more than a phrase in yoga; it is a way of finding the inner wisdom that is the promise of yoga.

Without breath there is no life. Breathing relieves tension in the body. Breathing helps our psychological state, regulates our emotions, stops panic attacks, detoxifies the body, helps us heal better, leads to longer life, enhances our focus, boosts physiological and psychological reactions to stress, assists in controlling anger and fear by lowering stress hormones being released into the blood stream, and helps us manage pain, among many other benefits.

Governor Douglas A. Ducey's Executive Order - 2021-06 - *Business Guidelines Transition from Requirement to Recommendations* executed on March 25, 2021 rescinds eight COVID-19 Executive Orders and very simply put, removes the government from regulating face coverings and physical distancing policies in Arizona (attached) based on a variety of factors that indicate that the risk previously posed by COVID-19 has significantly decreased.

Currently House Bill 2770 is engrossed in the Arizona House of Representatives. In its current form it reads:

> Notwithstanding any Other Law, a Business in this State is Not Required to Enforce on Its Premises a Mask Mandate That is Established by this State, a City, Town or County or any Other Jurisdiction of this State.

The time for ending the T&B Social Distancing Policy is here. It has been a year, or almost a year, since this good-intentioned, but ill-conceived and damaging Policy was put into force. I am aware of many staff, associates and partners at Tiffany & Bosco that have disagreed with this Policy, but simply complied because it was not important enough to lose the status of openly opposing it. They signed the Policy to simply keep the status quo and appease the policymakers.

A government based on individual freedoms does not infringe upon that liberty with a fleeting promise of security. Benjamin Franklin famously said, "They who can give up essential liberty to obtain a little temporary safety, deserve neither liberty nor safety."

T&B had in place an all-encompassing, over-reaching social distancing policy, mask mandate and directives to wipe down every surface, door, cabinet, and refrigerator handle touched. Everyone was permitted to stay at home when feeling ill or work from home. If someone tested positive for COVID-19, a two-week quarantine was mandated for both the tested person and everyone in close contact with that person. Still COVID-19 infected many in the ranks of this fine firm. So, either the staff, associates and partners were cheating on the Policy requirements, or the firm's stringent Policy proved ineffective.

1

**Exhibit 6**

At the first inaugural address of Franklin D. Roosevelt on March 4, 1933, amid the Great Depression, he stated in part, "… the only thing we have to fear is fear itself--nameless, unreasoning, unjustified terror which paralyzes needed efforts to convert retreat into advance." T&B's Policy attempted to address several concerns including, the need to "flatten the curve", its personnel's fear of death by COVID-19, the personnel's fear of being exposed to COVID-19 in the workplace, and most of all by the threat of litigation by a disgruntled former staff person, associate or partner (or worse, their estate) should someone have died from COVID-19.  In those first few months, these fears may be seen as natural, but now in light of the data we have, the rise of heard immunity through exposure to COVID-19 and many of the general public's faith in the vaccines made to protect against it, the fear has subsided and the time for rescinding T&B's Policy has arrived.

The Policy established by T&B was ineffective, over-reaching, and detrimental to the overall health of its employees and as Winston Churchill said, "If you have ten thousand regulations you destroy all respect for the law." Prime minister Churchill also said, "Courage is rightly esteemed the first of human qualities because it has been said, it is the quality which guarantees all others." And "Courage is what it takes to stand up and speak, it's also what it takes to sit down and listen." I asked this Board to take courage, listen and rescind its Policy.

There will be those who say that the Policy is for the protection of the health of T&B's personnel and clients, and it should not be removed.  Indeed, in the present circumstances, is it necessary for T&B to take on the role as guardian of the health of all those who walk in their doors?  Or perhaps, that was never a good role for T&B.  Instead, it is now as it was in the past: everyone has been making decisions to protect their own health; to shake hands, to wear a mask, to work from home, and now to take one of a variety of experimental vaccines (Emergency Use Authorization for Vaccines Explained | FDA).

For those who are fear-filled, no respite has been given them by the ongoing sacrifices of liberty by their fellow men and women.  It does not register in their minds that their lack of courage, infringes on others or that there are deaths that have been caused due to their fear, such as from suicide, or a failure to go to doctors or hospitals with minor conditions that if treated early would have normally been routine diagnosed and treated.

This simple paralegal asks this Board to rescind the T&B Social Distancing Policy immediately. Basic freedoms should not be infringed by the government and even more so - not by an employer. I ask you to take courage.  Breathe.


Louis A. Lofredo, paralegal
Tiffany & Bosco, P.A.

May 18, 2022

**VIA EMAIL (Laborinv@azica.gov; christina.lasater@azica.gov)**

David James
Christina Lasater
Industrial Commission of Arizona
Labor Department
PO Box 19070
Phoenix, Arizona 85007
602.542.5768

Dear Mr. James and Ms. Lasater:

I have received the Industrial Commission of Arizona's ("ICAZ") Notice to Claimant of Respondent's Response dated May 9, 2022 and the Response of Tiffany & Bosco, P.A. ("T&B") dated March 22, 2022, signed by Joseph T. Clees.  I appreciate the opportunity to Reply to T&B's Response.  I hereby request that the ICAZ issue a determination against T&B and in my favor in the amount of my wage claim of $3,498.42 **immediately**[1], because my statute of limitations on filing claims against T&B in the Arizona State Court is early June.

## T&B's Social Distancing Policy

T&B's extraordinary Social Distancing Policy ("Policy")[2], attached hereto as Exhibit 7, stated goal was to protect its employees from COVID-19 exposure, but it became known that the Policy's primary purpose was to protect T&B itself from liability that might arise from its employees initiating COVID-related negligence lawsuits against it.  About nine months *after* the Policy was put into place, I attended a March 11, 2021 all-employee Zoom meeting.  Mark Bosco called for questions after stating the mask policy would not be lifted.  I then posited questions and provided information about a bill engrossed at the Arizona House of Representatives that intended to lift mask mandates at all State buildings, provided the current status of the governor's rescinding of many COVID based Executive Orders; provided information on herd immunity; provided information about the rise in access and use of COVID vaccinations (among other information) in an effort to logically persuade T&B to remove or sunset what I viewed as an over-reaching and oppressive

---

[1] The original wage claim was filed on January 10, 2022.
[2] The attached Social Distancing Policy is the document I signed almost two months after all employees were directed to sign it.  I only signed this document after four meetings lasting a total of about three hours, because I was left with no choice but to sign it.  Chris Kaup did give direct permission to me to mark the document "as we had discussed in our meetings."  I emailed it to Kevin Newell, copied to Chris Kaup, on the date of my signature.

**Exhibit E2 to Complaint**

1

Policy that we employees had complied with for nine months.  I further stated that it should be everyone's individual choice to determine how best to protect their own health and the health of their family.  I commented that this health choice was not being enforced by my government, and was thereby so much more overreaching for my employer to mandate a Policy for which the penalty of perceived non-compliance could "… result in discipline, up to and including termination of employment." (*See* penultimate paragraph on page three of the Policy, Exhibit 7. *See also* Exhibit 6, the Open Letter to the Tiffany & Bosco Board of Directors, dated April 4, 2021.)

Mark Bosco, Chris Kaup, and the T&B Board reacted to my well-informed positions and my closely-held Catholic belief to witness my views through my freedom of speech in a public forum as a threat to T&B's Policy and by extension T&B's potential liability.  In their opinion, such views as mine put T&B at risk for lawsuits.  I had to be terminated before my views spread to other employees, attorneys and partners, particularly in light of the emerging discussions of the next hot issue: mandating the experimental RNA vaccinates for all employees.

Although it was clear that T&B discouraged open discussions on these taboo COVID topics, many at the firm disagreed with the Policy and/or the possibility of T&B creating another policy requiring vaccination by all of its employees.  About two months after the Zoom meeting, on May 21, 2021, the T&B equity shareholders voted to remove the mask mandate portion of the Policy.  At that multiple hour meeting, the partners had discussed the possibility that lifting the mask mandate would "open the door" to T&B liability, but rational, well-reasoned counterpoints to that argument won and the mask mandate was removed.  Unfortunately for me, Mark Bosco, Chris Kaup, and the T&B Board had already started my termination process 20 minutes after the March 11, 2021 all-employee Zoom meeting; and they still believed that it was me that had "opened that door" [3].

### Straw Lou Lofredo

T&B's Response and the intentionally inflammatory writing style of Mr. Clees would lead any reader that did not know me to think poorly of my character.  However, T&B needed to bulwark such an untruthful position, so they created a "Straw Lou Lofredo".  This "Straw Lou Lofredo" that was wonderful his first, second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth, and well into his sixteenth year, somehow became a "hostile, offensive, threatening, unsafe, sexist, agitated, angry,

---

[3] The very moment after the March 11, 2021 all-employee Zoom meeting ended, Mark Bosco dispatched Kevin Newell, Jen Lovato and others to locate and interview everyone I had spoken with before the Zoom meeting that morning.  So concerned that I would question the T&B Policy, the T&B Board directed Jen Lovato to work through that very weekend to provide a draft memo that would be the forerunner to my termination.  The problem was that my record, though not perfect, is clean.  Pieces of that early draft memo are incorporated into T&B's Response.

gesticulating, interrupting, criticizing, unprofessional, hostile (again), voice-raising, forcibly-waving, angrily-striking, erratic, haranguing, aggressive, outbursting, incident-causing, widespread-employee-concerning, refusing, failing paralegal" that provided T&B with no other alternative but to terminate Straw Lou Lofredo IMMEDIATELY.

I ask ICAZ to pay no attention to the Straw Lou Lofredo that T&B builds up, just to burn down. It is not truthful and in no way assists ICAZ to form a decision. Those that know me know the truth. They know that I *am not* a Nazi. I *am not* a white supremacist. I *am not* a misogynist. I *am not* a physical threat. What I am is a practicing Roman Catholic, a husband, a father of two boys and two girls, and three children that are in heaven. I hold my faith-filled belief that the life of a human being begins at conception and in the womb of a woman. I believe that all life, the life of the child, the mother, the father, all children of God, are precious and deserve dignity because all of us are made in His image.

I believe God, the author of life, empowers me, and I, in turn, allow others to exercise authority over me, with the hope that those I give such authority will use that power in a just and reasonable manner. To my government, I give my vote. To my employer, I give my labor. My employer took for granted the use of my labor and wrongly ended my career because I questioned a Policy. I hope that my government, through the ICAZ, recognizes the truth of my wage claim after reviewing the evidence and counters my former employer's injustice by making a determination in my favor on my wage claim.

### No Evidence

There was no evidence of my behavior attached to the Response[4]: no evidence of "repeated workplace outbursts", "numerous complaints from coworkers", "workplace threats", "widespread concerns among employees regarding their own safety". T&B, currently has sole possession and control of my personnel file, the bulk of which was created after March 11, 2021, which it claims is private property of the employer and thus will not provide to me. (*See* attached email at Exhibit 8. *Also see* email at Exhibit 5, attached to my wage complaint.) Neither I, nor the ICAZ, has seen my personnel file. I hereby request that the ICAZ, through its authority, demand a copy of my entire personnel file.

To be clear, I complied with all appropriate T&B policies. I was not a disruptive employee. I had many friends at T&B, and my co-workers enjoyed working with me and appreciated my skill and demeanor. I was not a physical threat to anyone[5]. I wore my mask, sanitized

---

[4] If any *ex-parte* documents, emails, etc. were provided to the ICAZ, they should also be provided to me. If ex-parte verbal communications were made, I should also be provided such access to ICAZ in fairness.

[5] When I was escorted off the premises at about 5:30 p.m. on June 8, 2021, my escort *was not* a physically intimidating, off-duty, armed police officer. Instead, it was a security guard that happened to be female, who was about 5'6" tall and weighed about 120 lbs. Unlike the assertions

surfaces, fist-bumped clients instead of shaking hands, social distanced from others, stayed home when I was sick, stayed home when directed to because of possible COVID-19 transmission events, and otherwise complied in all reasonable ways with the Policy that I strongly disagreed with for about the eleven months it was in place.

Even though T&B did not provide the evidence, T&B and I both have evidence of my (i) phenomenal ability to work with others, (ii) my strong paralegal skills, (iii) my skill as a trainer, (iv) my calm demeanor, (v) my ability to work under pressure, (vi) my ability to work in many different legal fields, including (vii) bankruptcy, (viii) Arizona civil litigation, (ix) Federal civil litigation, (x) intellectual property, (xi) court appeals, including the 9th Circuit appeals, etc. Attached is Exhibit 10, which is composed of many nice messages sent or given to me from my co-workers, outside counsel, outside paralegals, and even Chris Kaup himself! These same documents are in T&B's files. I know this because I provided them to Jen Lovato before I was terminated. These messages evidence my good character[6].

Based on T&B's Response, the ICAZ may ask, what changed with Mr. Lofredo since these nice messages were written? The answer is that my demonstrated 17-year working character did not change. The mind of Mark Bosco did. T&B planned to terminate me for expressing my faith-informed free speech at the March 11, 2021 all-employee Zoom meeting, where I questioned the wisdom of continuing the policy that had been in place for over nine months.

**Severance Agreement**

I have attached two T&B Severance Agreements to this Reply as Exhibits 11 and 12. Exhibit 13 is an email from Jen Lovato dated Friday, June 4, 2021 at 2:04 p.m.[7], the date of my termination and the date on which I entered the Exit Agreement. T&B Response in

---

in Mr. Clees July 29, 2021 email, associating supposed "threatening" comments to "coworkers... fear for their safety", T&B's actions show it understood that I was **no** threat, therefore no physical security precautions were necessary or obtained. *See* attached email as Exhibit 9.

[6] One document that is not in my file is the Tyler S. Woods associate attorney biography. It is the last page of Exhibit 10. As you can read, Mr. Woods graduated as the Valedictorian at Arizona State University. Mr. Woods, while working as a file clerk under my supervision, wrote the attached Christmas card, stating, "... I have been at this company [T&B] for a year and a half, and more than anyone else you have developed my legal knowledge and contributed to my experience within the realm of Law.... You're generous, hardworking, and ultimately an incredible person to work with." Mr. Woods, after obtaining his JD from Arizona State University, *magna cum laude*, became employed as an attorney at Gallagher & Kennedy.

[7] It should be noted the email quotes a 21-day review period for employees over 40. I was 54 at the time. Jen Lovato said on both June 4, 2021 and again on June 8, 2021 that the Severance Agreement explicitly contained a timing provision so the employee had adequate time to consult with an attorney.

4

several sections provides the impression that I agreed to sign the Severance Agreement, which I did not.

You will see the first Severance Agreement (Exhibit 11) I received on Friday, June 4, 2021 (after entering into my Exit Agreement with Chris Kaup) is in draft form. It contains blanks for termination date and amount. Other than those two blanks, Ms. Lovato informed me that they would enter in my name and calculate my two weeks' severance pay, including PPT/PSL, but otherwise the agreement was a "canned form" and could not be changed[8]. The second Severance Agreement (Exhibit 12) was provided to me literally three minutes before I was escorted out of the premises on Tuesday, June 8, 2021. You will notice that the second Severance Agreement at paragraph 1 states that T&B would pay me eight weeks of compensation, for a total amount of $15,779.20[9,10]. Another change, which is odd for a canned form, is that the first form pays the employee in one lump sum, but the second final version states it would pay me in four installments.[11,12] All the changes between the first and second Severance Agreements were done without my consultation or knowledge

---

[8] T&B's Response states, "…each agreement is narrowly tailored to fit the particular circumstances." However, Jen Lovato made it clear to me on June 4, 2021, that no changes could be made except for name and amount, because it was a "canned form." Mr. Kaup was at that meeting and he did not correct her.

[9] My wage claim only requests a decision from the ICAZ for T&B to pay me $3,498.92 for the Exit Agreement, while my Severance Agreement would have paid me over four times that amount! If I do not have to file a lawsuit on this claim, I do not intend to request treble damages under ARS 23-355. I am interested to read how T&B attempts to spin out of this falsehood. They may state that time has expired, but I have emails that show T&B, through Mr. Clees lifted all deadline restrictions on the Severance Agreement of $15,779.20 AND he added the $3,498.42 wage claim to the severance payment for a total amount of **$19,277.62**, if I would be willing to sign the Severance Agreement. *See* Exhibit 9.

[10] Please note, that I have provided notice on several occasion that no communications, even those settlement communications under FRCP 408 or any state law equivalent are protected from use to determine the truth of the matter. *See* attached email at Exhibit 17, "Third, I do not agree to any non-public settlement communications from you on behalf of Tiffany & Bosco or from a Tiffany & Bosco representative. Please be advised that every communication that is made may be public, and further, if I decide a litigation is necessary, I will use all documents, even those claiming to be sen[t] under the state equivalent of FRCP 408, in a Court of law." I fairly and property provide this notice another time in the last paragraph of Exhibit 1 attached to the wage claim.

[11] I want to note that until the day I was terminated on June 4, 2021, I enjoyed working at T&B and I believed all the best about my employers. Now, after what they have done to me and after communicating with at least a score of former partners, associates and employees, I have lost respect for them. T&B's worst aspects come to the surface after someone departs, because they were terminated, quit or were forced out.

[12] One example of the power that T&B wields against former employees is shown in the Severance Agreements at paragraph 10 on pages 3-4, titled, "Violation of Agreement". First, it is not reciprocal. Second, the "Hammer clause" is monstrously punitive to deter even a skilled attorney's challenge to its validity. It reads, "violation … shall give rise to … a refund of the consideration

## Exit Agreement

T&B claims, I have "... no evidence of a purported `Exit Agreement'". It is ironic that Mr. Clees 1) fails to provide any evidence of the score of bad character claims that he made against me; 2) ignores Exhibits 4 and 5 to my wage claim; and 3) states that I have no evidence, when Tiffany & Bosco deprived me evidence that exists in my own personnel file and internal emails. Fortunately for me, I do have a few emails that provide written evidence of the Exit Agreement, which are hereby attached as Exhibits 14 and 15. Additional evidence includes the draft and final Severance Agreements themselves.

Exhibit 14 is an email from Jen Lovato to me, dated June 4, 2021 at 4:45 p.m., the day of my termination. Ms. Lovato's email is regarding COBRA Information, which she is providing to me because I was terminated. Evidence of the amount of time agreed to in the Exit Agreement appears in the last line, "I will try to obtain as much detail as possible over the next couple of weeks." Since June 4, 2021, the date of the email, is a Friday and two weeks ends on June 18, 2021, it evidences the agreed-upon Exit Agreement departure date of June 18, 2021. It demonstrates there was a meeting of minds, not only between Chris Kaup and I, but also as understood by Jen Lovato. Mr. Kaup is copied on this email.

Exhibit 15 is another email from Jen Lovato to me, dated June 4, 2021 about two hours after my termination, time stamped 12:37 p.m. It provides PPT and PSL balances as of that date. Jen Lovato then calculates what I will accrue in my last two weeks to Friday, June 18, 2021. It is clear that the "06.10" date reference is a typographical error that should read, "06.18". The evidence of the typographical error is that no employee at T&B accrues 7.5 PPT/PST time every 32 hours of work; that is, such amounts are only earned after 80 hours of work. Next, she states that my "PPT/PSL payout would be paid direct deposit on 6.30..." this is important because T&B paid its employees for ALL time worked on the 15th and 30th of each month. So, if my Exit Agreement ended on "06.10", I would be fully paid (like every other employee at T&B) on June 15, 2021, rather than June 30 as stated. Again, this email is evidence that the Exit Agreement's departure date was June 18, 2021, which was agreed upon after Chris Kaup terminated my almost 17-year employment agreement[13].

---

paid....", which appears reasonable, then the "Hammer" comes: "Employee agrees to an award of $1,000,000 [MILLION DOLLARS!] against him for any Violation of Paragraph 7". Indeed, part of paragraph 7 is damaging Employer's servers, which admittedly would cause T&B great injury, but lumped into the same paragraph 7 is "electronically stored information..." presumably such items as a flash drive. So, if T&B ever brings suit against a former employee, the threat of a $1,000,000 consequence is real, daunting, and an abuse of power to which a former employee is required to submit in order to be paid ANY severance payment amount.

[13] Again, T&B never provided me with my personnel file, even upon my repeated requests/demands to do so. Jen Lovato, before I was terminated, did agree to provide my personnel file to me, but did not do so. Why didn't T&B provide the ICAZ my signed and countersigned agreement from 17 years ago?

Returning to Exhibits 11 and 12, both the Severance Agreements, *which I never signed and never agreed to sign*, contain paragraph 26, which states, "EMPLOYEE acknowledges that he has been given at least 21 days to consider this Agreement." Now read paragraph 2 of page 2 of T&B's Response, wherein conditions were supposedly outlined for me, that is "... **if**: (1) ...and (2) Mr. Lofredo executed a severance agreement." I never agreed to the Severance Agreement, because it was not a term of the Exit Agreement, regardless of how T&B wordsmiths the sentences.

Either I did not agree to signing the Severance Agreement in that moment, or T&B is admitting that Chris Kaup, after terminating me at the June 4, 2021 meeting, forced me to agree to train my replacement and transition all my work by "... induc[ing] and influenc[ing] [me to] Execut[e]...This Agreement" without the requisite time to review it. The latter did not happen, because if it had, Mr. Kaup would have violated paragraph 25 f. of the Severance Agreement. Instead, what happened is that Mr. Kaup accepted my Exit Agreement term that I would not be signing the Severance Agreement, and expressed his pleasure at my professionalism to agree to transition my *replacement* (after he began work *six days later*), and was heartened that he was correct about my fine character.

Exhibit 13 now provides greater understanding to this Exit Agreement because if I had indeed agreed to sign the Severance Agreement on the morning of June 4, 2021, why then at 2:04 p.m. did Jen Lovato write, "Attached is the draft Severance Agreement *for your information*." (Emphasis added.) If I had indeed agreed to this Severance Agreement, which T&B desperately wants me to sign, Ms. Lovato would have instead written in this email something to the effect of, "Lou you agreed to sign this", and she would have attached a final copy of the Severance Agreement for me to sign. She did not do so.

### Purported Legal Deficiencies with the Exit Agreement

The reasons that T&B did not provide legal authority to prove that the Exit Agreement cannot be "separate and distinct" is because the Exit Agreement is valid and binding upon T&B[14]. See Exhibit 1 to the wage claim, wherein I set forth, in brief below, the following:

My employment was terminated on June 4, 2021. Until that day, I desired and planned to be employed with T&B until well into retirement age. Mark Bosco, Chris Kaup and the

---

[14] I ask the ICAZ to not allow T&B to further supplement the failures endemic to its Response, because it would be prejudicial to my wage claim. I am a *pro per* paralegal, while Mr. Clees is presumably a skilled attorney that allowed T&B's unpersuasive Response to be filed. I am familiar with T&B's document reviewing procedures because I worked with Chris Kaup for over a decade, and I am confident that at a minimum other skilled attorneys reviewed and approved the Response to be filed with the ICAZ. At least one of those attorneys was a T&B Board member with authority to authorize such a ICAZ submission.

T&B Board disagreed and decided to wrongfully, unlawfully, and discriminatorily terminate me instead because I challenged the authority of Mark Bosco on an all-employee Zoom meeting.  There was nothing I could say at the moment of termination to change that; the decision had already been made[15].

Chris Kaup then offered a separate and distinct Exit Agreement after termination of my 17-year employment agreement.  He offered these terms:

- Train your replacement;
- Transition your work; and
- I'll allow you to work during this period dependent on when your replacement starts work.
  - Matthew Burns, my replacement had already been hired.[16]

My counteroffer:

- I did not agree, and stated that I would not sign a Severance Agreement in order to retain my legal claims;
  - This was verbally said and agreed to.  Chris stated that he did not intend to take away my time to consider the Severance Agreement and my claim options;
- I did agree to train my replacement, transition my work, and stay two weeks, possibly three, to complete these tasks.

Chris accepted my counteroffer.  Further, he smiled and expressed his pleasure at my professionalism to agree to such a transition, and was heartened that he was correct about my character.

The consideration in the Exit Agreement was that in exchange for me staying at T&B to (i) transition my responsibilities for Chris Kaup, Robert Mitchell, Amy Sells, Rob Royal, Rich Gramlich and other attorneys who I was currently working with to other responsible people, and (ii) to physically train my replacement after his arrival, I would have time to begin preparing a resume, and locating a new paralegal position at another firm.  Each of the above-referenced attorneys directly, except Rob Royal, spoke with me on either June 7 or 8 about transitioning work, before I was escorted out.  If the ICAZ believes it needs to interview these attorneys to make a determination in my favor, I ask ICAZ to interview

---

[15] Sam Mayasich of GPAC, had been searching for "fantastic paralegals" for Chris Kaup for about a month or two prior to my termination.

[16] Chris Kaup had hired my replacement before my termination date.  His rate of pay was about $5 less an hour than my rate of pay.

these attorneys to confirm my transitional duties were carried out, contrary to T&B's Response that states I failed to do this[17,18].

There is no question that all the elements of a contract existed: an offer, counteroffer, acceptance and consideration. The **Exit Agreement contract did exist**. T&B admits this, but references it as a "tentative timeline" or "arrangement". This argument was crafted after I was escorted out on June 8, 2021.

The Exit Agreement was distinct from my 17-year employment agreement and is binding. T&B inaccurately conflates the employment agreement with the Exit Agreement, and although before in emails Mr. Clees wrote the Exit Agreement was "unenforceable"", now the Exit Agreement only has uncited "legal deficiencies". Fortunately, **the verbal Exit Agreement is just as valid as a written agreement, and is enforceable.** If it was not enforceable, T&B would have provided their legal authority to support this position.

### The Social Distancing Policy is Promissory in Nature.

T&B's Social Distancing Policy ("Policy"), which I, and every employee at T&B, was made to sign, makes a lot of strong unilateral statements, such as, "Failure to comply ... may result in discipline, up to and including termination of employment.", "If you witness ... any employee... violating this policy you are encouraged to report them...", and "Tiffany & Bosco, P.A. reserves the right to modify this policy at any time in its sole discretion..." No rational person would agree that an employer could change the rules of employment for any reason, without consent, and with the possibility of termination for violation any new Policy change. However, we were forced to sign such a Policy, without recourse.

In effect the Policy demanded my compliance to work at T&B, it contains statements to protect T&B should a Court actually read the Policy and disagree, such as "Nothing in this policy alters the at-will nature of your employment." And "This policy is not promissory and does not set terms or conditions of employment or create an employment contract." I

---

[17] T&B also utilizes a document management program called Perfect Law ("PL"). I believe that a review of the PL logs will show that I transitioned scores of docket dates to new individuals or added helpful notes to docket entries, evidencing my commitment to the Exit Agreement.

[18] Just an hour or so before T&B escorted me out, Sara Hammond, a legal assistant at T&B, discussed her brilliant idea for me to enlist T&B's IT staff to set-up an account for my replacement prior to his start date, Monday, June 14, 2021. Ms. Hammond explained that though it was not standard practice for IT to set-up an account prior to someone starting work at T&B, it had been done before. In this manner, I could directly assign docket tasks to his profile before he starts. I believe that evidence of this task is either shown on a yellow note pad that was on my desk or an email that was being written or was written and sent to IT (James Oswald), copied to Chris Kaup. I do not have access to or possession of this evidence, because I was prevented from going back to my office before being escorted out on June 8, 2021.

disagree.  If the Policy can be mandated on an employee or they will lose their career, then that same Policy, regardless of such examples of litigation safeguard language, the Policy is indeed promissory.  Therefore, I hereby state that I complied with the Policy as attached, without recourse to not sign the Policy, and after nine months of no actions being taken by my employer to sunset the Policy -- even in light of the changes in the governmental mandates -- I was terminated for speaking about ending the Policy at the March 11, 2021 all-employee Zoom meeting.

This Policy, by its very extraordinary nature, is promissory, and constitutes an employment agreement.  For the purposes of only this wage claim, and while reserving all my other rights, I ask that this Policy be applied to the relevant time period of my wage claim as additional evidence of my Exit Agreement and the failure of T&B to properly and timely pay me in the amount of $3,498.42[19].

### Responses to the ICAZ Specific Questions

I was paid for all the hours that were worked.  I was not paid in full as detailed in my Reply, under both the Exit Agreement and the Policy.   I am due the following amounts, which total $3,498.42.

| Hourly Rate | Hours Owed | Wages | Medical Health Savings Account | Accrued PPT/ PST Hours | Amount | Total Due |
|---|---|---|---|---|---|---|
| $49.31 | 64.00 | $3,155.84 | $115.00 | 4.62 | $227.58 | $3,498.42 |

I had a valid Exit Agreement with T&B, made by my direct supervising attorney, Chris Kaup, who directed me with verbal or email instructions on all tasks for 14 years at Tiffany & Bosco.  At that time, I relied on, and had no doubt that Chris Kaup was being truthful about fulfilling the T&B's Exit Agreement we had entered into.  Furthermore, T&B is different than other firms, T&B shareholders are directors of their own departments and may make decisions without outside authority relating to their departments.  I had no way of knowing the Board (one Board member being Chris Kaup), would breach the agreement Chris Kaup made with me.  I am due these unpaid wages, and the ICAZ has authority to order T&B to pay this amount.

---

[19] Nothing contained in this Reply nor the original wage claim are intended to restrict, waive or otherwise limit any of my claims, demands, or lawsuits that may arise under any of the following laws or regulations: Title VII of the Civil Rights Act of 1964, as amended; the Age Discrimination in Employment Act of 1967, as amended; the Employee Retirement Income Security Act, as amended; the Family and Medical Leave Act, as amended; the Arizona Civil Rights Act, as amended; the Arizona Employment Protection Act, as amended; Arizona wage statutes; any other federal, state, or local constitution, statute, ordinance, or regulation; or any other theory of recovery including, but not limited, to claims for breach of contract, wrongful discharge, and any tort or other claim.

T&B's Response admits there was an agreement ("Exit Agreement"), but couches it as a "tentative timeline" or "arrangement" and states that I breached it supposedly by:

    (a) not transitioning client duties;
        i.  which I did;
        ii.  evidence attached to this Reply;
    (b) not training the new paralegal;
        i.  T&B escorted me out and threatened to call the police if I returned to the premises;
        ii.  I was walked out before the new paralegal's start date;
        iii.  The failure attributed to me on this term is due to T&B's breach of the Exit Agreement;
    (c) not executing a Severance Agreement; and
        i.  As detailed above in both explanation and documentation, I never agreed to sign a Severance Agreement.

In addition, in other sections of the Response, Mr. Clees states that T&B promised to "… provide two weeks' worth of severance pay and a letter of recommendation **if** (1) Mr. Lofredo remained employed through June 18, 2021 to help train a new paralegal and transition his duties; and Mr. Lofredo executed a severance agreement." First, T&B breached the Exit Agreement, which robbed me of my ability to provide services. Second, T&B -- through Chris Kaup -- and I did not come to any agreement relating to recommendations or reference letters on June 4, 2021[20],[21]. That recommendation issue arose after I had been escorted out on June 8, 2021. T&B refused to provide me with a recommendation letter AND directed all attorneys to refrain from providing me a reference [or reference letter] only "… as a part of the [signed] Agreement. (*See* Exhibit 5 to the original wage claim. *See* also Exhibit 9.)

---

[20] In that moment that I was terminated by my supervisor, who called me his "right hand" for over a decade, I did not desire a recommendation from him. To this date I have never requested a letter of recommendation from Chris Kaup. Instead, I have requested recommendation letters from about 20 individuals that worked with me, including T&B's attorneys, outside counsel, other paralegals, associates, and Ronald J. Norick, former mayor of Oklahoma City, Oklahoma, who oversaw that city through the tragic 1995 bombing of the Alfred P. Murrah Federal Building. Mr. Norick is one of the most recognizable and noteworthy living mayors in modern times. Mr. Norick recognized the content of my character, my skills as a paralegal and thus provided me with a recommendation letter.

[21] Attached as Exhibit 16 are two letters of recommendation that I received to seek new employment: one from Ronald J. Norick, former mayor of Oklahoma City, Oklahoma, and a second one from a former T&B attorney, Marcos A. Tapia. I received other letters of recommendation from T&B attorneys, but cannot reveal them as they would likely lead to retaliation by T&B. T&B specifically directed its attorneys not to provide recommendations to me because I "failed" to sign the Severance Agreement.

I do not recall if I have provided written revocation to T&B regarding the withholding of benefits. Also, I am not sure I understand what you are asking for. Please provide further information and perhaps I can locate what you are requesting.

### Conclusion

In the present wage claim dispute between me and T&B, I have provided evidence that (1) the Exit Agreement is binding and enforceable; (2) that but for being escorted out by T&B and threatened with arrest, I had, or would have, fulfilled all the terms of the Exit Agreement; (3) despite Mr. Clees' use of abusive, disgraceful, disrespectful, insolent, and inflammatory language[22] about my character[23], I have provided excessive written evidence contrary to T&B's false narrative about the content of my character; and (4) that my wage claim should be fully paid as calculated.

My understanding is that should I file a lawsuit against T&B in June, the ICAZ will dismiss my wage claim. It has been quite an amount of work for me to provide this Reply within about one week of receiving the Response. I pray that the ICAZ will issue its decision prior to June 1, 2022,[24] because even attorneys abuse the power that they are given and that is the case with termination. The T&B Board, Chris Kaup and Mark Bosco, abused their authority and used their power to wrongfully, unlawfully, discriminatorily terminate me, and I hereby request that ICAZ issue a determination against T&B and for me in the amount of my wage claim of $3,498.42, **immediately**.

Sincerely,

Louis A. Lofredo
Paralegal
*pro per*

---

[22] I personally implore Mr. Clees, T&B's new counsel, and T&B itself to be more cognizant of the type of inflammatory rhetoric it utilized in its Response and to refrain from using such language in its future disputes with me.
[23] Please note that I am not the one exercising power or authority in this instance. T&B has my personnel file. T&B terminated me after almost 17 years. T&B retaliated against me and escorted me out because I was telling others that I had been terminated for speaking at the March 11, 2021 all-employee Zoom meeting. T&B directed all attorneys and staff not to communicate with me. T&B directed its attorneys not to provide me with a recommendation letter. T&B *did not* provide the evidence supporting its assertions against me. T&B did not provide legal authority supporting its positions against me.
[24] The original wage claim was filed on January 10, 2022.

# Social Distancing Policy
### Last Revised June 25, 2020

As you return to work in the midst of the 2019 novel coronavirus (COVID-19) pandemic, Tiffany & Bosco, P.A. wants to assure you of its continued commitment to maintaining a safe and healthy workplace and that we are taking additional measures to protect you, your coworkers, and your families from the spread of COVID-19. As part of those efforts, we are implementing a new Social Distancing Policy. Please read this policy carefully.

## Importance of Social Distancing

The Centers for Disease Control and Prevention (CDC) has found that one of the most effective ways of preventing the spread of COVID-19 is limiting face-to-face contact with others, known as social distancing or physical distancing. The Occupational Safety and Health Authority (OSHA) similarly recommends increased social distancing when preparing workplaces to respond to COVID-19.

This Social Distancing Policy is a key part of our overall strategy and commitment to maintaining a healthy workplace in light of the COVID-19 pandemic. Although our knowledge about the virus and how it spreads is evolving, based on the information we have now, these measures will help curb its spread. Compliance with this policy is essential because current consensus on the virus suggests, among other things, that:

- COVID-19 is highly contagious.
- COVID-19 spreads mostly among people who are in close contact (within about 6 feet, or two arms' lengths) for a prolonged time period (between 10 and 30 minutes, depending on the distance).
- The virus generally spreads when an infected person coughs, sneezes, or talks, and droplets from their mouth or nose get in the air and land in the mouths or noses of nearby people.
- A person who has the virus may not have any symptoms but may still spread COVID-19.
- A person can get COVID-19 by touching another person, such as with a handshake, or by touching another surface or object that has the virus on it and then touching their own mouth, nose, or eyes.
- The virus can live on surfaces for up to several days, depending on the surface and other conditions.

*[handwritten marginal note:]* Current consensus has evolved; there are no longer all tenants of "consensus." Certain doctors are being silenced that disagree with many aspects of the management of this virus and the response to it and effective therapies (e.g. Hydroxy-chloroquine). Therefore, "consensus" may not have been arrived at; it is the consideration of all available data.

For these reasons, the CDC and other public health experts have recommended limiting contact with other people and common surfaces to limit the spread of COVID-19. We need your full cooperation and compliance with these measures to make them effective in this new work environment.

## Social Distancing Measures

Following the CDC's guidance, Tiffany & Bosco, P.A. requires that you comply with the protocols and procedures listed herein while in the workplace. The City of Phoenix and Maricopa County has implemented new emergency proclamations with specific mask requirements in businesses and public spaces. Become familiar with those requirements. As these emergency orders are ever changing, to the extent that this policy is not as strict as any emergency proclamation or order, you are expected to comply with the stricter of the two.

*[handwritten marginal note:]* I affirm I will comply with only proclamations of the City of Phoenix and Maricopa County.

*[handwritten note:]* I will comply •

- **Masks:** You are expected to wear a mask at any time you are unable to maintain a distance of six feet between yourself and another person and any other time as required

**Exhibit 7**

by a current emergency proclamation or order in effect. If you believe you are eligible for an exception to this mask requirement, bring any exception request to Jen C. Lovato.

*[handwritten: I will comply]* • **Health:** If you are not feeling well and/or have a fever, you **must** stay home.

*[handwritten: I will comply with not reports to work after known exposure. I will not be tested. I will not assist with "contact tracing", but will likely let Jo B know my "contacts" at work. I will comply]* • **Known exposure:** Do not report to work if you have knowingly been exposed to COVID-19, even if you are asymptomatic. Report any known exposure to Jennifer Lovato, or if unavailable to Kevin Newell. You will need to be tested prior to returning to the office. In the meantime, you must assist us in contact tracing, so we can take the necessary steps to reduce the potential spread throughout the workspace.

**Teleworking/Work from Home:** Tiffany & Bosco, P.A. is committed to teleworking arrangements to the extent feasible and consistent with business necessity. Please check with your Department Head whether your department and business needs can accommodate telecommuting.

*[handwritten: I understand]* • **Schedule Changes:** Your Department Head may change your schedule to minimize the number of employees in the workplace at any given time. These changes may involve any combination of:

- continued or increased teleworking, to the extent feasible;
- alternate day work schedules;
- staggered lunch and break times; and
- staggered arrival and departure times.

*[handwritten: I will comply]* • **Large Gatherings Prohibited.** Large in-person gatherings and in-person meetings of more than ten people are prohibited in the workplace until further notice. However, nothing in this policy prohibits employees from communicating with one another about workplace issues or gathering virtually using audio, visual, or other technology.

*[handwritten: I will comply]* • **Meeting Restrictions.** Limit in-person meetings to the extent consistent with business necessity. If meeting in-person:

- maintain at least a six-foot distance between participants;
- use alternate spaced seating arrangements across tables or desks to avoid direct face-to-face positioning;
- you may wear a face mask during the meeting;
- you should engage in regular handwashing or use of hand sanitizer which is available in each conference room;
- accommodate reasonable employee requests to participate remotely or from a private workspace in the office to the extent feasible; and
- do not attend if you are experiencing any COVID-19 symptoms or have knowingly been exposed to COVID-19.

*[handwritten: I will comply]* • **Six-Foot Distance.** To the extent possible, maintain a six-foot distance from others when crossing paths or walking near others' desks or workstations. Because a six-foot distance is not always possible, masks must be worn when walking the hallways. When walking by an occupied workspace, put as much space between you and your coworker as possible as you walk by.

*I will comply*

- **No Physical Greetings**. Do not shake hands or greet others in any manner that requires physical contact (such as fist or elbow bumps). In the "new normal" this is considered polite, not rude.

*I will comply*

- **Common Spaces Restricted.** The lunchrooms may be used in compliance with the above social distancing guidelines. Employees must take care to clean[shared appliances, such as coffee makers, microwaves, and refrigerators, or vending machine before and after each use.

*I will comply*

- **Break Locations.** You are encouraged to take lunch or breaks at your desks or outdoors.

*I will comply*

- **Visitor Limitations.** All personal visitors are prohibited until further notice, except in cases of emergency. All other visitors are prohibited unless they are essential to facilities operations, cleaning, repair, or otherwise essential to the business.  Necessary clients, expert witnesses, opposing counsel, mediators and the like are permitted on the premises.

*I will comply, by limiting use of shared equipment .*

- **Shared Supplies and Equipment.** Do not share personal office supplies and equipment. Notify Facilities if you need equipment that was previously shared, such as staplers, scissors, or other personal office equipment. Limit the use of shared electronic and other equipment, such as printers, copiers, and scanners, to the extent consistent with business necessity. If you need to use this equipment:

  *✓*
  - wear a mask when in the mail room, lunch room, or other shared spaces;

  *I will comply ✓ As time permits →*
  - maintain a six-foot distance from others when waiting to use the equipment;

  *I will comply as time permits*
  - use hand sanitizer in the copy rooms before and after each use;

  *I will comply*
  - clean each shared equipment station before and after each use on all touch surfaces.

- **Elevator and Stairway Use.** Comply with building personnel instructions and limitations regarding elevator and stairway access. Exercise caution when making physical contact with elevator buttons or stairway doors to minimize risks. Be prepared to wear a mask in the elevator in the event you are not riding alone.

*I will consult posted notices.*

- **Consult Posted Notices.** Comply with all posted and distributed notices throughout the workplace reminding employees about social distancing, handwashing, and reporting illness and other safety and health protocols.

*I will review new guidelines and determine if I will comply at that time ;*

- **Be Flexible.** Adhere to new guidelines as they emerge, as this issue is new and evolving.

**Policy Modification**

*I understand T+Bs right to modify, I will review and determine my compliance at that time.*

Government and public health guidelines and restrictions and business and industry best practices regarding COVID-19 are changing rapidly as new information becomes available and further research is conducted. Tiffany & Bosco, P.A. reserves the right to modify this policy at any time in its sole discretion to adapt to changing circumstances and business needs, consistent with its commitment to maintaining a safe and healthy workplace. Even if this policy is not revised, you are expected to follow the emergency orders or proclamations in effect.

**Enforcement and Non-Retaliation**

*I do not agree to this enforcement policy.*

Failure to comply with these social distancing measures may result in discipline, up to and including termination of employment.

If you witness or become aware of any employees or other individuals violating this policy, you are encouraged to report them to your direct supervisor or your Department Head immediately.

3

Tiffany & Bosco, P.A. prohibits any form of discipline, reprisal, intimidation, or retaliation for reporting a violation of this policy or any other health and safety concern. Employees also have the right to report work-related injuries and illnesses, and Tiffany & Bosco, P.A. will not discharge, discriminate, or otherwise retaliate against employees for reporting work-related injuries or illnesses.

**Continued At-Will Employment**

**Nothing in this policy alters the at-will nature of your employment.**

**Policy Administration**

The COVID-19 task force of Mark S. Bosco, J. Lawrence McCormley, Christopher R. Kaup, Rosary A. Hernandez, Lance R. Broberg, Jodi R. Bohr, Kevin J. Newell, Jen C. Lovato, Julio Perez, James Oswald, Shranda Lopez and Jose Zapata are responsible for administering and enforcing this policy. If you have any questions regarding this policy, or if you have questions about health and safety that are not addressed in this policy, please contact Jen C. Lovato or Kevin J. Newell.

**Acknowledgment of Receipt and Review**

I, _Louis A. Lofredo_ (employee name), acknowledge that on ~~I disagree that~~
_____ (date), I received and read a copy of Tiffany & Bosco, P.A.'s Social ~~this extraordinary~~
Distancing Policy, dated May 15, 2020 and understand that it is my responsibility to be familiar ~~length policy~~
with and abide by its terms. I understand that the information in this policy is intended to help ~~does not~~
Tiffany & Bosco, P.A.'s employees to work together effectively on assigned job responsibilities. ~~is not promissory~~
This policy is not promissory and does not set terms or conditions of employment or create an ~~by its very~~
employment contract. *I sign this policy under protest. This policy was signed* ~~nature.~~
*only because Chris Kaup & Kevin Newell had several meeting with me to discuss this policy and our*
*mutual concerns. It was very important*
*to me that I recent felt my liberties*      _____
*would not be further infringed upon in*     Signature
*the name of "public health."*

_Louis A. Lofredo_
Printed Name

_8/5/2020_
Date

4

5/12/22, 10:25 PM                                                        RE: Re: Personnel File for Lou Lofredo

## RE: Re: Personnel File for Lou Lofredo

From:  Jennifer C. Lovato <JCL@TBLAW.COM>
Sent:  Wed, Jun 30, 2021 at 5:17 pm
To:      loulofredo@reagan.com
Cc:      Christopher R. Kaup, Alexander Poulos, Mark S. Bosco

Lou,
Since speaking with you on June 2, 2021, I have followed up on your request for your personnel file. Please
note that personnel files are the private property of the employer and employers under Arizona law are not
required to provide copies of the same. The narrow scope of records provided to employees would only
include payroll data, such as hours worked, wages earned, deductions, and records relating to paid sick
time.  I am happy to provide you with that payroll data should you care to review those records.

Jen
## TIFFANY & BOSCO, P.A.
Jennifer C. Lovato | HR Manager | 602.288.7919
jcl@tblaw.com | Website

**From:** loulofredo@reagan.com <loulofredo@reagan.com>
**Sent:** Sunday, June 27, 2021 5:59 PM
**To:** IThelpdesk <ithelpdesk@tblaw.com>
**Cc:** Jennifer C. Lovato <JCL@TBLAW.COM>
**Subject:** FW: Re: Personnel File for Lou Lofredo

Dear James:

I saw that I incorrectly wrote the address to IThelpdesk below.  When will you be sending me my electronic
personnel file?

Sincerely,

Lou
——Original Message——
From: "loulofredo@reagan.com" <loulofredo@reagan.com>
Sent: Friday, June 18, 2021 4:34pm
To: "Jennifer Lovato" <jcl@tblaw.com>
Cc: ithelpdesk@tablaw.com
Subject: Re: Personnel File for Lou Lofredo

Dear Jen:

In reviewing the dates of my termination today, I recalled that you had promised to provide me with my entire
personnel file, including drafts, at the June 2, 2021 meeting with Chris Kaup.  I also sent you a follow-up
email on that request, when I provided you additional documentation that I asked you to add to my file.
When can I expect to receive my electronic personnel file?  Perhaps James Oswald can send that to me?

Sincerely,

Lou Lofredo
(623) 444-4841

## Exhibit 8

5/16/22, 7:59 PM                                          Personal &amp; Confidential

## Personal & Confidential
From: Camarena, Cheyenne <cheyenne.camarena@ogletree.com>
Sent:  Thu, Jul 29, 2021 at 10:54 am
To:    loulofredo@reagan.com

Please see the below correspondence on behalf of Joseph Clees:

                                                              Pursuant to Rule 408

Mr. Lofredo,

Responding to your email dated July 15, 2021, please note the following:

First, as you have previously been advised, you have been paid all wages due. There was no "verbal agreement" to pay you through June 18, 2021 and even if there were, you breached the agreement by threatening to "cause an incident" prior to your departure. As with your prior workplace threats and disruptions, this comment also caused coworkers to fear for their safety.

Second, you were timely paid all wages due. Your legal research that wages were due to you within 3 days is erroneous. Arizona law clearly provides that final wages may be paid:

…within seven working days or the end of the next regular pay period, whichever is sooner.

A.R.S. § 23-353.

As you can see, you were paid well within statutory requirements. Your erroneous research appears to be referring to an antiquated version of the state wage law that was updated nearly one decade ago.

Third, Tiffany & Bosco employees continue to complain that you are communicating with them at work. As I have previously requested, please direct all workplace inquires to me, including reference requests, and we will follow up as necessary. By the way, your previous mass communications with Tiffany & Bosco personnel have included false and defamatory statements and the firm and its personnel reserve all legal rights in that regard.

Fourth, you have misconstrued and misinterpreted the terms of FRCP 408 and its state law counterpart. The terms of Rule 408 are self-evident irrespective of your personal intentions.

Finally, Tiffany & Bosco offered you 8-weeks' pay in exchange for a release.  You did not accept it.  Without admission of liability and reserving Tiffany & Bosco's legal rights and remedies, are you willing to accept the 8 weeks' pay, plus the pay for the period from June 9-18, 2021 in exchange for a release?  If yes, please let me know and I will send you a revised draft release agreement.

**Joseph T. Clees | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
Esplanade Center III, 2415 East Camelback Road, Suite 800 | Phoenix, AZ 85016 | Telephone: 602-778-3701 | Mobile: 602-663-3001
joseph.clees@ogletreedeakins.com | www.ogletree.com | Bio

## Exhibit 9

Personal &amp; Confidential

*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

| | |
|---|---|
| **From:** | Russ Stowers <russ@stowerswest.com> |
| **Sent:** | Tuesday, November 10, 2020 5:24 PM |
| **To:** | Louis A. Lofredo |
| **Subject:** | |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Due By:** | Tuesday, November 10, 2020 2:00 PM |
| **Flag Status:** | Completed |

I'm not sure when you have annual evaluations, compensation reviews, etc., but if you would let me know what a good time might be, I'd like to send a note commending you to the powers-that-be.  I really appreciate your work, your responsiveness and your attention to detail.  It's better than a lot of the lawyers I deal with from all firms.  Thanks, Lou.

Russ Stowers
Russell B. Stowers, PLLC
Rillito Business Park
4574 North 1st Avenue, Suite 100
Tucson, AZ 85718
Office:  (520) 209-2777
Cell: (520) 331-2255
Fax:  (520) 882-3249
Web site:  StowersWest.com

1
**Exhibit 10**

| | |
|---|---|
| **From:** | Tanya Bainter <Tanya@hutzbah.com> |
| **Sent:** | Friday, February 26, 2021 3:20 PM |
| **To:** | Louis A. Lofredo |
| **Subject:** | RE: Draft Index of Documents from the R     ; In re R    , et al.; T&B No. 26448-001 |

I have never seen this quality of work, and I've worked with Marc for 9-1/2 years and with attorneys for 45!  I am totally impressed!

Tanya

Law Office of Marc S. Stern
1825 NW 65th St.
Seattle, WA 98117
206-448-7996
206-297-8778 (fax)
tanya@hutzbah.com

NOTICE: This e-mail may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you are not the intended recipient any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this e-mail in error, please immediately notify us. Thank you for your cooperation.

**From:** Louis A. Lofredo <lal@tblaw.com>
**Sent:** Friday, February 26, 2021 2:18 PM
**To:** Tanya Bainter <Tanya@hutzbah.com>
**Subject:** RE: Draft Index of Documents from the R    ; In re R    , et al.; T&B No. 26448-001

That was very sweet of you to say. ☺

Thank you.



Louis A. Lofredo | Paralegal
Seventh Floor Camelback Esplanade II | 2525 E Camelback Road | Phoenix, AZ 85016
P 602.255.6034 | F 602.255.0103
lal@tblaw.com | Website

Offices: Alabama | Arizona | California | Florida | Michigan | Nevada | New Mexico

**From:** Tanya Bainter <Tanya@hutzbah.com>
**Sent:** Friday, February 26, 2021 3:04 PM
**To:** Louis A. Lofredo <lal@tblaw.com>
**Subject:** RE: Draft Index of Documents from the R    ; In re R    , et al.; T&B No. 26448-001

I hope you are very well paid! ☺ You truly are exceptional!

Tanya

**From:** Louis A. Lofredo <lal@tblaw.com>
**Sent:** Friday, February 26, 2021 1:53 PM

1

**To:** Sallye Quinn (squinn@barronsmithlaw.com) <squinn@barronsmithlaw.com>
**Cc:** Christopher R. Kaup <CRK@tblaw.com>; Marc Stern <marc@hutzbah.com>; Tanya Bainter <Tanya@hutzbah.com>
**Subject:** Re: Draft Index of Documents from the R      ; In re R     , et al.; T&B No. 26448-001

     Re:     *In re R      , et al.*
              United States Bankruptcy Court, Western District of Washington (Seattle)
              Case No.:      -CMA
              File No.: 26448-001

Dear Ms. Quinn:

Although I shared the Bates labeled documents (Rathjen-000001-828) with Debtors counsel for ease of reference at the deposition, I am only sending the draft of the index in of those documents to you (both in Excel and pdf). I may not have time before the deposition to fill in each Bates entry for each document, but it is a good start for you and Chris during your review process and for reference when speaking with each other.

Sincerely,


Lou


 **TIFFANY & BOSCO**
P.A.

Louis A. Lofredo | Paralegal
Seventh Floor Camelback Esplanade II | 2525 E Camelback Road | Phoenix, AZ 85016
P 602.255.6034 | F 602.255.0103
lal@tblaw.com | Website

Offices:  Alabama | Arizona | California | Florida | Michigan | Nevada | New Mexico

**CONFIDENTIALITY NOTICE:  The information contained in this message may be protected by the attorney-client privilege.  If you believe that it has been sent to you in error, do not read it.  Please immediately reply to the sender that you have received the message in error, then delete it.  Thank you.**

| | |
|---|---|
| **From:** | Mike Williams <mike.williams@aztore.com> |
| **Sent:** | Friday, April 30, 2021 5:14 PM |
| **To:** | Louis A. Lofredo |
| **Cc:** | Christopher R. Kaup; Rick Buonincontri |
| **Subject:** | LOU U R A LIFESAVER - thanks for prompt response before I pulled out hair |

Glad U forward'd my email to the "fixer"

----

**From:** Louis A. Lofredo <lal@tblaw.com>
**Sent:** Friday, April 30, 2021 4:03 PM
**To:** Mike Williams <mike.williams@aztore.com>
**Cc:** James Fallon <jamesfallon60@gmail.com>; Lanny Lang <llang@langfsi.com>; markgiunta@giuntalaw.com;
Christopher R. Kaup <CRK@tblaw.com>
**Subject:** RE: HELP !!!!!!!!!!!!!

Dear Mr. Williams:

Attached is the following document (without the voluminous Exhibits):

    FIRST AMENDED DISCLOSURE STATEMENT DATED JULY 23, 2001 IN SUPPORT OF THE
    PROPOSED FIRST AMENDED JOINT PLAN OF REORGANIZATION

It includes the footer file stamp.

I found that this PACER link worked for me: U.S. Bankruptcy Court, District of Arizona (uscourts.gov).

Sincerely,

Lou

 **TIFFANY & BOSCO**
P.A.

Louis A. Lofredo | Paralegal
Seventh Floor Camelback Esplanade II | 2525 E Camelback Road | Phoenix, AZ 85016
P 602.255.6034 | F 602.255.0103
lal@tblaw.com | Website

Offices:  Alabama | Arizona | California | Florida | Michigan | Nevada | New Mexico

----

**From:** Mike Williams <mike.williams@aztore.com>
**Sent:** Friday, April 30, 2021 3:47 PM
**To:** James Fallon <jamesfallon60@gmail.com>; Lanny Lang <llang@langfsi.com>; Christopher R. Kaup
<CRK@tblaw.com>; markgiunta@giuntalaw.com
**Subject:** HELP !!!!!!!!!!!!!

Any chance U have a copy of the as filed V                's First Disclosure and BK Plan (as amended) – dated July 23, 2001
and filed July 24, 2001
Apparently too old for PACER to retain
Shows on docket but nothing accessible
If U don't have – do U have any ideas where I could find one ?? I am looking for a stamped copy

Is there a paper archive or microfilm ?? for old cases

Thanks, Mike Williams

| | |
|---|---|
| **From:** | Rebecca Lewis |
| **Sent:** | Thursday, July 2, 2020 3:26 PM |
| **To:** | Louis A. Lofredo |
| **Subject:** | FW: AZTurboCourt E-Filing Courtesy Notification |

Woo! Thanks again for all your help and expertise! ☺

**From:** TurboCourt Customer Service <CustomerService@TurboCourt.com>
**Sent:** Thursday, July 2, 2020 3:25 PM
**To:** Rebecca Lewis <rlewis@tblaw.com>
**Subject:** AZTurboCourt E-Filing Courtesy Notification

PLEASE DO NOT REPLY TO THIS EMAIL.

A party in this case requested that you receive an AZTurboCourt Courtesy Notification.

AZTurboCourt Form Set #4730487 has been accepted for filing at Court of Appeals Division 1 - Court of Appeals Division 1.

Here are the filing details:
Case Number: CV-20-0023
Filed By: Tina M Ezzell
AZTurboCourt Form Set: #4730487
Filing date and time: Jul 01, 2020 7:33 PM MST.
Keyword/Matter #:

Forms:
Summary Sheet


Attached Documents:
BRIEF - Answering/Cross-Opening: Combined Answering Brief and Opening Brief on Cross Appeal*
Certificate of Compliance: Certificate of Compliance for Combined Answering Brief and Opening Brief on Cross Appeal*
Certificate of Service: Certificate of Service of Combined Answering Brief and Opening Brief on Cross Appeal*

* Please note that attachment type or title was changed by the court/agency.

**From:** Christopher R. Kaup
**Sent:** Thursday, December 7, 2017 2:27 PM
**To:** Louis A. Lofredo
**Subject:** FW: Louis A. Lofredo

Please see the email below from Russ Stowers.   He is absolutely correct in every respect.   It is fantastic for me and our firm to receive this type of feedback about you from a lawyer with Russ' experience and skills.    Everything each of us does reflects on the firm as a whole.   You know that and perform with that in mind.   More than that: you succeed.

Thank you for everything you do.   I deeply appreciate and value you and your contributions to the success of our department and the firm.

Christopher R. Kaup | Shareholder | 602.255.6024

 **TIFFANY & BOSCO**
P.A.

Seventh Floor Camelback Esplanade II | 2525 E Camelback Road | Phoenix, AZ 85016
P 602.255.6000 | F 602.255.0103
crk@tblaw.com | Bio | vCard | Website | Practice Areas

Offices:  Arizona | California | Nevada

**CONFIDENTIALITY NOTICE:**  The information contained in this message may be protected by the attorney-client privilege.
If you believe that it has been sent to you in error, do not read it.  Please immediately reply to the sender that you have
received the message in error, then delete it.  Thank you.

**From:** Russ Stowers [mailto:russ@stowerswest.com]
**Sent:** Thursday, December 07, 2017 1:28 PM
**To:** Christopher R. Kaup <CRK@tblaw.com>
**Cc:** Robert A. Royal <RAR@tblaw.com>
**Subject:** Louis A. Lofredo

Chris:

I suspect that firm management is coming up on year-end things, perhaps including compensation, holiday bonuses or the like.  With that in mind, I wanted to make sure that the great work of Lou Lofredo on bankruptcy and litigation matters for the S         is recognized.

As you know, I have the joy  of managing litigation and related matters for the S         across the country.  Over the years I have served in this capacity, I have worked with many law firms, large and small, on cases involving hundreds of hourly rate and other professionals, and I have reviewed literally millions of dollars in legal bills in the process.  As you may also recall, I came from a large firm environment (17 years at Snell & Wilmer) and have served as in-house and outside risk management and claims counsel for a number of larger firms in Arizona and elsewhere.  I have also represented a number of firms when their fees were being challenged for various reasons.  I offer this background not to sound like an expert but to put my comments on Lou in the proper context.

You are already familiar with Lou's work on the S         bankruptcy cases, so there is no need to explain to you how excellent it has been.  But let me explain it this way from the client's perspective given my role on these cases:

1

**Lou Lofredo is the single best paraprofessional from any firm I have encountered on any of these cases, and he is one of the best legal professionals of any kind on any of my cases.   That is the truth, and it was obvious to me from the first time I dealt with Lou.**

This is not to diminish any of the other professionals or their work.  I'm just saying that Lou stands out immediately as someone who is very smart, skilled, articulate and responsive, and he has been extremely helpful to me in getting answers for these clients when I needed them the most.   If I could only pick one paraprofessional from all of my cases, Lou would be it.   I assume this is apparent to you inside the firm, but I wanted you and your partners to know how clear it is from the client perspective as well.

Russ Stowers
Russell B. Stowers, PLLC
La Paloma Corporate Center
3573 East Sunrise Drive, Suite 215
Tucson, AZ 85718
Office:  (520) 209-2777
Cell:  (520) 331-2255
Fax:  (520) 882-3249
Web site:  StowersWest.com

| | |
|---|---|
| **From:** | Rebecca Lewis |
| **Sent:** | Tuesday, September 29, 2020 9:42 AM |
| **To:** | Louis A. Lofredo |
| **Cc:** | Tina M. Ezzell |
| **Subject:** | Document: DRAFT Reply Brief ISO Cross Appeal |

Good morning Lou! Thank you again for your assistance yesterday, much appreciated. Below I have the doc link to the reply brief which I *believe* is pretty much ready to go at this point. Can you please take a last glance at it and let me know if you see any glaring errors or problems? Thank you!

KeyWords: DN4N93409
Client: 18146 O            , LLC
Matter: 008 v. J      F. S
Author: RL
Doc Type: PLD
Profiled by: RL

DRAFT Reply Brief ISO Cross Appeal= File://P:\DOCS\18146\008\PLD\4N93409.DOCX

**TB TIFFANY & BOSCO**
P.A.

Rebecca C. Lewis | Legal Assistant to Tina Ezzell and Jessica Brown
(602) 452-2746 (direct)
Seventh Floor Camelback Esplanade II
2525 E. Camelback Road | Phoenix, AZ 85016
rlewis@tblaw.com | Website

Offices: Alabama | Arizona | California | Florida | Michigan | Nevada | New Mexico

**CONFIDENTIALITY NOTICE:** The information contained in this message may be protected by the attorney-client privilege. If you believe that it has been sent to you in error, do not read it. Please immediately reply to the sender that you have received the message in error, then delete it. Thank you.

**From:**        Louis A. Lofredo
**Sent:**        Wednesday, April 21, 2021 5:58 PM
**To:**          Christopher R. Kaup
**Subject:**     RE: Nice email from Russ Stowers

FYI.



Louis A. Lofredo | Paralegal
Seventh Floor Camelback Esplanade II | 2525 E Camelback Road | Phoenix, AZ 85016
P 602.255.6034 | F 602.255.0103
lal@tblaw.com | Website

Offices: Alabama | Arizona | California | Florida | Michigan | Nevada | New Mexico

**From:** Russ Stowers <russ@stowerswest.com>
**Sent:** Wednesday, April 21, 2021 5:35 PM
**To:** Louis A. Lofredo <lal@tblaw.com>
**Subject:** RE:        BK

I have no doubt you vetted all of this with Amy, but you're selling yourself short, Lou. You are one of the best paraprofessionals with whom I work from any firm. That's the truth.

Russ

**From:** Louis A. Lofredo <lal@tblaw.com>
**Sent:** Wednesday, April 21, 2021 10:54 AM
**To:** Russ Stowers <russ@stowerswest.com>
**Subject:** RE: s        BK

Dear Russ:

I wanted you to be aware that before your email came in Amy and I did discuss the prior filings in the trial court (bankruptcy court) and the appeals court (district court). I sent her several links to documents in our system for her review. As you can see from her response a few hours after your email below, she is really good at what she does – appeals.

I appreciated your comment below, but truthfully I am only a reflection of the attorneys I work with and Amy is one of the best.

Sincerely,

Lou



Louis A. Lofredo | Paralegal
Seventh Floor Camelback Esplanade II | 2525 E Camelback Road | Phoenix, AZ 85016
P 602.255.6034 | F 602.255.0103
lal@tblaw.com | Website

1

Offices:  Alabama | Arizona | California | Florida | Michigan | Nevada | New Mexico

**From:** Russ Stowers <russ@stowerswest.com>
**Sent:** Tuesday, April 20, 2021 3:51 PM
**To:** Robert Sherrets <rsherrets@sherrets.com>; Amy D. Sells <ADS@tblaw.com>
**Cc:** Louis A. Lofredo <lal@tblaw.com>
**Subject:** RE: s       BK

   I'm going to loop T & B paralegal and docket guru Lou Lofredo into this discussion to see what, if anything, we received from any court, docketed and/or did on this issue before.   Amy is the 9th Circuit appellate veteran, so I'm sure she'll know what to do once Lou gives us any historical info on this.  Thanks, all.

**From:** Robert Sherrets <rsherrets@sherrets.com>
**Sent:** Tuesday, April 20, 2021 2:02 PM
**To:** Russ Stowers <russ@stowerswest.com>; Amy D. Sells (ADS@tblaw.com) <ADS@tblaw.com>
**Subject:** s        BK

Russ,

Per our call.

Attorney at Law

2

| | |
|---|---|
| **From:** | Russ Stowers <russ@stowerswest.com> |
| **Sent:** | Friday, November 20, 2020 12:29 PM |
| **To:** | Louis A. Lofredo; Todd T. Lenczycki |
| **Cc:** | Robert A. Royal; Amy D. Sells; Debra Davenport; Regina L. Smith; Law Office |
| **Subject:** | RE:          ; Deadline for Response to Attorneys' Fees; T&B No. 16957-005 |

Excellent work as always, Lou.  Thanks.

---

**From:** Louis A. Lofredo <lal@tblaw.com>
**Sent:** Friday, November 20, 2020 12:28 PM
**To:** Russ Stowers <russ@stowerswest.com>; Todd T. Lenczycki <ttl@tblaw.com>
**Cc:** Robert A. Royal <RAR@tblaw.com>; Amy D. Sells <ADS@tblaw.com>; Debra Davenport <dddavenport@tblaw.com>;
Regina L. Smith <RSmith@tblaw.com>; Law Office <law@sherrets.com>
**Subject:** RE:          ; Deadline for Response to Attorneys' Fees; T&B No. 16957-005

Dear Russ:

Short Answer: <u>December 8, 2020</u>.

Longer Answer:

The attached Minute Entry simply states:

> FURTHER ORDERED: Request for Attorneys' Fees (Appellees          Development et al) = GRANTED.

The *Affidavit of               regarding Attorneys' Fees* was served on us on November 19, 2020.  If we treat the
Affidavit as a Motion, our Response is due in 10 (business) days, with a Reply being due in 5 (business) days (ARCAP 6,
ARCAP 1 states ARCAP governs appeals to the AZ Supreme Court).  Since we received it in a manner that was not by
hand-delivery, we get an additional 5 (calendar) days (ARCAP 5 citing ARCP 6).  My calculation based on the information
above is that it is due as a *Response* on <u>December 8, 2020</u> (Served on 11-19-2020 + 10 calendar days = 12-3-2020 + 5
mailing days = 12-8-2020).

Attached are the cited rules for review.

Sincerely,

Lou



Louis A. Lofredo | Paralegal
Seventh Floor Camelback Esplanade II | 2525 E Camelback Road | Phoenix, AZ 85016
P 602.255.6034 | F 602.255.0103
lal@tblaw.com | Website

Offices:  Alabama | Arizona | California | Florida | Michigan | Nevada | New Mexico

---

**From:** Russ Stowers <russ@stowerswest.com>
**Sent:** Thursday, November 19, 2020 8:11 PM
**To:** Todd T. Lenczycki <ttl@tblaw.com>

1

**Cc:** Robert A. Royal <RAR@tblaw.com>; Amy D. Sells <ADS@tblaw.com>; Debra Davenport <dddavenport@tblaw.com>; Regina L. Smith <RSmith@tblaw.com>; Law Office <law@sherrets.com>; Louis A. Lofredo <lal@tblaw.com>
**Subject:** Re:


Lou:  please advise on the deadline for our response when you have the chance.  Thanks.

Sent from my iPhone


On Nov 19, 2020, at 8:02 PM, Todd T. Lenczycki <ttl@tblaw.com> wrote:


Hi Everyone.
The                      filed their attorney fee application with the Arizona Supreme Court case. Attached.
-TODD

**From:** Iannelli, Gregory B. <gregory.iannelli@bclplaw.com>
**Sent:** Thursday, November 19, 2020 7:57 PM
**To:** Robert A. Royal <RAR@tblaw.com>; Todd T. Lenczycki <ttl@tblaw.com>
**Cc:** McElenney, Sean <skmcelenney@bclplaw.com>; Russell, Catherine <carussell@bclplaw.com>
**Subject:**


See attached which was filed today in the Arizona Supreme Court.

| From: | Linda McFee <linda@aimlawgroup.com> |
|---|---|
| **Sent:** | Thursday, May 13, 2021 8:51 PM |
| **To:** | Louis A. Lofredo |
| **Subject:** | Re: Version of A _____'s Answer to Counterclaims (with Caption and Verification for Signature); T&B No. 26684-001 |

Thank you.  I will use the version you circulated last.

For the record, you are incredible.

Sent from my iPhone

> On May 13, 2021, at 10:41 PM, Louis A. Lofredo <lal@tblaw.com> wrote:

Please use the Answer that I sent you.  It took a bit of time to format it. ☺

By the way, as _____ said you are a very good (and detailed) writer.

Sincerely,

Lou



**Louis A. Lofredo | Paralegal**
Seventh Floor Camelback Esplanade II | 2525 E Camelback Road | Phoenix, AZ 85016
P 602.255.6034 | F 602.255.0103
lal@tblaw.com | Website

Offices:  Alabama | Arizona | California | Florida | Michigan | Nevada | New Mexico

**From:** Linda McFee <linda@aimlawgroup.com>
**Sent:** Thursday, May 13, 2021 8:04 PM
**To:** Christopher R. Kaup <CRK@tblaw.com>
**Cc:** Amit Raizada <amit@sbv.com>; King, Anthony <aking@swlaw.com>; Ali Rashid <alirashid@gmail.com>; Christopher J. Waznik <cjw@tblaw.com>; Louis A. Lofredo <lal@tblaw.com>; Robert D. Mitchell <rdm@tblaw.com>
**Subject:** RE: Need Signed Verification for _____ Answer to Counterclaims (with Caption and Verification for Signature); T&B No. 26684-001

I am happy to prepare the the new answer.  Most is the same.  There are a few new paragraphs.   I will circulate an answer tomorrow.

**From:** Christopher R. Kaup <CRK@tblaw.com>
**Sent:** Thursday, May 13, 2021 10:01 PM
**To:** Linda McFee <linda@aimlawgroup.com>
**Cc:** Amit Raizada <amit@sbv.com>; King, Anthony <aking@swlaw.com>; Ali Rashid <alirashid@gmail.com>; Christopher J. Waznik <cjw@tblaw.com>; Louis A. Lofredo <lal@tblaw.com>; Robert D. Mitchell <rdm@tblaw.com>

1

Lou,                                    5/11/2021

Thank you for the Miracle mile
Deli gift card! I'm looking
forward to trying their Pastrami
burger soon. It is such a
pleasure to work with you.

Sincerely,
Sara







602-530-8000    CONTACT US    CAREERS    PAYMENT         | Search |



**EDUCATION**

Arizona State University
J.D., *magna cum laude*, 2021
Order of the Coif
Order of the Barristers
Articles Editor, Law Journal

Arizona State University
B.A., 2017
Valedictorian

## SEVERANCE AGREEMENT AND GENERAL RELEASE

This Severance Agreement and General Release ("Agreement") is entered into as of MONTH DAY, YEAR, in the County of Maricopa, State of Arizona, between EMPLOYEE NAME ("EMPLOYEE") and Tiffany & Bosco, P.A. ("EMPLOYER" or "Company"). EMPLOYEE and EMPLOYER are the "parties" to this Agreement.  In consideration of the mutual promises in this Agreement, and other good and valuable consideration, the parties agree to be legally bound by the following promises and acknowledgements:

1.    Payments to EMPLOYEE:  EMPLOYER agrees to pay EMPLOYEE HOURS AND/OR PAYMENT DETAIL (1) payment of XX Hundred dollars and XX cents ($XX.XX) less lawfully required deductions and withholdings, for which a Form W-2 shall issue if EMPLOYEE is not in default of any provision of this agreement.  The payments shall be made on the next regularly scheduled pay date and paid thereafter on the regularly scheduled payroll dates, after this Agreement becomes effective pursuant to Paragraph 17. The parties agree that these payments are in addition to any other benefits and payments to which EMPLOYEE is otherwise legally entitled.  EMPLOYEE acknowledges and agrees that he has received payment of all compensation and benefits owed to him pursuant to his employment with EMPLOYER, and that the Company is not indebted to him in any amount or for any reason.

2.    Release of Claims:    EMPLOYEE acknowledges that the consideration in Paragraph 1 represents full and final payment of all claims by EMPLOYEE against the Company, and is in excess of what EMPLOYEE would otherwise be entitled by virtue of his employment. By signing this Agreement and in consideration for the payments in Paragraph 1, EMPLOYEE completely and forever releases EMPLOYER, and any past, present, or future owners, shareholders, directors, officers employees, attorneys, agents, insurers, partners, predecessors and successors in interest, beneficiaries, executors, administrators, personal representatives, heirs, successors, affiliates and assigns of the Company and any other persons, firms, corporations, or entities with which the Company has been, is now, or may hereafter be affiliated (hereinafter the "Released Parties"), from any and all existing claims, demands, grievances, or lawsuits that involve or arise from the employment relationship between EMPLOYEE and EMPLOYER, or the termination of that relationship.  This general release includes, but is not limited to, claims, demands, or lawsuits that arise under any of the following laws or regulations: Title VII of the Civil Rights Act of 1964, as amended; the Age Discrimination in Employment Act of 1967, as amended; the Employee Retirement Income Security Act, as amended; the Americans with Disabilities Act, as amended; the Family and Medical Leave Act, as amended; the Arizona Civil Rights Act, as amended; the Arizona Employment Protection Act, as amended; Arizona wage statutes; the Arizona Medical Marijuana Act; any other federal, state, or local constitution, statute, ordinance, or regulation; or any other theory of recovery including, but not limited, to claims for breach of contract, wrongful discharge, and any tort or other claim of personal injury.  EMPLOYEE's release includes any and all existing claims that in any way involve or arise from the employment relationship between EMPLOYEE and the Company that exist as of the EMPLOYEE's execution of this Agreement, even if the facts and/or legal theories supporting those claims are unknown to EMPLOYEE at this time. This release binds EMPLOYEE's marital community, heirs, and assigns, as well as him.

Employee's Initials _____

**Exhibit 11**

4G67406

3.     <u>Covenant Not To Sue/Right To Participate In Agency Proceedings</u>: EMPLOYEE agrees that he will not bring a lawsuit against the Released Parties asserting any of the claims released in this Agreement.  In the event EMPLOYEE ever acts in disregard of the covenants made in this Paragraph, and files a lawsuit based on any legal claims that the EMPLOYEE has agreed to release, EMPLOYEE will pay for all costs incurred by EMPLOYER, including all reasonable attorneys' fees incurred in defending against EMPLOYEE's previously-released claims.  EMPLOYEE acknowledges and agrees that this Agreement may be pled as a complete bar to any action or suit before any court or adjudicative body with respect to any complaint or claim arising under any federal, state, local or other law relating to any possible claim that existed or may have existed as a result of his employment or termination with EMPLOYER. EMPLOYEE also affirmatively represents that he is not aware of any claims he is not releasing through this Agreement.

Nothing in this Agreement is intended to limit or impair in any way EMPLOYEE's right to file a charge with the U.S. Equal Employment Opportunity Commission (EEOC) or comparable federal, state and local agencies, or EMPLOYEE's right to participate in any such charge filed with such agencies and to recover any appropriate relief in any such action. However, the parties agree that appropriate relief may not include remedies that personally benefit EMPLOYEE and which he has released and waived under this Agreement, including all legal relief, equitable relief, statutory relief, reinstatement, back pay, and front pay, and all other damages, benefits, remedies, or relief that EMPLOYEE may be entitled to as a result of the filing or prosecution of any such charge against EMPLOYER by EMPLOYEE, or any resulting civil proceeding or lawsuit brought on behalf of EMPLOYEE and which arises out of any matters that are released or waived by this Agreement.  This Agreement shall not preclude EMPLOYEE from bringing a charge or suit to challenge the validity or enforceability of this Agreement under the Age Discrimination employment Act (29 U.S.C. § 620, et seq.) as amended by the Older Workers Benefit Protection Act.

4.     <u>Application for Employment</u>:  EMPLOYEE understands and agrees that, as a condition of this Agreement, he shall not be entitled to any employment with the Company, its subsidiaries, affiliates, joint ventures, or any successor, and he hereby waives any alleged right of employment or re-employment with the Company, its subsidiaries or related companies, or any successor.  EMPLOYEE further acknowledges and agrees that the forbearance to seek future employment stated in this Paragraph is purely contractual, and is in no way involuntary, discriminatory or retaliatory.

5.     <u>Neutral Reference</u>:  EMPLOYER agrees that it will respond to any employment reference requests directed to EMPLOYER's Human Resource Manager regarding EMPLOYEE by providing only EMPLOYEE's date of employment and position/title, per the Company standard policy.

6.     <u>Confidential and Proprietary Information</u>:  EMPLOYEE agrees that the Company is in a highly competitive business and that its success depends in great part on maintaining a competitive advantage through having and using confidential and/or proprietary information (hereinafter referred to collectively as "Proprietary Information").  By way of illustration but not limitation, the term "Proprietary Information" includes any of the following in any form of data storage: (a) financial information regarding EMPLOYER, its Shareholders and employees, customer lists, trade secrets, inventions, ideas, copyrights, art works, images, drawings, designs

Employee's Initials _____

and techniques, other works of authorship, know-how, improvements, discoveries, developments; (b) company policies, manuals, procedures, forms, checklists, flow charts, and (c) information regarding plans for research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers. EMPLOYEE agrees that he has had access to Proprietary Information, and therefore: EMPLOYEE promises to immediately return all Proprietary Information to the Company, and not to disclose any such materials to any person, including any competitor of the Company or otherwise use such materials in any future employment or business efforts; and EMPLOYEE further agrees that any retention or use of Proprietary Information would irreparably harm the Company and that monetary damages might not be an adequate remedy for any such retention or use. EMPLOYEE therefore agrees that a court may enjoin and restrain him from violating this Paragraph without a showing by the Company that irreparable harm might result from the violation.

7.    Future Actions:  EMPLOYEE agrees that he will not take any actions which may damage any assets of EMPLOYER, including any computer systems, servers or electronically stored information and will not attempt to access any servers, systems or electronically stored information at any time for any purpose.  EMPLOYEE further agrees that he will not assist any person with attempting to access EMPLOYER's computer systems, servers and/or electronically stored information.  EMPLOYEE also agrees that if he has any electronically stored information belonging to EMPLOYER or any other confidential material of EMPLOYER, he will inform Kevin J. Newell, Chief Operating Officer, about that fact and either return that material or information to EMPLOYER or destroy it at the option of the EMPLOYER.

8.    Non-Disclosure of Agreement:  EMPLOYEE agrees to hold in strict confidence the negotiations resulting in, contents, and terms of this Agreement, except (1) as required by law, (2) to secure advice from a legal or tax advisor, (3) to his immediate family, or (4) in a legal action to enforce the terms of this Agreement.  EMPLOYEE further agrees to use every effort to prevent disclosure of the existence or terms of this Agreement by any of the persons referred to in (2) and (3) above.  EMPLOYEE agrees that the contents of this Paragraph are material terms of the Agreement.

9.    Non-Disparagement:  EMPLOYEE agrees not to publicly make comments that are derogatory, defamatory, or disparaging of EMPLOYER and any Released Parties.  Such prohibited comments include any communication, oral or written, which would cause or tend to cause the recipient of the communication to question the business condition, integrity, competence, fairness, or good character of the person or entity to whom the communication relates. This Paragraph shall not apply to communications required by law, or that are otherwise privileged as a matter of law.  EMPLOYEE's non-disparagement obligations under this Paragraph do not interfere with or restrict EMPLOYEE's ability to communicate with any federal, state, or local agency, including any with which a charge has been filed.

10.    Violation of Agreement:  EMPLOYEE understands that any violation or breach of a material term of this Agreement by him shall give rise to a claim against him by the Company and/or its parent, subsidiaries, affiliates, successors, or assigns for a refund of the consideration paid pursuant to this Agreement and shall forever release and discharge the Company and its parents, subsidiaries, affiliates, successors, and assigns from the performance of any obligations arising from this Agreement, including those payment obligations outlined in

Employee's Initials _____

Paragraph 1, but shall not release EMPLOYEE from performance of his obligations under this Agreement. Because the calculation of the damages to EMPLOYER from any breach by EMPLOYEE of Paragraph 7, EMPLOYEE agrees to an award of $1,000,000.00 against him for any violation by him of Paragraph 7. You also agree that any such actions by you would be willful and malicious and necessarily will cause damage to the Firm and its property.

   11.   Medicare:  EMPLOYEE affirms, covenants, and warrants he is not a Medicare beneficiary and is not currently receiving, has not received in the past, will not have received at the time of payment pursuant to this Agreement, is not entitled to, is not eligible for, and has not applied for or sought Social Security Disability or Medicare benefits. In the event any statement in the preceding sentence is incorrect (for example, but not limited to, if EMPLOYEE is a Medicare beneficiary, etc.), the following sentences (i.e., the remaining sentences of this Paragraph) apply.  EMPLOYEE affirms, covenants, and warrants he has made no claim for illness or injury against, nor is he aware of any facts supporting any claim against, the released parties under which the released parties could be liable for medical expenses incurred by the EMPLOYEE before or after the execution of this agreement. Furthermore, EMPLOYEE is aware of no medical expenses which Medicare has paid and for which the released parties are or could be liable now or in the future. EMPLOYEE agrees and affirms that, to the best of his knowledge, no liens of any governmental entities, including those for Medicare conditional payments, exist. EMPLOYEE will indemnify, defend, and hold the released parties harmless from Medicare claims, liens, damages, conditional payments, and rights to payment, if any, including attorneys' fees, and EMPLOYEE further agrees to waive any and all future private causes of action for damages pursuant to 42 U.S.C. § 1395y(b)(3)(A) et seq.

   12.   No External Representations or Agreements:  This Agreement constitutes the sole and entire agreement between the parties regarding the subject matter addressed herein, and supersedes any and all understandings and agreements that may have been reached earlier on this subject matter. There are no understandings, representations, or agreements other than those set forth in this Agreement. No provision of this Agreement shall be amended, waived or modified except in writing, signed by the parties.

   13.   Limited Admissibility of Agreement:  The parties agree that this Agreement may not be introduced in any proceeding, except to establish conclusively the settlement and release of the claims it encompasses or to otherwise ensure rights created by this Agreement. This Agreement is not to be interpreted as an admission of any liability or other obligation to EMPLOYEE except as expressly set forth in this Agreement.

   14.   Severability:  If any provision of this Agreement is held by a court or arbitrator of competent jurisdiction to be invalid, void, or unenforceable for whatever reason, the remaining provisions of this Agreement shall nevertheless continue in full force and effect without being impaired in any manner whatsoever.

   15.   Arbitration.  All disputes or claims arising out of, or related to, or concerning this Agreement shall be determined exclusively by arbitration before a single arbitrator in accordance with the Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association ("AAA"). This Agreement is an individually negotiated agreement, and thereby the costs associated with any such arbitration shall be paid in accordance with AAA's Fee Schedule for such agreements.

Employee's Initials _____

4G67406

16.    Other Instruments: The Parties expressly agree to execute any further or additional instruments as may reasonably be required to perform any other acts necessary to effectuate and carry out the purposes of this Agreement.

17.    No Assignment of Claims: EMPLOYEE represents and warrants to the EMPLOYER that he has not assigned, and will not assign, in whole or in part, to any third party (whether an individual or entity), any claims EMPLOYEE may have against the EMPLOYER.

18.    Tax Treatment: The Payment to EMPLOYEE is intended to fall within the separation pay exception to the application of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") as set forth in Treasury Regulation Section 1.409A-1(b)(9). To the extent the Severance Payment becomes subject to Code Section 409A and applicable guidance thereunder, this Agreement shall be construed, and payments are made hereunder, as necessary to comply with such Code Section and such guidance. To the extent the terms of this Agreement are contrary to, or fail to address the minimum requirements of, Code Section 409A and all applicable guidance issued thereunder, the EMPLOYER may, in its sole discretion, take steps as it deems reasonable to provide the payments in a manner that complies with Code Section 409A and the guidance issued thereunder. However, any and all tax liability and penalties resulting from non-compliance with Code Section 409A shall remain the sole responsibility of EMPLOYEE.

19.    Reliance: EMPLOYEE warrants and represents that: (a) EMPLOYEE has relied on EMPLOYEE's own judgment regarding consideration for and language of this Agreement; (b) no statements made by the EMPLOYER have in any way coerced or unduly influenced EMPLOYEE to execute this Agreement; and (c) this Agreement is written in a manner that EMPLOYEE understands, and EMPLOYEE has read and understood all paragraphs of this Agreement.

20.    Modification: This Agreement may not be modified or changed unless done in writing and signed by both Parties.

21.    Choice of Law: This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona.

22.    Counterparts: This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall together constitute one and the same document.

23.    Health Benefits: Following the separation date identified in Paragraph 1 of this Agreement and/or termination of his eligibility for health benefits coverage as an active participant pursuant to applicable plan documents, EMPLOYEE shall be eligible to elect health insurance benefits continuation coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act (COBRA).

24.    Attorneys' Fees and Costs: In any proceeding or action to enforce this Agreement or recover damages arising out of its breach, the prevailing party shall be awarded its reasonable attorneys' fees and costs. In the event EMPLOYEE or EMPLOYER should breach any provision of this Agreement, and the other party employs an attorney to protect their or its

Employee's Initials _____

interests therein and obtains injunctive relief and/or a judgment in their or its favor, then the party which obtains injunctive relieve and/or judgment in their or its favor shall be entitled to recover from the other party reasonable attorneys' fees, costs of action, and applicable pre-judgment and post-judgment interest at the legal rate of interest, in addition to all other categories of recovery to which the prevailing party may be entitled. Further, in the event EMPLOYEE should breach this Agreement, EMPLOYEE shall be obligated to tender back and return to EMPLOYER all payments set forth in Paragraph 1 of this Agreement previously paid at the time of breach.

     25.   <u>EMPLOYEE Avowals</u>:  EMPLOYEE, by his execution of this Agreement, avows that the following statements are true:

     a.    That he has been given the opportunity and has in fact read this entire Agreement and has had all questions regarding its meaning answered to his satisfaction;

     b.    That he has done nothing and taken no actions, at any time, which has or may in the future cause any damage to or impair the operations of EMPLOYER's computer systems, servers and electronically stored information.

     c.    That he is hereby advised to seek independent legal advice and/or counsel of his own choosing prior to the execution of this Agreement;

     d.    That he fully understands the contents of this Agreement and understands that it is a FULL WAIVER OF ALL CLAIMS against the released parties;

     e.    That this FULL WAIVER OF ALL CLAIMS is given in return for valuable consideration, as provided under the terms of this Agreement;

     f.    That he enters into this Agreement knowingly and voluntarily in exchange for the promises referenced in this Agreement **AND THAT NO OTHER REPRESENTATIONS HAVE BEEN MADE TO HIM TO INDUCE OR INFLUENCE HIM EXECUTION OF THIS AGREEMENT**.

     26.   <u>Periods for Considering and Revoking Agreement</u>:  EMPLOYEE acknowledges that he has been given at least 21 days to consider this Agreement.  EMPLOYEE agrees that, if he signs this Agreement before the end of the above 21-day period, his signature is intended to waive his right to consider the Agreement for 21 days.  The parties agree that EMPLOYEE may revoke this Agreement at any time within 7 days after signing the Agreement by written notice, hand-delivered to the below address.  The parties acknowledge and agree that this Agreement is not effective or enforceable until the 7-day revocation period has expired.   Notice of revocation may be hand-delivered in writing by 5:00 p.m. or e-mailed no later than the seventh day of the revocation period to:

     Tiffany & Bosco, P.A.
     Human Resource Manager
     2525 E. Camelback Road, Seventh Floor
     Phoenix, AZ 85016
     hr@tblaw.com

Employee's Initials _____

4G67406

27.    <u>Code Section 409A</u>:    The terms of this Agreement shall be construed and administered in a manner calculated to satisfy the short-term deferral exception under Treas. Reg. Section 1.409A-1(b)(4); the separation pay plan exception under Treas. Reg. Section 1.409A-1(b)(9)(iii); and the welfare benefit exception under Treas. Reg. 1.409A-1(b)(9)(v) to Code Section 409A.   Any reference in this Agreement to a termination of employment (or similar term) means a "separation from service" as defined in Internal Revenue Code Section 409A and the applicable guidance issued thereunder.   In the event the Agreement fails to satisfy an exception to Internal Revenue Code Section 409A and the applicable guidance issued thereunder, it will be construed and administered in accordance therewith to the extent permitted by law.   All rights to payments and benefits hereunder shall be treated as rights to receive a series of separate payments and benefits to the fullest extent allowed by Internal Revenue Code Section 409A.

<u>EMPLOYEE</u>                                          Tiffany & Bosco, P.A.

_____                    By:_____

Signature                                          Its:_____

Date:_____                     Date:_____

Employee's Initials _____

## SEVERANCE AGREEMENT AND GENERAL RELEASE

This Severance Agreement and General Release ("Agreement") is entered into as of June 8, 2021, in the County of Maricopa, State of Arizona, between LOUIS A. LOFREDO ("EMPLOYEE") and Tiffany & Bosco, P.A. ("EMPLOYER" or "Company"). EMPLOYEE and EMPLOYER are the "parties" to this Agreement. In consideration of the mutual promises in this Agreement, and other good and valuable consideration, the parties agree to be legally bound by the following promises and acknowledgements:

1.     <u>Payments to EMPLOYEE</u>:  EMPLOYER agrees to pay EMPLOYEE eight weeks or 320 hours for a total of fifteen thousand seven hundred seventy nine dollars and 20 cents ($15,779.20), less lawfully required deductions and withholdings, for which a Form W-2 shall issue if EMPLOYEE is not in default of any provision of this agreement. The payments shall be made in four installments of three thousand, nine hundred forty four dollars and 80 cents ($3,944.80) on the next regularly scheduled pay date and paid thereafter on the regularly scheduled payroll dates, after this Agreement becomes effective pursuant to Paragraph 17. The parties agree that these payments are in addition to any other benefits and payments to which EMPLOYEE is otherwise legally entitled. EMPLOYEE acknowledges and agrees that he has received payment of all compensation and benefits owed to him pursuant to his employment with EMPLOYER, and that the Company is not indebted to him in any amount or for any reason.

2.     <u>Release of Claims</u>:    EMPLOYEE acknowledges that the consideration in Paragraph 1 represents full and final payment of all claims by EMPLOYEE against the Company, and is in excess of what EMPLOYEE would otherwise be entitled by virtue of his employment. By signing this Agreement and in consideration for the payments in Paragraph 1, EMPLOYEE completely and forever releases EMPLOYER, and any past, present, or future owners, shareholders, directors, officers employees, attorneys, agents, insurers, partners, predecessors and successors in interest, beneficiaries, executors, administrators, personal representatives, heirs, successors, affiliates and assigns of the Company and any other persons, firms, corporations, or entities with which the Company has been, is now, or may hereafter be affiliated (hereinafter the "Released Parties"), from any and all existing claims, demands, grievances, or lawsuits that involve or arise from the employment relationship between EMPLOYEE and EMPLOYER, or the termination of that relationship. This general release includes, but is not limited to, claims, demands, or lawsuits that arise under any of the following laws or regulations: Title VII of the Civil Rights Act of 1964, as amended; the Age Discrimination in Employment Act of 1967, as amended; the Employee Retirement Income Security Act, as amended; the Americans with Disabilities Act, as amended; the Family and Medical Leave Act, as amended; the Arizona Civil Rights Act, as amended; the Arizona Employment Protection Act, as amended; Arizona wage statutes; the Arizona Medical Marijuana Act; any other federal, state, or local constitution, statute, ordinance, or regulation; or any other theory of recovery including, but not limited, to claims for breach of contract, wrongful discharge, and any tort or other claim of personal injury. EMPLOYEE's release includes any and all existing claims that in any way involve or arise from the employment relationship between EMPLOYEE and the Company that exist as of the EMPLOYEE's execution of this Agreement, even if the facts and/or legal theories supporting those claims are unknown to EMPLOYEE at this time. This release binds EMPLOYEE's marital community, heirs, and assigns, as well as him.

Employee's Initials _____

**Exhibit 12**

3.    <u>Covenant Not To Sue/Right To Participate In Agency Proceedings</u>: EMPLOYEE agrees that he will not bring a lawsuit against the Released Parties asserting any of the claims released in this Agreement.  In the event EMPLOYEE ever acts in disregard of the covenants made in this Paragraph, and files a lawsuit based on any legal claims that the EMPLOYEE has agreed to release, EMPLOYEE will pay for all costs incurred by EMPLOYER, including all reasonable attorneys' fees incurred in defending against EMPLOYEE's previously-released claims.  EMPLOYEE acknowledges and agrees that this Agreement may be pled as a complete bar to any action or suit before any court or adjudicative body with respect to any complaint or claim arising under any federal, state, local or other law relating to any possible claim that existed or may have existed as a result of his employment or termination with EMPLOYER.  EMPLOYEE also affirmatively represents that he is not aware of any claims he is not releasing through this Agreement.

Nothing in this Agreement is intended to limit or impair in any way EMPLOYEE's right to file a charge with the U.S. Equal Employment Opportunity Commission (EEOC) or comparable federal, state and local agencies, or EMPLOYEE's right to participate in any such charge filed with such agencies and to recover any appropriate relief in any such action. However, the parties agree that appropriate relief may not include remedies that personally benefit EMPLOYEE and which he has released and waived under this Agreement, including all legal relief, equitable relief, statutory relief, reinstatement, back pay, and front pay, and all other damages, benefits, remedies, or relief that EMPLOYEE may be entitled to as a result of the filing or prosecution of any such charge against EMPLOYER by EMPLOYEE, or any resulting civil proceeding or lawsuit brought on behalf of EMPLOYEE and which arises out of any matters that are released or waived by this Agreement.  This Agreement shall not preclude EMPLOYEE from bringing a charge or suit to challenge the validity or enforceability of this Agreement under the Age Discrimination employment Act (29 U.S.C. § 620, et seq.) as amended by the Older Workers Benefit Protection Act.

4.    <u>Application for Employment</u>:  EMPLOYEE understands and agrees that, as a condition of this Agreement, he shall not be entitled to any employment with the Company, its subsidiaries, affiliates, joint ventures, or any successor, and he hereby waives any alleged right of employment or re-employment with the Company, its subsidiaries or related companies, or any successor.  EMPLOYEE further acknowledges and agrees that the forbearance to seek future employment stated in this Paragraph is purely contractual, and is in no way involuntary, discriminatory or retaliatory.

5.    <u>Neutral Reference</u>:  EMPLOYER agrees that it will respond to any employment reference requests directed to EMPLOYER's Human Resource Manager regarding EMPLOYEE by providing only EMPLOYEE's date of employment and position/title, per the Company standard policy.

6.    <u>Confidential and Proprietary Information</u>:  EMPLOYEE agrees that the Company is in a highly competitive business and that its success depends in great part on maintaining a competitive advantage through having and using confidential and/or proprietary information (hereinafter referred to collectively as "Proprietary Information").  By way of illustration but not limitation, the term "Proprietary Information" includes any of the following in any form of data storage: (a) financial information regarding EMPLOYER, its Shareholders and employees, customer lists, trade secrets, inventions, ideas, copyrights, art works, images, drawings, designs

Employee's Initials _____

and techniques, other works of authorship, know-how, improvements, discoveries, developments; (b) company policies, manuals, procedures, forms, checklists, flow charts, and (c) information regarding plans for research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers. EMPLOYEE agrees that he has had access to Proprietary Information, and therefore: EMPLOYEE promises to immediately return all Proprietary Information to the Company, and not to disclose any such materials to any person, including any competitor of the Company or otherwise use such materials in any future employment or business efforts; and EMPLOYEE further agrees that any retention or use of Proprietary Information would irreparably harm the Company and that monetary damages might not be an adequate remedy for any such retention or use. EMPLOYEE therefore agrees that a court may enjoin and restrain him from violating this Paragraph without a showing by the Company that irreparable harm might result from the violation.

7.  Future Actions: EMPLOYEE agrees that he will not take any actions which may damage any assets of EMPLOYER, including any computer systems, servers or electronically stored information and will not attempt to access any servers, systems or electronically stored information at any time for any purpose. EMPLOYEE further agrees that he will not assist any person with attempting to access EMPLOYER's computer systems, servers and/or electronically stored information. EMPLOYEE also agrees that if he has any electronically stored information belonging to EMPLOYER or any other confidential material of EMPLOYER, he will inform Kevin J. Newell, Chief Operating Officer, about that fact and either return that material or information to EMPLOYER or destroy it at the option of the EMPLOYER.

8.  Non-Disclosure of Agreement: EMPLOYEE agrees to hold in strict confidence the negotiations resulting in, contents, and terms of this Agreement, except (1) as required by law, (2) to secure advice from a legal or tax advisor, (3) to his immediate family, or (4) in a legal action to enforce the terms of this Agreement. EMPLOYEE further agrees to use every effort to prevent disclosure of the existence or terms of this Agreement by any of the persons referred to in (2) and (3) above. EMPLOYEE agrees that the contents of this Paragraph are material terms of the Agreement.

9.  Non-Disparagement: EMPLOYEE agrees not to publicly make comments that are derogatory, defamatory, or disparaging of EMPLOYER and any Released Parties. Such prohibited comments include any communication, oral or written, which would cause or tend to cause the recipient of the communication to question the business condition, integrity, competence, fairness, or good character of the person or entity to whom the communication relates. This Paragraph shall not apply to communications required by law, or that are otherwise privileged as a matter of law. EMPLOYEE's non-disparagement obligations under this Paragraph do not interfere with or restrict EMPLOYEE's ability to communicate with any federal, state, or local agency, including any with which a charge has been filed.

10.  Violation of Agreement: EMPLOYEE understands that any violation or breach of a material term of this Agreement by him shall give rise to a claim against him by the Company and/or its parent, subsidiaries, affiliates, successors, or assigns for a refund of the consideration paid pursuant to this Agreement and shall forever release and discharge the Company and its parents, subsidiaries, affiliates, successors, and assigns from the performance of any obligations arising from this Agreement, including those payment obligations outlined in

Page 3 of 7

Employee's Initials _____

Paragraph 1, but shall not release EMPLOYEE from performance of his obligations under this Agreement. Because the calculation of the damages to EMPLOYER from any breach by EMPLOYEE of Paragraph 7, EMPLOYEE agrees to an award of $1,000,000.00 against him for any violation by him of Paragraph 7. You also agree that any such actions by you would be willful and malicious and necessarily will cause damage to the Firm and its property.

 11. Medicare: EMPLOYEE affirms, covenants, and warrants he is not a Medicare beneficiary and is not currently receiving, has not received in the past, will not have received at the time of payment pursuant to this Agreement, is not entitled to, is not eligible for, and has not applied for or sought Social Security Disability or Medicare benefits. In the event any statement in the preceding sentence is incorrect (for example, but not limited to, if EMPLOYEE is a Medicare beneficiary, etc.), the following sentences (i.e., the remaining sentences of this Paragraph) apply. EMPLOYEE affirms, covenants, and warrants he has made no claim for illness or injury against, nor is he aware of any facts supporting any claim against, the released parties under which the released parties could be liable for medical expenses incurred by the EMPLOYEE before or after the execution of this agreement. Furthermore, EMPLOYEE is aware of no medical expenses which Medicare has paid and for which the released parties are or could be liable now or in the future. EMPLOYEE agrees and affirms that, to the best of his knowledge, no liens of any governmental entities, including those for Medicare conditional payments, exist. EMPLOYEE will indemnify, defend, and hold the released parties harmless from Medicare claims, liens, damages, conditional payments, and rights to payment, if any, including attorneys' fees, and EMPLOYEE further agrees to waive any and all future private causes of action for damages pursuant to 42 U.S.C. § 1395y(b)(3)(A) et seq.

 12. No External Representations or Agreements: This Agreement constitutes the sole and entire agreement between the parties regarding the subject matter addressed herein, and supersedes any and all understandings and agreements that may have been reached earlier on this subject matter. There are no understandings, representations, or agreements other than those set forth in this Agreement. No provision of this Agreement shall be amended, waived or modified except in writing, signed by the parties.

 13. Limited Admissibility of Agreement: The parties agree that this Agreement may not be introduced in any proceeding, except to establish conclusively the settlement and release of the claims it encompasses or to otherwise ensure rights created by this Agreement. This Agreement is not to be interpreted as an admission of any liability or other obligation to EMPLOYEE except as expressly set forth in this Agreement.

 14. Severability: If any provision of this Agreement is held by a court or arbitrator of competent jurisdiction to be invalid, void, or unenforceable for whatever reason, the remaining provisions of this Agreement shall nevertheless continue in full force and effect without being impaired in any manner whatsoever.

 15. Arbitration. All disputes or claims arising out of, or related to, or concerning this Agreement shall be determined exclusively by arbitration before a single arbitrator in accordance with the Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association ("AAA"). This Agreement is an individually negotiated agreement, and thereby the costs associated with any such arbitration shall be paid in accordance with AAA's Fee Schedule for such agreements.

Employee's Initials _____

16.   Other Instruments: The Parties expressly agree to execute any further or additional instruments as may reasonably be required to perform any other acts necessary to effectuate and carry out the purposes of this Agreement.

17.   No Assignment of Claims:   EMPLOYEE represents and warrants to the EMPLOYER that he has not assigned, and will not assign, in whole or in part, to any third party (whether an individual or entity), any claims EMPLOYEE may have against the EMPLOYER.

18.   Tax Treatment:   The Payment to EMPLOYEE is intended to fall within the separation pay exception to the application of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") as set forth in Treasury Regulation Section 1.409A-1(b)(9). To the extent the Severance Payment becomes subject to Code Section 409A and applicable guidance thereunder, this Agreement shall be construed, and payments are made hereunder, as necessary to comply with such Code Section and such guidance.  To the extent the terms of this Agreement are contrary to, or fail to address the minimum requirements of, Code Section 409A and all applicable guidance issued thereunder, the EMPLOYER may, in its sole discretion, take steps as it deems reasonable to provide the payments in a manner that complies with Code Section 409A and the guidance issued thereunder.  However, any and all tax liability and penalties resulting from non-compliance with Code Section 409A shall remain the sole responsibility of EMPLOYEE.

19.   Reliance:  EMPLOYEE warrants and represents that: (a) EMPLOYEE has relied on EMPLOYEE's own judgment regarding consideration for and language of this Agreement; (b) no statements made by the EMPLOYER have in any way coerced or unduly influenced EMPLOYEE to execute this Agreement; and (c) this Agreement is written in a manner that EMPLOYEE understands, and EMPLOYEE has read and understood all paragraphs of this Agreement.

20.   Modification:  This Agreement may not be modified or changed unless done in writing and signed by both Parties.

21.   Choice of Law: This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona.

22.   Counterparts: This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall together constitute one and the same document.

23.   Health Benefits: Following the separation date identified in Paragraph 1 of this Agreement and/or termination of his eligibility for health benefits coverage as an active participant pursuant to applicable plan documents, EMPLOYEE shall be eligible to elect health insurance benefits continuation coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act (COBRA).

24.   Attorneys' Fees and Costs:  In any proceeding or action to enforce this Agreement or recover damages arising out of its breach, the prevailing party shall be awarded its reasonable attorneys' fees and costs.  In the event EMPLOYEE or EMPLOYER should breach any provision of this Agreement, and the other party employs an attorney to protect their or its

Employee's Initials _____

4G67406

interests therein and obtains injunctive relief and/or a judgment in their or its favor, then the party which obtains injunctive relieve and/or judgment in their or its favor shall be entitled to recover from the other party reasonable attorneys' fees, costs of action, and applicable pre-judgment and post-judgment interest at the legal rate of interest, in addition to all other categories of recovery to which the prevailing party may be entitled.  Further, in the event EMPLOYEE should breach this Agreement, EMPLOYEE shall be obligated to tender back and return to EMPLOYER all payments set forth in Paragraph 1 of this Agreement previously paid at the time of breach.

     25.   <u>EMPLOYEE Avowals</u>:  EMPLOYEE, by his execution of this Agreement, avows that the following statements are true:

     a.     That he has been given the opportunity and has in fact read this entire Agreement and has had all questions regarding its meaning answered to his satisfaction;

     b.     That he has done nothing and taken no actions, at any time, which has or may in the future cause any damage to or impair the operations of EMPLOYER's computer systems, servers and electronically stored information.

     c.     That he is hereby advised to seek independent legal advice and/or counsel of his own choosing prior to the execution of this Agreement;

     d.     That he fully understands the contents of this Agreement and understands that it is a FULL WAIVER OF ALL CLAIMS against the released parties;

     e.     That this FULL WAIVER OF ALL CLAIMS is given in return for valuable consideration, as provided under the terms of this Agreement;

     f.     That he enters into this Agreement knowingly and voluntarily in exchange for the promises referenced in this Agreement **AND THAT NO OTHER REPRESENTATIONS HAVE BEEN MADE TO HIM TO INDUCE OR INFLUENCE HIM EXECUTION OF THIS AGREEMENT.**

     26.   <u>Periods for Considering and Revoking Agreement</u>:  EMPLOYEE acknowledges that he has been given at least 21 days to consider this Agreement.  EMPLOYEE agrees that, if he signs this Agreement before the end of the above 21-day period, his signature is intended to waive his right to consider the Agreement for 21 days.  The parties agree that EMPLOYEE may revoke this Agreement at any time within 7 days after signing the Agreement by written notice, hand-delivered to the below address.  The parties acknowledge and agree that this Agreement is not effective or enforceable until the 7-day revocation period has expired.  Notice of revocation may be hand-delivered in writing by 5:00 p.m. or e-mailed no later than the seventh day of the revocation period to:

     Tiffany & Bosco, P.A.
     Human Resource Manager
     2525 E. Camelback Road, Seventh Floor
     Phoenix, AZ 85016
     hr@tblaw.com

Employee's Initials _____

4G67406

27.    <u>Code Section 409A</u>:   The terms of this Agreement shall be construed and administered in a manner calculated to satisfy the short-term deferral exception under Treas. Reg. Section 1.409A-1(b)(4); the separation pay plan exception under Treas. Reg. Section 1.409A-1(b)(9)(iii); and the welfare benefit exception under Treas. Reg. 1.409A-1(b)(9)(v) to Code Section 409A.   Any reference in this Agreement to a termination of employment (or similar term) means a "separation from service" as defined in Internal Revenue Code Section 409A and the applicable guidance issued thereunder.   In the event the Agreement fails to satisfy an exception to Internal Revenue Code Section 409A and the applicable guidance issued thereunder, it will be construed and administered in accordance therewith to the extent permitted by law.   All rights to payments and benefits hereunder shall be treated as rights to receive a series of separate payments and benefits to the fullest extent allowed by Internal Revenue Code Section 409A.

LOUIS A. LOFREDO                              Tiffany & Bosco, P.A.


_____                  By:_____

Signature
                                              Its:_____

Date:_____                 Date:_____

Employee's Initials _____

**From:**        Jennifer C. Lovato
**Sent:**        Friday, June 4, 2021 2:04 PM
**To:**          Louis A. Lofredo
**Cc:**          Christopher R. Kaup
**Subject:**     Draft Severance Agreement
**Attachments:** SEVERANCE AGREEMENT AND GENERAL RELEASE - MALE.DOC

Lou,
Attached is the draft Severance Agreement for your information.  During today's meeting I quoted a 7-day review period.  Please note, employees over the age of 40 are entitled to a 21-day review period and that is reflected in the draft Agreement.

Jen
Jennifer Lovato | HR Manager | 602.288.7919

 TIFFANY & BOSCO
P.A.

Offices:  Alabama | Arizona | California | Florida | Michigan | Nevada | New Mexico

Seventh Floor Camelback Esplanade II | 2525 E Camelback Road | Phoenix, AZ 85016
Office: 602.255.6000
jcl@tblaw.com | www.tblaw.com

1
**Exhibit 13**

| | |
|---|---|
| **From:** | Jennifer C. Lovato |
| **Sent:** | Friday, June 4, 2021 4:45 PM |
| **To:** | Louis A. Lofredo |
| **Cc:** | Christopher R. Kaup |
| **Subject:** | COBRA Information |

Hi Lou,

Discovery Benefits is our 3rd Party COBRA Administrator.  I contacted them to obtain a sample form model notices.  Unfortunately, notices are generated specifically for each employee after the qualifying event.  I am unable to provide the letters but can confirm through the CARES Act, COBRA premiums are subsidized through September.  The rates thereafter would be as followed, plus a 2% administration fee:

- BCBS Alliance Family = $1,490.86 per month
- Unum Dental Family = $148.20 per month
- Unum Vision Family = $17.82 per month

Insurance continuation enrollment is done through the Discovery Benefits website and the letters provide instructions to facilitate that.  Likewise, the letter regarding the subsidy provides additional information.  To be honest, I do not know must about the actual process since it's handled by Discovery Benefits but I will try to obtain as much detail as possible over the next couple of weeks.

Please reach out with any specific questions as I am happy to assist in being a resource to you.

Jen
Jennifer Lovato | HR Manager | 602.288.7919



Offices:  Alabama | Arizona | California | Florida | Michigan | Nevada | New Mexico

Seventh Floor Camelback Esplanade II | 2525 E Camelback Road | Phoenix, AZ 85016
Office: 602.255.6000
jcl@tblaw.com | www.tblaw.com

1
**Exhibit 14**

| From: | Jennifer C. Lovato |
|---|---|
| **Sent:** | Friday, June 4, 2021 12:37 PM |
| **To:** | Louis A. Lofredo |
| **Cc:** | Christopher R. Kaup |
| **Subject:** | PPT/PSL Balance and Value |

Hi Lou,

As of today, your PPT and PSL balances are 52.60 and 34.43.  You will accrue 5.0 PPT and approximately 2.5 PSL on 06.10.  PSL is based on actual hours worked and may be slightly smaller or larger.  The accrual will result in balances of 57.6 PPT and approximately 36.93 PSL.  The value of your combined 94.53 hours is $4,661.27, less taxes and 401(k) contribution.  The PPT/PSL payout would be paid direct deposit on 06.30 or via a live check within 3 days of your last day of employment.  You would provide me directions regarding the method of payment.

Jen

Jennifer Lovato | HR Manager | 602.288.7919



**TIFFANY & BOSCO**
P.A.

Offices:  Alabama | Arizona | California | Florida | Michigan | Nevada | New Mexico

Seventh Floor Camelback Esplanade II | 2525 E Camelback Road | Phoenix, AZ 85016
Office: 602.255.6000
jcl@tblaw.com | www.tblaw.com

# NORICK INVESTMENT COMPANY

5400 NORTH GRAND BOULEVARD, SUITE 220
OKLAHOMA CITY, OK 73112
PHONE 405 943-7123   FAX 405 947-0245

July 26, 2021

**Re:   Letter of Recommendation for Lou Lofredo**

Dear Sir or Madam:

I was introduced to Lou Lofredo after I engaged Tiffany & Bosco in 2018 to represent me in the Chapter 11 bankruptcy case of Alasdair Andrew Fraser ("Debtor") in the District of Arizona, case no. 2:18-bk-14512-BKM. My company's secured Proof of Claim was challenged by the Debtor and Lou was assigned to this case as the litigating bankruptcy paralegal.

Although I primarily communicated with the attorneys in the case, Lou channeled most of the documents and necessary case information to me through email. Lou often provided brief explanations and what to expect next in the case when he sent me such documents. It became clear to me that Lou's familiarity with the bankruptcy court's procedures, litigation practice, and the facts of my case was tremendously valuable. I understood that the attorneys utilized Lou's expertise and knowledge in every aspect of the case from discovery, depositions, to motion practice and the evidentiary hearing.

Lou impressed me the most when he assisted Rich Gramlich in the five-day evidentiary hearing in this case. Lou arranged every procedural, administrative and trial preparation task that was necessary, including working on the draft pretrial statement, preparing electronic exhibits, exchanging exhibits with Debtor's counsel, providing electronic exhibits to the Court, setting-up witness preparation meetings, attending the pre-hearing Zoom readiness conference, running all the exhibits during the five-day hearing, and generally providing Rich with valuable support and commentary on witness testimony and evidence admission. Anecdotally, I understand that Lou even counseled and then convinced Rich that his single-monitor computer style would prove cumbersome at the Zoom evidentiary hearing and Lou had a second monitor added so that Rich could more effectively interface with the Court during the hearing.

In short, I highly recommend Lou Lofredo, and I am confident he will be a superb asset to your establishment. Lou is a very nice and polite individual. Please feel free to contact me directly with any questions.

Sincerely,

Ronald J. Norick
Former Mayor of Oklahoma City
April 14, 1987 - April 14, 1998

**Exhibit 16**



**TIFFANY
& BOSCO**
— P.A. —

**Marcos A. Tapia**
Shareholder
602.255.6045
mat@tblaw.com
Licensed in Arizona

Offices in:
Phoenix, Arizona
Las Vegas, Nevada
San Diego, California

June 30, 2021

**RE:    Letter of Recommendation for Lou Lofredo**

Dear Sir or Madam:

I came to know Lou Lofredo while working for several of my clients in the bankruptcy case of Verdugo Enterprises, LLC ("Debtor") in the District of Arizona, case no. 2:17-bk-04370-BKM. Mr. Lofredo assisted me as a skilled bankruptcy paralegal. His knowledge was particularly useful in this case because the US Trustee had initiated about 80 adversary cases relating to the Debtor's Ponzi schemes. Ultimately, I represented about a dozen separate clients that were unknowing, innocent victims of the Debtor; who were caught in the Trustee's pursuit of justice for all the Debtor's victims.

The attorneys for the Trustee were typically aggressive in communicating with my clients, who were, except for some children, originally from Mexico and whose first language was Spanish. I am bilingual and this set of clients came to Tiffany & Bosco because of the trust they placed in me. I knew that a significant portion of each of these client matters would require explaining each step in the (i) litigation process, (ii) settlement negotiations and (iii) potentially trial if negotiations with the Trustee's office failed.

I anticipated that Mr. Lofredo would bring great value to my clients with his bankruptcy expertise, but I did not know at the time the extent of Mr. Lofredo's understanding of Spanish. Mr. Lofredo not only requested permission to assist me in communicating with my clients but he was successful in drafting many emails to them. As a result, I implemented the procedure with great success. In fact, after sending several emails out myself, it became clear to me that Mr. Lofredo could take over all basic communications with the clients in Spanish. He prepared about 50-100 emails in Spanish to my clients, always copying me should they need attorney advice or just more clarification.

Mr. Lofredo continued to impress me. He attended about twenty client meetings that were almost always conducted in Spanish. He could follow along with the discussion and often handed me the affidavits, letters, documents or spreadsheets that were germane in that moment. Sometimes he would remind me to inform the clients on a cogent point that I had not discussed. He prepared all the tracking spreadsheets, assisted me in determining the best offer for each client, prepared the draft settlement letters, and many times directed communicated with the Trustee's attorneys.

Truly, Mr. Lofredo's skills in the bankruptcy process were extremely helpful to me. His preparation of Excel spreadsheets for each of my clients and sometimes as demonstrative exhibits

Camelback Esplanade II, Seventh Floor     602.255.6000 PHONE
2525 East Camelback Road                  602.255.0103 FAX
Phoenix, Arizona 85016-4229



Lou Lofredo
June 30, 2021
Page 2 of 2

for the Trustee's attorneys during settlement negotiations was masterful.    However, his professionalism and kindness to my clients will always be appreciated.

In short, Mr. Lofredo utilized more than the skills he already had, he expanded himself to meet my additional needs on these cases.  I am confidence that he will be a tremendous asset to a law firm.   Please feel free to contact me directly with any questions.

Yours truly,

**TIFFANY & BOSCO, P.A.**

_/s/ Marcos A. Tapia_____

Marcos A. Tapia

5/18/22, 7:47 PM                                        Re: Lofredo's Wages Not Fully Paid

## Re: Lofredo's Wages Not Fully Paid

From:  loulofredo@reagan.com <loulofredo@reagan.com>
Sent:  Thu, Jul 15, 2021 at 10:13 pm
To:    Joseph T. Clees
Cc:    Camarena@reagan.com, Cheyenne

---

2021-6-30 - Email Thread Lovato, Lofredo RE Error in Calculation of Wages.pdf (229.1 KB)

2021-7-2 - Email Poulos et al. re Response to Severance Agreement, Reference and Wages.pdf (1.3 MB)

Pay Statement (PPT and PSL Time) 6-15-2021.pdf (62.1 KB)      Pay Statement 6-15-2021.pdf (82 KB)  — **Download all**

---

Dear Mr. Clees:

I received your July 8, 2021 representation letter via email from Ms. Camarena.

First, now that you have had time to review my wage claim (emails attached for your ease of reference), please proceed in having T&B pay the amounts owed to me.  That is, I am due payment from June 9 through June 18 as agreed to by Chris Kaup on June 4, 2021 with Jen Lovato witnessing the agreement. See attached emails.  I relied on the June 18, 2021 end date for a host of personal and professional reasons and was performing my end of the agreement when T&B breached that agreement and made its unilateral decision to make my termination immediate.  T&B is responsible to pay these wages to me.

I expect payment by Wednesday, July 21, 2021 as you should have had sufficient time to determine the accuracy of the agreement and the amount that should be paid.  If this deadline is not reached, I may pursue options to obtain a claim for triple that amount.

Second, attached are my paystubs for my wages and earned PPT and PSL.  I was paid on June 15, 2021, which is past the required three day period because my termination became "effective immediately" on June 8, 2021.  Incidentally, after almost 17 years of employment, this day of termination was the day on which I was walked out by security to my vehicle and told that if I returned, "... the police will be called and we will have you arrested."  Attached are my paystubs for your review.

Third, I do not agree to any non-public settlement communications from you on behalf of Tiffany & Bosco or from a Tiffany & Bosco representative.  Please be advised that every communication that is made may be public, and further, if I decide a litigation is necessary, I will use all documents, even those claiming to be send under the state equivalent of FRCP 408, in a Court of law.

I will not have access to email for the next several days, but expect that the funds will be delivered to me by Wednesday, July 21, 2021.

Sincerely,

Lou Lofredo
(623) 444-4841

**Exhibit 17**

## VIDEO EXHIBIT

The video titled, "Kids Terminate Dad at Tiffany & Bosco" ("Video"), produced by Plaintiff is currently on the YouTube free viewing platform and is an official Exhibit to the Verified Complaint of Case No. (To be assigned on or about June 2, 2022 after filing), *Louis A. Lofredo vs. Tiffany & Bosco, P.A. et al.*, with the link https://www.youtube.com/watch?v=JwLBJlqnVWs).

Plaintiff has requested Declaratory Relief from the Court in the Verified Complaint as follows:

Plaintiff requests that the Court, or a Jury pursuant to ARS 12-1839, issue an Order to determine that:

a.   The Video does not infringe upon anyone's rights;

b.   Plaintiff's is free to express the events that personally occurred to him;

c.   Any valid complaints sent to YouTube about the Video, shall be adjudicated by the Court or by the tenets of the Court's Order after issuance; and

d.   YouTube may not remove from its free viewing platform, this Video, linked (https://www.youtube.com/watch?v=JwLBJlqnVWs) as **Exhibit F**, so as to become part of this Court's record.

**Exhibit F to Complaint**

CLERK OF THE
SUPERIOR COURT
FILED
C. ATKINS, DEP

2022 JUL 21  AM 9: 24

1
Louis A. Lofredo
7614 N. 46th Avenue
2
Glendale, Arizona 85301
Tel: (623) 444-4841
3
Email: loulofredo@reagan.com
*Plaintiff pro per*
4

**SUPERIOR COURT OF THE STATE OF ARIZONA**
5

**FOR THE COUNTY OF MARICOPA**
6

7
Louis A. Lofredo, an individual of the
State of Arizona,

Case No. Case No. CV2022-006898

8
                                    Plaintiff,

9
        vs.

**Motion for Special Appointment to
Serve Process**

10
Tiffany & Bosco, P.A., a Professional
Corporation, Tiffany & Bosco P.A.'s
11
Board of Directors (excluding Lance R.
Broberg and Rosary A. Hernandez),
12
Mark S. Bosco and Jane Doe Bosco,
husband and wife, Christopher R. Kaup
13
and Debra Kaup, husband and wife, J.
Lawrence McCormley and Jane Doe
14
McCormley, Alisa J. Gray, individually,

15
                                    Defendants.

16
**To: Judge Pamela Gates, Presiding Judge of the Superior Court of Arizona**

17
        Pursuant to Arizona Rules of Civil Procedure, Rule 4(d)(2), I, Louis A. Lofredo,

18
self-represented Plaintiff, in the above-captioned case, hereby request special

19
appointment of three individuals to serve process in this case as follows:

20
        •    Jim Hannasch;

21
        •    Jon Salinas; and

22
        •    Mark Nelson.

23

1    All three individuals are over the age of 21, are not parties to this case or attorneys,

2    and are otherwise qualified under Rule 4. The issuance of an Order allowing appointment

3    of all three of these individuals will allow the Plaintiff to reduce costs by utilizing the

4    services of three friends instead of a paid process server. It is important that all three

5    friends be appointed because all these men have a wife, a child or children and careers.

6    They have all agreed to be appointed but have all informed me that their respective time

7    and availability for service will be limited. Therefore, all three individuals need

8    authorization to serve process from this Court to assure timely, effective service upon all

9    Defendants.

10    Plaintiff also requests clarification that during the discovery phase of this case that

11    any of these individuals may serve Subpoenas pursuant to the Arizona Rules of Civil

12    Procedure, Rule 45(d).

13    This Motion is accompanied by a proposed order.

14    Respectfully submitted on July 21, 2022,

15

16    By:

17    Louis A. Loffredo
    *Plaintiff pro per*

18

19

20

21

22

23

Clerk of the Superior Court
*** Electronically Filed ***
T. Hays, Deputy
8/9/2022 8:20:30 AM
Filing ID 14670746

1

2

3

4

5

6

7

**SUPERIOR COURT OF THE STATE OF ARIZONA**

**FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| Louis A. Lofredo, an individual of the State of Arizona, | Case No. CV2022-006898 |
| Plaintiff, | |
| vs. | **Order Granting Motion for Special Appointment to Serve Process** |
| Tiffany & Bosco, P.A., a Professional Corporation, Tiffany & Bosco P.A.'s Board of Directors (excluding Lance R. Broberg and Rosary A. Hernandez), Mark S. Bosco and Jane Doe Bosco, husband and wife, Christopher R. Kaup and Debra Kaup, husband and wife, J. Lawrence McCormley and Jane Doe McCormley, Alisa J. Gray, individually, | |
| Defendants. | |

Upon Plaintiff's *Motion for Special Appointment to Serve Process* ("Motion"), and good cause appearing,

**IT IS HEREBY ORDERED** that the Motion is granted; and

**IT IS FURTHER ORDERED** that (i) Jim Hannasch, (ii) Jon Salinas, and (iii) Mark Nelson are authorized to serve process under Rule 4 of the Arizona Rules of Civil Procedure only for the above-captioned matter.

1    **IT IS FURTHER ORDERED** (i) Jim Hannasch, (ii) Jon Salinas, and (iii) Mark

2    Nelson may serve Subpoenas pursuant to the Arizona Rules of Civil Procedure, Rule

3    45(d) for this case.

4

5    DATED this ___9th___ day of August, 2022.

6

7                                          _D. Viola_

8                                          _____
                                           The Honorable Danielle J. Viola

9

10

11

12

13

14

15

16

17

18

19

20

21

22


Office Distribution

# SUPERIOR COURT OF ARIZONA
# MARICOPA COUNTY

**FILED**
08/10/2022
by Superior Court Admin
on behalf of Clerk of the
Superior Court

Ct. Admin
Deputy

08/06/2022                          COURT ADMINISTRATION

**Case Number:** CV2022-006898

**Louis A Lofredo**

**V.**

**Tiffany & Bosco P A**

---

The Judge assigned to this action is the Honorable Connie Contes

### NOTICE OF INTENT TO DISMISS FOR LACK OF SERVICE

You are hereby notified that the complaint filed on 06/02/2022 is subject to dismissal pursuant to Rule 4 (i) of the Arizona Rules of Civil Procedure. The deadline for completing service is 08/31/2022. If the time for completing service has not been extended by the court and no defendants have been served by this date, the case will be dismissed without prejudice.

All documents required to be filed with the court should be electronically filed through Arizona Turbo Court at www.azturbocourt.gov.

Superior Court of Maricopa County - integrated Court Information System
**Endorsee Party Listing**
Case Number: CV2022-006898

| Party Name | Attorney Name |
| --- | --- |
| Louis A Lofredo | Pro Per |

Clerk of the Superior Court
*** Electronically Filed ***
M. De La Cruz, Deputy
8/12/2022 4:45:34 PM
Filing ID 14695483

1  L. Eric Dowell, SBN 011458
   Ricardo R. Bours, SBN 034054
2  OGLETREE, DEAKINS, NASH, SMOAK &
   STEWART, P.C., SBN 00504800
3  Esplanade Center III, Suite 800
   2415 East Camelback Road
4  Phoenix, AZ  85016
   Telephone: 602-778-3700
5  Fax:  602-778-3750
   eric.dowell@ogletree.com
6  ricardo.bours@ogletree.com
   Attorneys for Defendant Tiffany & Bosco, P.A.,
7  Tiffany & Bosco, P.A.'s Board of Directors,
   Mark S. Bosco and Jane Doe Bosco,
8  Christopher R. Kaup and Debra Kaup, J.
   Lawrence McCormley and Jane Doe
9  McCormley, and Alisa J Gray

10

11                    SUPERIOR COURT OF ARIZONA

                           MARICOPA COUNTY

12  Louis A. Lofredo, an individual of the          No.  Case No. CV2022-006898
    State of Arizona,
13
                  Plaintiff,                         **MOTION FOR
14                                                   RECONSIDERATION OF COURT'S
        v.                                           ORDER GRANTING MOTION FOR
15                                                   SPECIAL APPOINTMENT TO
                                                     SERVE PROCESS AND TO
16  Tiffany & Bosco, P.A., a Professional            UNILATERALLY STAY ORDER**
    Corporation, Tiffany & Bosco P.A.'s
17  Board of Directors (excluding Lance R.
    Broberg and Rosary A. Hernandez), Mark
18  S. Bosco and Jane Doe Bosco, husbnad             (Hon. Danielle J. Viola)
    and wife, Christopher R. Kaup and Debra
19  Kaup, husband and wife, J. Lawrence
    McCormley and Jane Doe McCormley,
20  Alisa J Gray, individually,,

21                  Defendant.

22

23      Defendants Tiffany & Bosco, P.A., Tiffany & Bosco, P.A.'s Board of Directors,

24  Mark S. Bosco and Jane Doe Bosco, Christopher R. Kaup and Debra Kaup, J. Lawrence

25  McCormley and Jane Doe McCormley, and Alisa J Gray (collectively, "Defendants")

26  hereby specially appear and request that the Court reconsider its August 9, 2022 Order

27  ("Order") granting Plaintiff Louis A. Lofredo's ("Plaintiff") Motion for Special

28

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

1   Appointment to Serve Process ("Motion") and unilaterally stay the Order.[1]

2        Plaintiff filed his Complaint on June 2, 2022 and made no effort whatsoever to serve

3   it thereafter. Instead, he spent the following weeks and months distributing copies of his

4   unserved Complaint throughout the Phoenix legal community in an effort to embarrass and

5   harass the Defendants. He then waited until the eleventh hour to seek leave to appoint

6   "special" process servers, rather than utilizing the usual methods of service of process.

7   Defendants did not receive notice of, or have an opportunity to respond to, Plaintiff's *ex*

8   *parte* Motion prior to the Court issuing its Order. Nor did Plaintiff provide prior notice of

9   his Motion to Defendants' counsel.

10        Further, Plaintiff has a history of threats, harassment, and personal vendettas against

11   Defendants—just some of which are revealed in his own bizarre, rambling

12   manifesto/Complaint. Plaintiff's record of conduct (as described in more detail below),

13   suggests that his last-minute *ex parte* Motion is yet another attempt by him to harass

14   Defendants and their families at work and at their homes by utilizing the three cronies

15   proposed as process servers in his Motion, rather than relying on routine service of process,

16   utilizing certified, professional process servers.

17        As background, Plaintiff's Complaint arises out of his termination of employment

18   from Tiffany & Bosco, P.A. ("T&B"), where he was a bankruptcy paralegal. His

19   employment was terminated after numerous complaints from coworkers about his hostile

20   and offensive workplace behavior and his workplace threats. His inappropriate workplace

21   conduct ranged from "Heil Hitler" salutes to employees to sexist remarks to female

22   coworkers, including unwanted admonitions that they should marry and bear children and

23   that "abortion is murder." This culminated with his threats to "blow up" a firm-wide Covid

24   meeting, and ultimately, to "cause an incident" after he was notified of T&B's decision to

25

26   ───────────────

[1] Counsel for Defendants is entering a special appearance in order to challenge Plaintiff's Motion. This

27   motion is not intended to be an entry of appearance and is not submitted for purposes of submitting to the
Court's jurisdiction or venue. By filing this motions Defendants do not waive personal jurisdiction or

28   service.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

1  terminate his employment.

2      As noted above, Plaintiff never attempted to serve the Complaint prior to filing his

3  Motion. Instead, he distributed copies of his unserved Complaint throughout the Phoenix

4  legal community in an effort to disparage Defendants and defame their personal and

5  professional reputations. Plaintiff went so far as to create a YouTube video with his own

6  children purporting to reenact his termination from T&B, which is a disturbing insight into

7  both       his       psyche       and       his       vengeful       motives.

8  https://www.youtube.com/watch?v=JwLBJlqnVWs. Then, at the eleventh hour Plaintiff

9  filed his Motion asking the Court to specially appoint a Jim Hannasch, Jon Salinas, and

10  Mark Nelson, to serve his Complaint on Defendants at their private homes and at work.

11  Plaintiff provided the Court with no information whatsoever about the individuals he

12  enlisted as his surrogates for service of process. While little is known about these

13  individuals, a cursory informal social media search reveals that at least one of them

14  represents himself on LinkedIn solely as a silhouette holding an assault weapon:



26      Based on Plaintiff's bizarre, confrontational, and threatening workplace history,

27  Defendants all have a genuine fear that Plaintiff and his henchmen all pose a potential

28  threat to Defendants, their families, their homes, and their workplaces. Thus, Defendants

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

1   ask the Court to reconsider and deny Plaintiff's Motion and curtail Plaintiff's attempt to

2   dispatch his cronies to their homes and work. Finally, and in order to safeguard and

3   minimize the trauma already inflicted on Defendants, undersigned counsel is willing to

4   accept service of the Complaint on their behalf.

5       For the foregoing reasons, Defendants respectfully request that the Court stay,

6   reconsider and vacate its Order. Defendants welcome the opportunity for oral argument.

7       DATED this 12th day of August, 2022.

8           OGLETREE, DEAKINS, NASH, SMOAK &

9           STEWART, P.C.

10

11

12       By:  /s/ Ricardo R. Bours
        Ricardo R. Bours, SBN 034054

13           L. Eric Dowell, SBN 011458
        Esplanade Center III, Suite 800

14           2415 East Camelback Road
        Phoenix, AZ  85016

15           Attorneys for Defendant Tiffany & Bosco,
        P.A., Tiffany & Bosco, P.A.'s Board of

16           Directors, Mark S. Bosco and Jane Doe
        Bosco, Christopher R. Kaup and Debra Kaup,

17           J. Lawrence McCormley and Jane Doe
        McCormley, and Alisa J Gray

18

19           **CERTIFICATE OF SERVICE**

20

21       E-filed this 12th day of August 2022, and copy mailed this same day to:

22   Lou Lofredo
7614 N. 46th Avenue

23   Glendale, AZ 85301

24

25   By: /s/Cheyenne Camarena

26

27

28

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602-778-3700

Clerk of the Superior Court
*** Electronically Filed ***
08/18/2022 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-006898                                         08/17/2022

CLERK OF THE COURT

HONORABLE DANIELLE J. VIOLA                        K. Cabral
                                                    Deputy

LOUIS A LOFREDO                          LOUIS A LOFREDO
                                         7614 N 46TH AVE
                                         GLENDALE AZ  85301

v.

TIFFANY & BOSCO P A, et al.              RICARDO E ROBINSON-BOURS


                                         JUDGE CONTES
                                         JUDGE VIOLA


**CIVIL PRESIDING JUDGE – MINUTE ENTRY**

**ORDER FOR SPECIAL APPOINTMENT TO SERVE PROCESS DEEMED MOOT and
VACATED**

**ORDER RE SERVICE OF PROCESS ON DEFENDANTS DEEMED COMPLETED**

**DEFENDANTS' MOTION FOR RECONSIDERATION - MOOT**

The Court previously issued an order granting Plaintiff's Motion for Special
Appointment to Service Process. *See* Order issued August 9, 2022.  Defendants filed a Motion
for Reconsideration of Court's Order Granting Motion for Special Appointment to Serve Process
and to Unilaterally Stay Order filed 8/12/2022 as Moot filed on August 15, 2022.

The Court ordered a response to Plaintiff's Motion for Reconsideration via email.  Based
on the email communication from and between Plaintiff and Counsel for Defendants, a response
is deemed unnecessary and the Court issues the following orders:

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-006898                                         08/17/2022

**IT IS ORDERED** deeming service of the Complaint waived by Defendants pursuant to
Rule 4.1(c), Ariz. R. Civ. P.  Accordingly, service is deemed complete as of the date of this
minute entry.

**IT IS FURTHER ORDERED** deeming moot Defendants' Motion for Reconsideration
of Court's Order Granting Motion for Special Appointment to Serve Process and to Unilaterally
Stay Order filed 8/12/2022.

**IT IS FURTHER ORDERED** deeming moot the Order Granting Motion for Special
Appointment to Serve Process signed August 9, 2022.  The Order is vacated as of the date of this
minute entry.

This case was assigned to the Honorable Connie Contes effective June 2, 2022, and all
other matters shall be addressed to Senior Commissioner Contes.

The Clerk of Court will file the email exchange between the parties reflecting the
agreements regarding waiver of service and Defendants' Motion for Reconsideration.

FILED:  Email

Clerk of the Superior Court
*** Electronically Filed ***
K. Higuchi-Mason, Deputy
8/22/2022 11:26:14 AM
Filing ID 14732990

**Person Filing:**     **RICARDO BOURS**
**Address:**          **2415 E CAMELBACK RD**
**City, State, Zip:**    **PHOENIX AZ 85016**
**State Bar:**        **034054**

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

|  |  |  |
|---|---|---|
| LOUIS A LOFREDO | ) | **CREDIT MEMO** |
|  | ) |  |
| vs | ) |  |
|  | ) | **CASE NO. CV2022-006898** |
| TIFFANY & BOSCO P A ET AL; | ) |  |

RECEIVED FROM:    **RICARDO BOURS**          DATE RECEIVED:    **08/12/2022**

PAYMENT FOR:      TIFFANY & BOSCO P A ET AL;

**PAYMENT IS FOR THE FOLLOWING:**

☐ 600                        ☐ TRANSMITTAL FEE FOR CHANGE OF VENUE

☐ JUDGMENT DEBTOR EXAM      ☐ INTERVENOR

☒ ANSWER/APPEARANCE          ☐ MEDIATION

☐ OPEN NEGOTIATION            ☐ PARENTING CONFERENCE FEE

☐ OTHER:

AMOUNT PAID:     $245.00       PAID

RECEIPT#28899697    CLERK NAME: M DE LA CRUZ

**HOW PAID**

☐ CASH:

☐ BUSINESS CHECK       CHECK#       BANK NAME:

☐ MONEY ORDER

☐ MASTER CARD    ☒ VISA    ☐ AMERICAN EXPRESS

Docket Code
CME/CAN

CLERK OF THE SUPERIOR COURT
FILED

Keleigh Cabral (COC) CV2022-006898

AUG 17 2022  11:00 AM

K. Cabral, Deputy

| | |
|---|---|
| **From:** | Bours, Ricardo R. <ricardo.bours@ogletree.com> |
| **Sent:** | Tuesday, August 16, 2022 5:48 PM |
| **To:** | Tayler Born (SUP); loulofredo@reagan.com |
| **Cc:** | Corpora, Berlinda L; Camarena, Cheyenne; Clees, Joseph T. |
| **Subject:** | RE: Court's Ruling re Acceptance of Service of Process by Defendants? - Louis A. Lofredo v. Tiffany & Bosco, P.A. - CV2022-006898 |

Ms. Born,

Thank you for your patience. Defendants hereby agree to **waive** service of the Complaint pursuant to Rule 4.1(c), Ariz. R. Civ. P.

Thank you very much for your time.

**Ricardo R. Bours | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
Esplanade Center III, 2415 East Camelback Road, Suite 800 | Phoenix, AZ 85016 | Telephone: 602-778-3703
ricardo.bours@ogletree.com | www.ogletree.com

**From:** Tayler Born (SUP) <Tayler.Born@JBAZMC.Maricopa.Gov>
**Sent:** Monday, August 15, 2022 4:56 PM
**To:** loulofredo@reagan.com; Bours, Ricardo R. <ricardo.bours@ogletreedeakins.com>
**Cc:** Corpora, Berlinda L. <berlinda.corpora@ogletreedeakins.com>; Camarena, Cheyenne
<cheyenne.camarena@ogletreedeakins.com>; Clees, Joseph T. <Joseph.Clees@OgletreeDeakins.com>
**Subject:** RE: Court's Ruling re Acceptance of Service of Process by Defendants? - Louis A. Lofredo v. Tiffany & Bosco, P.A. - CV2022-006898
**Importance:** High

[Caution: Email received from external source]

Mr. Bours,

Based on the email below, are you agreeing to accept service of the Complaint on behalf of the Defendants? If so, that seems to Moot both the Motion for Reconsideration and the Order Granting Motion for Special Appointment to Serve Process signed August 9, 2022.

Upon confirmation, the Court will issue an Order that service was accepted and no further action will be taken by the Court.

Any further issues should be directed to the assigned division for Ruling.

Thank you,

Tayler Born
Judicial Assistant to the Honorable Danielle J. Viola – Civil Presiding Judge
Superior Court in Maricopa County



101 W. Jefferson St., Suite 714, Phoenix, AZ 85003
602-506-3442
Tayler.Born@JBAZMC.Maricopa.Gov

---

**From:** loulofredo@reagan.com <loulofredo@reagan.com>
**Sent:** Monday, August 15, 2022 4:35 PM
**To:** Tayler Born (SUP) <Tayler.Born@JBAZMC.Maricopa.Gov>
**Cc:** Bours, Ricardo R. <ricardo.bours@ogletree.com>; Corpora, Berlinda L. <berlinda.corpora@ogletreedeakins.com>; Camarena, Cheyenne <cheyenne.camarena@ogletreedeakins.com>; Clees, Joseph T. <joseph.clees@ogletreedeakins.com>
**Subject:** Re: Court's Ruling re Acceptance of Service of Process by Defendants? - Louis A. Lofredo v. Tiffany & Bosco, P.A. - CV2022-006898

Dear Ms. Born:

Thank you for your email.

I have just opened my emails and besides your email at 11:07 a.m. Defendants' counsel has not contacted me (other than service of the Response).  Defendants' "Response" to my Motion for Special Appointment to Serve Process though couched as a Motion for Reconsideration did not state Defendants "hereby accept service of the Complaint and Summons", it reads, instead:

Finally, and in order to safeguard and minimize the trauma already inflicted on Defendants, undersigned counsel *is willing to* accept service of the Complaint on their behalf. (Emphasis added).

If it is the Court's ruling that this constitutes acceptance of service of process, yes, I agree.  I also agree that it moots the need for any service of process and my special process servers will not attempt service.  I also agree that Defendants' counsel and I must determine when the responsive pleading would be due.  <u>**Will there be an issued Order on this ruling?**</u>

I do reserve my right to file a Reply to their Response however.

Sincerely,

Louis A. Lofredo,
Plaintiff pro per

-----Original Message-----
From: "Tayler Born (SUP)" <Tayler.Born@JBAZMC.Maricopa.Gov>
Sent: Monday, August 15, 2022 11:07am
To: "Bours, Ricardo R." <ricardo.bours@ogletree.com>, "loulofredo@reagan.com" <loulofredo@reagan.com>
Cc: "Corpora, Berlinda L." <berlinda.corpora@ogletreedeakins.com>, "Camarena, Cheyenne" <cheyenne.camarena@ogletreedeakins.com>, "Clees, Joseph T." <Joseph.Clees@OgletreeDeakins.com>
Subject: FW: Louis A. Lofredo v. Tiffany & Bosco, P.A. - CV2022-006898 Courtesy Copy

Good morning all,

The Court has received the attached Motion for Reconsideration which suggests that undersigned Counsel is willing to accept service of the Complaint on behalf of the Defendants.

The Court believes this would Moot the Order Granting Motion for Special Appointment to Serve Process signed August 9, 2022.

Mr. Lofredo – if you do not believe this Moots the need for the Order Granting Motion for Special Appointment to Serve Process signed August 9, 2022, then the Court would like a Response to the attached Motion for Reconsideration filed today, **August 15, 2022.**

Thank you,



**Tayler Born**
Judicial Assistant to the Honorable Danielle J. Viola – Civil Presiding Judge
Superior Court in Maricopa County
101 W. Jefferson St., Suite 714, Phoenix, AZ 85003
602-506-3442
Tayler.Born@JBAZMC.Maricopa.Gov

---

**From:** Bours, Ricardo R. <ricardo.bours@ogletree.com>
**Sent:** Friday, August 12, 2022 5:16 PM
**To:** Tayler Born (SUP) <Tayler.Born@JBAZMC.Maricopa.Gov>
**Cc:** Corpora, Berlinda L. <berlinda.corpora@ogletreedeakins.com>; Camarena, Cheyenne <cheyenne.camarena@ogletreedeakins.com>; Clees, Joseph T. <Joseph.Clees@OgletreeDeakins.com>
**Subject:** Louis A. Lofredo v. Tiffany & Bosco, P.A. - CV2022-006898 Courtesy Copy

Hi Ms. Born, I have attached a courtesy copy of Defendants' Motion for Reconsideration filed with the Court today. As mentioned, we need Judge Viola to review and rule as soon as possible as Plaintiff indicated he intends to serve the complaint this weekend.

Thank you very much for your cooperation in, and prompt attention to, this matter.

**Ricardo R. Bours | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
Esplanade Center III, 2415 East Camelback Road, Suite 800 | Phoenix, AZ 85016 | Telephone: 602-778-3703
ricardo.bours@ogletree.com | www.ogletree.com